```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2

 3   --------------------------------X
                                     :
 4   WEBB TRACKING SOLUTIONS, INC.,  :
      et al.,                        :
 5                                   : 08-CV-3139
               Plaintiffs,           :
 6                                   :
               v.                    :
 7                                   : 225 Cadman Plaza East
     GOOGLE,                         : Brooklyn, New York
 8                                   :
               Defendant.            : November 25, 2008
 9   --------------------------------X

10
             TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
11           BEFORE THE HONORABLE RAMON E. REYES, JR.
                 UNITED STATES MAGISTRATE JUDGE
12

13   APPEARANCES:

14   For the Plaintiffs:      PAUL LESKO, ESQ.

15

16
     For the Defendant:       EDWARD DeFRANCO, ESQ.
17

18

19

20   Court Transcriber:       SHARI RIEMER
                              Typewrite Word Processing Service
21                            211 North Milton Road
                              Saratoga Springs, New York  12866
22

23

24

25



     Proceedings recorded by electronic sound recording, transcript
     produced by transcription service
```

1  [Proceedings began at 10:44 a.m.]
2            THE CLERK: Civil Cause for Initial Conference,
3  Docket Number 08-CV-3139, <u>Web Tracking Solutions, Inc. v.</u>
4  <u>Google, Inc.</u>
5            Counsel for plaintiff, please state your name for
6  the record.
7            MR. LESKO:  Paul Lesko for Web Tracking Solutions
8  and Daniel Wexler.
9            THE COURT: What was your name again?
10           MR. LESKO: Paul Lesko.
11           MR. HAYES:  My name, Your Honor, is Steve Hayes from
12  the Hanly Conroy firm also for plaintiffs.
13           MR. FLYNN:  I'm Ed Flynn from the Eckert Seamans
14  firm in Pittsburgh also for plaintiffs.
15           MR. DeFRANCO:  Ed DeFranco and Pat Curran from Quinn
16  Emanuel for defendant Google.
17           THE COURT: Excellent.
18           Just tell me about the case.
19           MR. LESKO:  Basically it's a patent infringement
20  action.  Our client Daniel Wexler is the inventor of a -- came
21  up with a method of accounting for an advertising.  When a
22  person visits website, puts in an advertisement he gets
23  redirected to that website.  He came up with an invention that
24  account for those clicks and filed that application, got the
25  patent, and he's working with -- the licensee in this case is

1 Web Tracking Solutions and we're alleging that Google's, or a
2 portion of Google's [inaudible] infringes our patent.
3     THE COURT: What portion of it?
4     MR. LESKO: It's the accounting, the actual
5 accounting method. When you click on -- for example, if
6 there's -- [inaudible] ads by Google. If you click on one of
7 those websites [inaudible] automatically transfer you to that
8 link. It transfers you to an intermediary third website which
9 does the logging itself before it redirects you and in that
10 process that's how the accounting takes place. It's a more
11 secure method of counting and it also serves an advertiser and
12 publisher because it's a third party, an independent party
13 that whatever numbers are reported is more likely to be
14 trusted [inaudible].
15     THE COURT: Is that -- on Ad Sense when you get
16 diverted to that third website -- that third party website, is
17 that something that the user sees or is it happening behind
18 the scenes?
19     MR. LESKO: I think both, in both ways depending on
20 how slowly or how quickly it works.
21     THE COURT: It's like when -- sometimes when you see
22 a little thing blink and then disappear?
23     MR. LESKO: That's right.
24     THE COURT: My computer doesn't disappear so quickly.
25     MR. LESKO: Right.

1  THE COURT: Now, that is -- is your client's argument
2  that that is what -- that's his --
3  MR. LESKO: Correct.
4  THE COURT: Exactly what he did or what he invented?
5  MR. LESKO: What he invented and patented.
6  THE COURT: Okay. Pretty simple.
7  MR. LESKO: Yes, in theory.
8  THE COURT: Good. What does Google have to say?
9  MR. DeFRANCO: Well, Your Honor, we will be asserting
10 the typical defenses you see in a patent case. We believe
11 that the patent --
12 THE COURT: Assume that I'm a patent novice. So tell
13 me what those typical defenses are.
14 MR. DeFRANCO: Well, the front line defenses are
15 invalidity and non infringement. Invalidity is that what is
16 claimed in the claims of the patent was actually out there
17 before. In other words, there may have been an earlier patent
18 filed by somebody else that the Patent office either was not
19 aware of or was not brought to the Patent Office's attention
20 or there could be a system that was used publically prior to
21 when the application was filed that may constitute
22 invalidating prior art. The Patent Office obviously is not a
23 perfect universe. They're not all knowing. They don't have
24 all conceivable information that might be relevant to the
25 issue of patentability. In other words, is the inventor the

first to come up with this invention. So we will definitely be asserting that defense.

Then of course in patent cases there's the fairly detailed process of determining what the claims mean. Claims obviously capture the scope of the invention using words that the patentee came up with to describe what the invention is all about.

The process of determining what the claims mean, the scope of the claims is a back and forth between the parties and then decided as a matter of law by the court. The court of course hears the arguments from both sides, hears the record in front of the Patent Office, hears what the patent says in the background, hears the terms that the claims use and hears the scope that should be a fairly accorded for the claims that are asserted. We think when the claims are interpreted properly what Google does falls outside the scope of the claims.

The good news is that can be a fairly complicated and contentious process between the parties and the parties have been I would say working together and getting along pretty well so far. We've agreed to a schedule or that scope of discovery in the case which I think is very good news and we proposed of course if it's acceptable to the Court an overall discovery plan, close of discovery next September and then a trial the following year.

1  Maybe I should segway into some other things we've
2 been talking about.
3  THE COURT: Take it wherever you want to take it.
4  MR. DeFRANCO: So we're pretty good on the schedule,
5 Your Honor. We're continuing to work on the second part,
6 which is a more detailed discovery plan as Your Honor likes to
7 see in terms of documents we will be producing, procedures for
8 handling electronic discovery. Obviously Google is a big
9 company. We have no intention of showing up with ten tractor-
10 trailer loads of documents that will overwhelm the plaintiffs.
11 So I think it's in both party's interest to cooperate and
12 we've had these discussions, worked together, focusing now on
13 the scope of discovery and come up with procedures that make
14 sense in terms of where are we going to look for documents,
15 the number of custodians, how we're going to produce it.
16  THE COURT: You mean you worked all the discovery
17 issues out or you're working on it?
18  MR. LESKO: We're working on it now, Your Honor.
19  MR. DeFRANCO: Judge, with the protective order that
20 I referred to, I am anticipating, hope that we can work all
21 that out. We provided in this draft order, scheduling order
22 for [inaudible] come back to Your Honor and resolve any issues
23 that we don't get worked out. We're going to try to do that by
24 the second week of December.
25  THE COURT: That's Paragraph --

1          MR. DeFRANCO:   Paragraph 1, Your Honor.
2          THE COURT: So if you don't work it out you're going
3   to drop it right in my lap.   Thank you very much.
4          MR. DeFRANCO: Simply put, yes, Your Honor.
5          THE COURT: Thank you very much.
6          MR. LESKO:   We'll try to avoid doing that.
7          MR. DeFRANCO:   It's a little complicated in cases
8   such as this, Your Honor, where there are lots of technical
9   documents and issues and particularly source code issues.
10  Plaintiff has said that they're definitely going to want
11  production of some source codes.   We're not objecting to that.
12  We would prefer to give them higher level specification
13  documents but we understand they want source code and to the
14  extent the source code is directed to the technical issues in
15  the case we're not objecting to producing that out of the box,
16  but we would like to continue working together to put in place
17  procedures that of course will protect the Google -- plainly
18  perceives, rightfully so, is the crown jewels of the company.
19  For example, typical setup of third party -- a reading room
20  where experts would go.   Plaintiff's expert could see the
21  information and -- we're working on procedures for that.   They
22  could be kind of complicated and we're hoping to agree to
23  procedures in both directions without having to trouble the
24  Court to resolve the disputes.
25         MR. LESKO: So I suppose from our standpoint, Your

Honor, it's the central part of proving our case. We would need it and we do plan on working with the Quinn Emanuel firm to try to work out some parameters. What happens of course from our standpoint is we'd like to have as free access [inaudible], for our expert to have access [inaudible] to do his work. Of course they have full access [inaudible] own source code. So it's our intention between protecting their rights to the confidentiality and our desire to properly prepare our case we do it with some degree of ease [inaudible] access. We're working on trying to --

THE COURT: Is there any way -- well, a reading room I assume is a physical room where a computer or computers are set up with the information on it, people have access to maybe walk in, do whatever it is they have to do, take a look at it, request paper copies of things, whatever. Is there a way to set up a virtual reading room?

MR. DeFRANCO: It's pretty difficult, Your Honor. I mean it's pretty difficult to set up a location that is absolutely secure and no third parties can break into. There are actually services companies out there that are in the business of setting up these meeting rooms for just this purpose and the only information that we -- we're not setting this up and we're not interested in getting into their -- we've already had some of these discussions. There's expert work product but basically you log when people are going in

1  and out of the room and figure out how to deal with some
2  limited printout or other information they may need to prepare
3  their expert reports.
4      THE COURT: I assume the issue of source code it's a
5  two-way street; right?
6      MR. LESKO:  It could be.  To back up a little bit
7  with the reading room.  I have seen in other patent cases that
8  a lot of -- that people put more emphasis on computer code
9  than -- saying it's more important than any other type of
10 document but really it's just simply another type of document.
11 It's no more important than customer lists or something -- or
12 pricing.  It's -- so the fact that companies want -- sometimes
13 if they ask for additional attachments for source codes they
14 really aren't warranted especially in a case like this when at
15 least the degree that we're looking at that I can source code
16 is limiting it to counsel and maybe approved outside experts.
17 It would seem in a case like that those should be adequate
18 [inaudible] by themselves.
19      Requiring us to have a reading room is really -- the
20 concept of a reading room would work if it puts us on an even
21 playing field with -- in a case like this.  They have full
22 access to -- at any time they can draft their expert reports
23 or 48 hours straight.  They wanted to have their expert to do
24 that. If we're in a reading room we may be bound at certain
25 time periods and limited to what we can print out, what we can

1 leave with. It really puts a lot more hurdles within what
2 we're going to do and it's not really an even playing field.
3 It really seems to me that -- really, a source code is simply
4 another type of document with the people that are going to see
5 the documents in this case [inaudible].
6     THE COURT: I hear what you're saying but I would
7 assume that it's not only who gets to see the source code but
8 it's how the source code is reviewed, what machines it's on,
9 whether they're susceptible to being hacked into and
10 manipulated, stolen, whatever. So --
11     MR. LESKO: It's like setting up a computer
12 [inaudible] internet in our offices and restricting the source
13 code to that computer when there's no outside access or no
14 outside connection to it. We'd be willing to do a limitation
15 like that but really a reading room versus our offices versus
16 our expert's computer is really where the limitation comes in.
17     THE COURT: I think we're getting ahead of ourselves
18 because you need to work this out.
19     MR. DeFRANCO: We had discussed these parameters and
20 [inaudible] but we've also agreed right before coming in here
21 look, we're going to work together to see if we can --
22     THE COURT: I just find this really fascinating and I
23 like to talk about techy stuff all the time.
24     What I think will help you is knowing a little bit
25 about my philosophy in discovery. I like new sayings. Put

1  your cards on the table, let the chips fall where they may and
2  things like that.  Discovery is a two-way street.  What's good
3  for the goose is good for the gander.  All these things you
4  should -- as you're discussing what to do and how to do it
5  think what would Reyes say and what is he going to rule.
6        Obviously you don't hide the ball.  I don't think
7  you gentlemen are going to be doing that.  We want to get to
8  the bottom of this and find out whether there was
9  infringement, the patents are valid, all that.  So keep that
10 in mind.  Really no different than most of the other judges in
11 this court or across the river.
12       Also, when you are unable to work things out and you
13 bring them to me, simplify them as much as you can.
14       MR. LESKO: Especially right before Christmas.
15       THE COURT: Exactly.  So we'll deal with that --
16 those issues if we have to in December and January.
17       MR. DeFRANCO:  Your Honor, along those lines we
18 contemplated submitting a joint letter brief that seems to be
19 a simple procedure and more convenient for the court to have
20 both parties' positions.
21       THE COURT: That's a good suggestion.  I've done that
22 in some cases where you say we've worked out everything but
23 these three issues.  The issues are and you come up with a
24 neutral way of phrasing the issue.  Plaintiff's position,
25 defendant's position right in the same document then I can --

1   not shifting between two sets of papers and -- I would
2   appreciate that.
3           I cut you off, Mr. DeFranco.
4           MR. DeFRANCO: Yes, Your Honor.  The other -- the
5   joint letters we discussed.  The other issue is there are some
6   new federal rule, amendments to the federal rules relating to
7   expert discovery that's pending directed toward protecting
8   experts' notes and draft reports and guidelines for discovery
9   of expert related information.  The parties I understand it
10  have agreed to follow those rules even though they're
11  [inaudible] to simplify that process.
12          THE COURT: That's fine.
13          MR. LESKO: And that would be reflected [inaudible].
14          MR. DeFRANCO:  I think that's pretty much all we
15  have to report.
16          THE COURT: All right.
17          MR. LESKO: I think so, Your Honor.
18          THE COURT: I briefly looked at the scheduling order.
19  Nothing jumped out as problematic.
20          The dates for the status conference, you have August
21  18, 2009 or such other time as the court is available and also
22  the -- what's called the final pretrial conference -- maybe
23  not final but May 25, 2010.  I leave those in for now but they
24  may be changed.
25          Who do you want to hold the Markman hearing?  Do you

1 want Judge Mauskopf to hold that or do you want me to hold it
2 on a report and recommendation basis to her?  If you haven't
3 discussed it --
4            MR. LESKO: We haven't.
5            THE COURT: Or do you want to consent to have me --
6            MR. LESKO:  If it's okay with Your Honor can we
7 discuss that --
8            THE COURT: Talk about it and let me know.
9            I don't think there are any dates in here other than
10 for conferences other than the status conference in August
11 2009 and the final pretrial conference.  Is that right?  I
12 mean the Markman hearing --
13            MR. DeFRANCO: We do have a number of protected dates
14 in there in terms of exchange.  We hope to keep to those
15 dates.  It's not uncommon in patent cases where there would
16 be -- the dates have to be adjusted.  I assume if we needed to
17 do that we would come back to Your Honor and suggest to the
18 court new dates.
19            THE COURT: That's great.  If you don't mind what I
20 will do when I have a little bit of time to sort of really
21 absorb this is maybe add in a couple of dates for telephone
22 conferences so I can keep track of you folks.
23            MR. LESKO: [Inaudible] give you notice on
24 [inaudible]?
25            THE COURT: Any really substantive motions. If it's a

1  discovery motion, no.  You meet and confer. You try and work
2  it out.  If you can't work it out then the aggrieved party
3  writes me a letter and three days later the answering party
4  can write me a letter.  I have -- I like those letters to be
5  limited but in this case they might be more extensive in which
6  case when you write your first letter you say we've gone over
7  the page limit because we need to.  I'm not going to have you
8  make a separate motion to exceed the page limit on that.  It's
9  not necessary.
10         But if you're looking for sanctions or anything like
11 that, which I don't expect you to ask for, that you write me a
12 premotion letter and I'll get you on the phone and say why are
13 you bothering me.
14         I'm not going to enter this right now.  I'm not
15 going to sign it but I have it.  I'm going to review it.
16 Maybe add a couple of dates and put it on ECF.
17         MR. DeFRANCO: Your Honor, the parties have brought
18 an electronic version.
19         THE COURT: That's great.  That's great.
20                [Pause in proceedings.]
21         THE COURT: Anything else we need to talk about?
22         MR. DeFRANCO: Not today, Your Honor.  Thank you.
23         MR. LESKO: Thank you, Judge.  Good meeting you.
24         THE COURT: Good meeting you.
25                        *  *  *  *  *

```
                                                             15
 1        I certify that the foregoing is a court transcript from
 2   an electronic sound recording of the proceedings in the above-
 3   entitled matter.
 4
 5                              _____
 6                                      Shari Riemer
 7   Dated:  January 23, 2009
```