# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK
### BROOKLYN DIVISION

| | | |
|---|---|---|
| **WEB TRACKING SOLUTIONS,** | ) | |
| **LLC and DANIEL WEXLER,** | ) | |
| | ) | |
| *Plaintiffs/* | ) | |
| *Counterclaim Defendants,* | ) | |
| v. | ) | Case No:  1:08-cv-03139-RRM-RER |
| | ) | |
| **GOOGLE, INC.,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| *Defendant/* | ) | |
| *Counterclaim Plaintiff.* | ) | |
| _____ | ) | |

**PLAINTIFFS WEB TRACKING SOLUTIONS, LLC AND DANIEL WEXLER'S CLAIM CONSTRUCTION BRIEF FOR U.S. PATENT NO. 5,960,409**

Paul A. Lesko - *pro hac vice*
Jo Anna Pollock - *pro hac vice*
Stephen C. Smith - *pro hac vice*
SIMMONS BROWDER GIANARIS ANGELIDES & BARNERD LLC
707 Berkshire Blvd., PO Box 521
East Alton, Illinois 62024
618.259.2222 Telephone
618.259.2251 Facsimile
E-mail: plesko@simmonscooper.com

Steven M. Hayes
HANLY CONROY BIERSTEIN & SHERIDAN LLP
112 Madison Ave.
New York, NY  10016-7416
212.784.6400 Telephone
212.784.6420 Facsimile
E-mail: shayes@hanlyconroy.com

Edward C. Flynn - *pro hac vice*
Paul D. Steinman – *pro hac vice*
ECKERT SEAMANS CHERIN & MELLOT, LLC
600 Grant St., 44th Floor
Pittsburgh, PA  15219
412.566-6000 Telephone
412.566.6099 Facsimile
E-mail: eflynn@eckertseamans.com

*Attorneys for Plaintiffs Web Tracking Solutions, LLC and Daniel Wexler*
Submitted on March 17, 2010

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS...................................................................... i

TABLE OF AUTHORITIES .............................................................. iii

I.      INTRODUCTION........................................................... 1

II.     BACKGROUND ............................................................. 3

     A.   The Wexler Patent................................................... 3

     B.   Prosecution History................................................ 7

III.   LEGAL ARGUMENT...................................................... 8

     A   Basic Legal Principles of Claim Construction............................ 8

     B.   Disputed Claim Term Constructions...................................... 13

     <u>Independent Claim 1</u>

     Disputed claim term: "fourth Web site".. .......................... 13

          1.  "Owned and Operated by an Entity Independent From the Entity(s) That Own and Operated the First, Second and Third Web Sites" vs. "Owned and Operate Independently from the First, Second and Third Web sites".............................. 15

          2.  "That Performs the Function of a Third Party Accounting and Statistical Service" vs. "That Performs the Function of an Unbiased Third Party Accounting and Statistical Service..... 16

     Disputed claim term: "first Web site, second Web site and third Web site"................................................................. 19

     Disputed claim term: "the first uniform resource locator is obtained by the first user's Web browser from the first Web site".......... ..... ... 20

     Disputed claim term: "redirecting...to the third Web site in response to the receipt of the first uniform resource locator"........................ 24

          1.   Plaintiffs' Position is Directly Supported by the Intrinsic Evidence and by General Claim Construction Principles...... 25

2.   The Principle of Claim Differentiation Further Precludes
Google from Limiting the Scope of this Claim.................... 27

<u>Dependent Claim 2</u>

Disputed claim term: "banner".………….. ........................................ 29

<u>Independent Claim 7</u>

Disputed claim term: "fourth node".………........................................ 31

<u>Independent Claim 9</u>

Disputed claim term: "first Web site, second Web site, and third
Web site".………………………………….......................................... 33

Disputed claim term:  "transmitting, in response to the receipt of the
first uniform resource locator, a second uniform resource locator to the
first browser".……………………………………………………….. 34

IV.     CONCLUSION ............................................................... 36

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                        <u>Page</u>

*Acumed LLC v. Stryker Corp.,* ...............................................   27
    483 F.3d 800 (Fed. Cir. 2007)

*Astrazeneca AB v. Mutual Pharm. Co.,* ...............................   11
    384 F.3d 1333 (Fed. Cir. 2004)

*CCS Fitness, Inc.v. Brunswick Corp.,* ..................................   12
    288 F.3d 1359 (Fed. Cir. 2002)

*C.R. Bard, Inc. v. U.S. Surgical corp.,* ................................   11
    388 F.3d 858 (Fed. Cir. 2004)

*Gillette Co. v. Energizer Holdings, Inc.,* ................   11, 23-24, 26, 35
    405 F.3d 1367 (Fed. Cir. 2005)

*Hoechst Celanese Corp.v. BP Chems. Ltd.,* ..........................   11
    78 F.3d 1575 (Fed. Cir. 1996)

*Housey Pharms., Inc. v. Astrazeneca UK Ltd.,* ..................   24, 26
    366 F.3d 1348 (Fed. Cir. 2004)

*Howmedica Osteonics Corp. v. Wright Medical Technology, Inc.,* .....   11
    540 F.3d 1337 (Fed. Cir. 2008)

*Johnson Worldwide Assocs. v. Zebco Corp.,* .......................   11
    175 F.3d 985 (Fed. Cir. 1999)

*Karlin Technology, Inc. v. Surgical Dynamics, Inc.,* ...............   12
    177 F.3d 968 (Fed. Cir. 1999)

*Liebel-Flarsheim Co. v. Medrad, Inc.,* ...................10, 12, 24, 26
    358 F.3d 898 (Fed. Cir. 2004)

*Markman v. Westview Instruments, Inc.,* .............................   9, 11
    52 F.3d 967 (Fed. Cir. 1995) (en banc), 517, U.S. 370 (1996)

*Markman v. Westview Instruments, Inc.,* ............................   9

*Omega Eng'g, Inc. v. Raytek Corp.,* ..................................   12
    334 F.3d 1314 (Fed. Cir. 2003)

*Phillips v. AWH Corp.,* ...............................9, 10, 11, 12, 13, 27
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)

*Southwall Technologies, Inc. v. Cardinal IG Co.,*.....................................  12
    54 F.3d 1570 (Fed. Cir. 1995)

*Teleflex, Inc. v. Ficosa N. Am. Corp.,*...............................................  10, 12
    299 F.3d 1313 (Fed. Cir. 2002)

*Transmatic, Inc. v. Gulton Indust., Inc.,*..............................................  10
    53 F.3d 1270 (Fed. Cir. 1995)

*Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n,*.........................  11
    366 F.3d 1311 (Fed. Cir. 2004)

*Vitronics Corp. v. Conceptronic, Inc.,*..............................................9, 10, 11
    90 F.3d 1576 (Fed. Cir. 1996)

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.,*.....................................  12
    239 F.3d 1225 (Fed. Cir. 2001)


Statutes

35 U.S.C. §102(e) .....................................................................  7

35 U.S.C. §112 .......................................................................  9

I.      **INTRODUCTION**

In 1996, Daniel Wexler ("Wexler") was an independent, computer consultant, performing a number of computer and Internet-related jobs for various customers. His customers included companies who owned Web sites ("publishers"), as well as companies whose advertisements were displayed at those Web sites ("advertisers"). Both the publishers and advertisers attempted to account for the number of clicks by users on the advertisements displayed at the publishers' Web sites. In the early stages of his work, a problem was identified relating to discrepancies in click statistics that were maintained by the publisher compared to the click statistics maintained by the advertiser. In response to that problem, Wexler conceived and developed a method by which a third party accounting and statistical service would provide more trusted and credible statistical information regarding user clicks on advertisements, to the benefit of both publishers and advertisers.

Wexler was awarded a patent by the United States Patent and Trademark Office ("USPTO") on September 29, 1999. As described more fully below, the Wexler patent claims a method for providing third party online accounting and statistical information pertaining to users' clicks on advertisements displayed at publishers' Web sites.

In November, 2007, Wexler granted exclusive license rights to his patent to Acacia Patent Acquisition Corporation ("APAC"). In June, 2008, APAC assigned its license rights to Web Tracking Solutions, LLC ("WTS").

Google, Inc. ("Google") is a global Internet search technologies corporation that generates tens of billions of dollars in revenues, primarily from its online advertising programs, including AdSense and AdWords. *See* Google, Inc. Annual Report (Form 10-

1

K), at 41 (February 12, 2010).[1]  In 2009, for example, Google generated -$22,888,800,000.00 in advertising revenues.  *Id.*  At issue in this case is Google's AdSense program, which is a key component of its business model for generating online advertising revenues.  AdSense allows publishers of Web sites to display advertisements on their Web sites, and to earn revenues from users' clicks on those advertisements.[2]  In 2009, Google earned $7,166,300,000.00 in revenues from its Global Network Web sites, which include its AdSense program.  *See* Google, Inc. Annual Report (Form 10-K), at 41 (February 12, 2010).

WTS and Wexler filed this patent infringement lawsuit alleging that Google infringes certain claims of United States Patent No. 5,960,409 to Wexler ("the Wexler patent").  *See* Ex. A attached hereto.  Plaintiffs allege in this action that Google, in implementing its online advertising programs, has utilized technology that is encompassed by the scope of the claims of the Wexler patent.  Specifically, as described more fully in Plaintiffs' Preliminary Infringement Contentions, Plaintiffs assert that where an advertisement of an advertiser participating in Google's advertising network program is displayed at a publisher's Web page, a user who clicks on that advertisement is redirected through Google's third party Web site to the advertiser's Web site.  Plaintiffs further assert that the Google method performs all of the features claimed by the Wexler patent, including counting and logging the number of user clicks on the advertisement.  Google has not compensated Wexler for its use of Wexler's patented technology.

---

[1] Google's Annual Report is a public document that can be accessed at http://www.sec.gov/Archives/edgar/data/1288776/000119312510030774/d10k.htm.

[2] *See* https://www.google.com/adsense/login/en_US/

Various claim terms in the Wexler patent are at issue in this case and subject to *Markman* construction. Plaintiffs submit this brief in support of its proposed constructions for these disputed terms.

## II.   BACKGROUND

### A.   The Wexler Patent

The patent application that subsequently issued as the Wexler patent was filed in the USPTO on October 11, 1996. *See* Ex. A, cover. At the time of filing, one of the ways that individuals and organizations communicated and shared information with one another was through the Internet, a global network of interconnected computers. *See* Ex. A, Col. 1, lines 11-16, Col. 3, lines 11-15. As is commonly known, the Internet has grown to be the leading vehicle for sharing communications and information throughout the world, and a major marketplace for businesses of all sizes. *Id.*

Businesses recognized the benefits of establishing a presence on the Internet and, in particular, on the World Wide Web. *Id.,* Col. 1, lines 14-16. Such benefits included a convenient method for a buyer and a seller to conduct a transaction for products and services, and a method of advertising wherein an advertiser could cost-effectively distribute an advertisement to a wide range of prospective customers. *Id.,* Col. 1, lines 16-20.

A business could increase its advertising presence by having an advertisement (e.g., banner) conspicuously displayed or published on frequently visited Web sites, in order to entice users to obtain further information about the advertisement. *Id.,* Col. 1, lines 44-48. If users then wanted additional information about the advertisement, they would click on the advertisement, and be transferred to the advertiser's Web site. *Id.,*

Col. 1, lines 52-54.  This transfer was accomplished, for example, by way of a link included in the  advertisement.  *Id.*

Advertising with an advertisement on a publisher's Web site was typically provided to the advertising business for a fee.  *Id.,* Col. 1, lines 61-63.  The cost of advertising could be based on the number of times that the publisher's Web site displayed the advertisement, referred to as the number of "impressions."  *Id.,* Col. 1, lines 63-67; Col. 2, lines 1-6; Col. 6, lines 1-7.  Alternatively, the advertising cost could be based on the number of times that a user actually clicked on the advertisement.  *Id.*

Initially, advertising fees were typically charged on an impressions basis. Advertisers soon realized, however, that the number of times that an advertisement was displayed at a publisher's Web site did not translate into the number of times that users visited the advertiser's Web site.  Accordingly, it was determined that the number of times that users actually clicked on the advertisement was a more accurate method of measuring the effectiveness of that advertisement.

Both the Web site that displayed the advertisement and the advertiser had an interest in obtaining certain statistics pertaining to advertising effectiveness.  *Id.,* Col. 2, lines 7-10.  For example, if the fee for advertising on a particular publisher's Web site was based on the number of clicks on the advertisement, both parties would want to know this statistic.  *Id.,* Col. 2, lines 10-12.  The publisher could determine the number of clicks on an advertisement displayed at its Web site, by accessing a log maintained by the publisher's Web site.  *Id.,* Col. 2, lines 12-14.  The advertiser could determine the number of users who actually arrived at the advertiser's Web site after clicking on the advertisement, by accessing a log maintained by the advertiser's Web site.  *Id.*  There

4

were typically discrepancies between the publisher's click statistics and the advertiser's click statistics, however, and neither the publisher nor the advertiser typically had access to each other's click statistics. *See id.,* Col. 2, lines 7-30. Furthermore, since advertisers often advertised at more than one location, both the advertisers and the publishers would have an interest in knowing the percentage of the total number of clicks on an advertisement that were generated by each of the publishers' Web sites. *Id.,* Col. 2, lines 19-23. The Wexler patent addressed the need for this kind of statistical information to be consistently provided by a credible third party Web site. *Id.,* Col. 2, lines 31-35.

In the claimed invention, the user accesses the publisher's Web site. *See, e.g., id.,* Col. 4, lines 28-36. This is accomplished by a user's Web browser sending a request for information to the publisher's Web site. *Id.* The publisher's Web site, in turn, downloads to the user's Web browser information that enables the user's Web browser to construct and display the publisher's Web page. *Id.* Within the scope of the Wexler patent, the publisher's Web page, as displayed in the user's Web browser, includes an advertisement of an advertiser. *Id.*

If the user is interested in obtaining more information about the advertisement, the user clicks on the advertisement. *Id.,* Col. 4, lines 37-38. In accordance with the invention, the advertisement includes a uniform resource locator ("URL"), associated with the advertisement for the advertiser, which points the user's Web browser to a third party Web site instead of to the advertiser's Web site. *Id.,* Col. 4, lines 38-41. When the user clicks on the advertisement, a link is established between the user's Web browser and the third party Web site. *Id.,* Col. 4, lines 41-44. In this way, the user's Web browser is temporarily detoured to the third party Web site prior to going to the

advertiser's Web site.  *Id.*, Col. 4, lines 54-61.  The user is not necessarily aware of the detour to the third party Web site.  *Id.*, Col. 5, lines 12-13.

The third party Web site receives this URL from the user's Web browser, and partly in response thereto, increments a counter that keeps track of the number of request signals generated by clicks on the advertisement.  *Id.*, Col. 4, lines 54-61.  The third party Web site can also be operable to log a variety of additional information, such as, but not limited to, the address of the publisher at whose Web site the user clicked on the advertisement.  *Id.*, Col. 4, lines 61-67.

Because the advertiser may advertise at more than one publisher Web site, it would want to be able to determine the effectiveness of advertising at each of those Web sites.  *Id.*, Col.5, lines 24-29.  Similarly, the publisher's Web site may want to display advertisements associated with more than one advertiser.  *Id.*, Col. 5, lines 29-31.  By detouring all such traffic through the independent third party Web site, the Wexler invention provides a third party accounting system that is operable to count clicks for multiple publishers and multiple advertisers.  *Id.*, Col. 5, lines 36-40.

The Wexler patent further claims that, following the receipt and logging at the third party Web site of the URL generated when the user clicks on the advertisement, the third party Web site redirects the user's Web browser to the intended advertiser's Web site.  Col. 5, lines 3-5.  The redirect request is sent to the user's Web browser from the third party Web site, and the user's Web browser sends a request for information to the advertiser's Web site.  *Id.*, Col. 5, lines 5-7.  In response to the receipt of this request for information, the advertiser's Web page is downloaded to the user's Web browser.  *Id.*, Col. 5, lines 9-11.

6

B.      **Prosecution History**

The following is a brief recitation of the prosecution history as it relates to the claim constructions presently at issue. Wexler filed his patent application with the USPTO on October 11, 1996. *See* Ex. A, cover. The USPTO issued a first Office Action on July 13, 1998, rejecting all claims under 35 U.S.C. § 102(e), as being anticipated by United States Patent Nos. 5,712,979 to Graber ("Graber 979"), 5,717,860 to Graber ("Graber 860") and 5,751,956 to Kirsch ("Kirsch"). Ex. B at WTS 000038-43. Wexler filed an Amendment on November 13, 1998, in response to the first Office Action. Ex. B at WTS 000046-52. Wexler asserted that as amended, the pending claims were patentably distinguishable over the Graber and Kirsch references and any combination thereof. *Id.* Specifically, Wexler argued that the cited references do not enable the accounting site to be owned and operated by a third-party, independent entity that is neither the publisher nor the advertiser. *Id.* Wexler further argued that in the prior art, the accounting is performed by either the publisher or the advertiser:

> A disadvantage with Internet accounting systems in the prior art is that the accounting is performed by either the publisher or by the advertiser. And because the amount of money paid by the advertiser to the publisher is dependent on the accounting statistics collected, there is, or is perceived to be, the temptation by the one doing the accounting to bias the statistics in its favor. In other words, advertisers don't completely trust publishers to be honest and publishers don't completely trust advertisers either.

Ex. B at WTS 000051.

The USPTO issued a second and final Office Action on February 9, 1999. Ex. B, at WTS 000053-61. In this final Office Action, the Examiner maintained the rejection from the first Office Action, and further rejected the pending claims on the basis of a third Graber reference, United States Patent No. 5,812,769. *Id.* In response to this final

7

Office Action, Wexler and his patent prosecution counsel met with the Examiner on April

29, 1999.  *See* Ex. B, at WTS 000062-64.  The Examiner's Interview Summary indicated

that the Graber and Kirsch references were discussed during this interview.  *Id.*  Wexler

explained specifically that none of the Graber or Kirsch references disclosed an third

party accounting site.  *See* WTS 000063-64.  For example, he explained that in Kirsch,

the click tracking was performed by the publisher.  *Id.*  Wexler filed his Amendment

After Final Rejection on May 3, 1999.  Ex. B, at WTS 000067-71.  In this Amendment,

Wexler elaborated on the arguments presented in response to the first office action, and

restated the arguments presented to the Examiner during the interview, distinguishing his

invention from Graber and Kirsch:

> For example, it is contemplated that the system of Kirsch is to be operated
> by a publisher (*e.g.*, Infoseek, Yahoo, *etc.*) and the system of Graber I,
> Graber II and Graber III is to be operated by the advertiser (*e.g.*,
> Amazon.com, ebay.com, *etc.*), but the present invention can be operated
> by an independent entity that is neither the publisher nor the advertiser.

Ex. B, at WTS 000070.

In response to these arguments, the USPTO issued a Notice of Allowability.  Ex.

B, at WTS 000073.  The Wexler patent issued on September 28, 1999.  *See* Ex. A.


## III.   LEGAL ARGUMENT

### A.   Basic Legal Principles of Claim Construction

A patent includes a specification which fully describes the invention and at least

one claim which distinctly points out the scope of the invention.  35 U.S.C. § 112.  The

specification concludes by reciting one or more numbered claims of the patent that

distinctly claim the subject matter which the applicant regards as his invention.  *Id.*

8

The determination of patent infringement requires the court to undertake a two-step analysis.  The first step is to determine the meaning and the scope of the patent claims that are alleged to be infringed.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd,* 517 U.S. 370 (1996).  The second step is the comparison of the properly construed claims to the accused device or method.  *Id.*  "[T]he construction of a patent, including terms of art within its claims, is [a duty] exclusively within the province of the court."  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).

In *Markman,* the Federal Circuit held that there were three sources that should be considered to determine the meaning of claims: (i) the claims themselves, (ii) the specification and (iii) the prosecution history.  *Markman v. Westview Instruments, Inc.*, 52 F.3d  at 979.  These three sources comprise the intrinsic evidence of the patented invention.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314-1317 (Fed. Cir. 2005) (*en banc*).  Intrinsic evidence is a reliable indicator of a claim's meaning and receives first priority during claim construction.  *Id.*  In interpreting an asserted claim, the intrinsic evidence of record is to be considered before extrinsic evidence because it is the most significant source of the legally operative meaning of the claim language.  *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582-1583 (Fed. Cir. 1996).  In considering the intrinsic evidence, the words of the claims are examined first to define the scope of the patented invention.  *Id.* at 1582.  It is also well-settled that the specification "is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."  *Id.*  If in evidence, the prosecution history may then be considered, as it often has critical significance in determining the

9

meaning of the claims. *Id.* Accordingly, for these purposes, it is always necessary to review the specification and prosecution history of a patent. *Id.*

Notwithstanding the importance of the specification in the claim construction process, it is also well settled that unclaimed limitations may not be imported from the specification into the claims. *Phillips*, 415 F.3d at 1323. It is a basic tenet of claim construction that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004), *quoting Teleflex, Inc. v. Ficosa North American Corp.* 299 F.3d 1313, 1327 (Fed. Cir. 2002).

After first consulting the intrinsic evidence, a court may also consider extrinsic evidence, which is evidence external to the patent and prosecution history, such as inventor and expert testimony, dictionaries and learned treatises. *Phillips*, 415 F.3d at 1317. The *Phillips* court recognized that general purpose dictionaries may be helpful because in some cases, "the ordinary meaning of claim language... may be readily apparent... [involving] little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. Thus, the court "may rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the [intrinsic evidence]." *Phillips*, 415 F.3d 1322-23 (*quoting Vitronics*, 90 F.3d at 1584, n.6).

Notwithstanding the usefulness of extrinsic evidence in some circumstances to shed light on the relevant art, the courts have made clear that it is "less significant than

the intrinsic record in determining 'the legally operative meaning of claim language.'"
*C.R. Bard, Inc. v. U.S. Surgical Corp.,* 388 F.3d 858, 862 (Fed.Cir.2004), *quoting*
*Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n,* 366 F.3d 1311, 1318
(Fed.Cir.2004); *see also Astrazeneca AB v. Mutual Pharm. Co.,* 384 F.3d 1333, 1337
(Fed.Cir.2004).  With respect to reliance on inventor testimony, for example, it is
established that

> [t]he testimony of an inventor "cannot be relied on to change the meaning
> of the claims." *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979
> (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370 (1996); *see also Hoechst
> Celanese Corp. v. BP Chems. Ltd.,* 78 F.3d 1575, 1580 (Fed.Cir.1996)
> ("*Markman* requires us to give no deference to the testimony of the
> inventor about the meaning of the claims.").  In particular, we have
> explained that "[t]he subjective intent of the inventor when he used a
> particular term is of little or no probative weight in determining the scope
> of a claim." *Markman,* 52 F.3d at 985.

*Howmedica Osteonics Corp. v. Wright Medical Technology, Inc.,* 540 F.3d 1337, 1346
(Fed. Cir. 2008).

In construing the terms of a claim, "the focus is on the objective test of what one
of ordinary skill in the art at the time of the invention would have understood the term to
mean." *Markman,* 52 F.3d at 986.  The ordinary and customary meaning of a claim term
is the point at which to begin the construction of that claim term, and the construction
should deviate from the ordinary and customary meaning only when the patentee acted as
his own lexicographer or relinquished claim scope during prosecution.  *See Johnson
Worldwide Assocs.  v. Zebco Corp.,* 175 F.3d 985, 990 (Fed Cir.  1999); *Gillette Co. v.
Energizer Holdings, Inc.,* 405 F.3d 1367, 1374 (Fed. Cir. 2005).  The words of a claim
are to be given their ordinary and customary meaning as viewed by a person of ordinary
skill in the art at the time of the invention.  *Phillips,* 415 F.3d at 1312.  The words of the

claims are to be given their ordinary meaning unless the intrinsic evidence shows that the inventor used them differently. *Karlin Technology, Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971 (Fed. Cir. 1999). "Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Phillips,* 415 F.3d at 1321. Indeed, "the context in which a term is used in the asserted claim can be highly instructive." *Id.* at 1314. The Federal Circuit "indulge[s] a 'heavy presumption' that claim terms carry their full ordinary and customary meaning, unless the patentee unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) (citing *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d at 1313, 1325-26 and *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)).

Apart from the literal language of the asserted claims, the presence of additional claim limitations provided in dependent claims may impact the meaning of the literal language. For example, independent claims are presumed to have fewer limitations than a claim that depends from the independent claim. *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001). Thus, the "presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim." *Liebel-Flarsheim Co.* 358 F.3d at 910. In addition, "[d]ifferences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Phillips,* 415 F.3d at 1314. However, claim terms should be interpreted consistently in different claims. *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995).

### B.      Disputed Claim Term Constructions

Of the 11 claims that Plaintiffs assert, the claim terms that are in dispute involve independent Claim 1, dependent Claim 2, and independent Claims 7 and 9.  Each of the disputed claim terms and the parties' competing constructions of these disputed terms are set forth below.

**Independent Claim 1**

**Disputed claim term:  "fourth Web site"**

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| "a Web site that is owned and operated by an entity that is independent from the entity(s) that own and operate the first, second and third Web sites, and that performs the function of a third party accounting and statistical service." | "a Web site owned and operated independently from the first, second and third Web sites, and that performs the function of an unbiased third party accounting and statistical service." |

Independent Claim 1 recites the functions that are performed at "the fourth Web site."  The claim term "fourth Web site" refers to the third party accounting and statistical service.[3]

There are two primary differences between the parties' competing constructions of "fourth Web site."  First, Plaintiffs' construction provides that the fourth Web site "is owned and *operated by an entity that is independent from the entity(s)*" that own and operate the other Web sites, whereas Google's construction recites that the fourth Web site "is owned and operated *independently from*" the other Web sites.  Secondly, whereas Plaintiffs' construction provides that the fourth Web site "performs the function of a third

---

[3] The "first Web site", "second Web site" and "third Web site" refer to the first publisher's Web site, second publisher's Web site and advertiser's Web site, respectively.

party accounting and statistical service," under Google's construction, the fourth Web site "performs the function of an *unbiased* third party accounting and statistical service." In both instances, Plaintiffs' construction finds direct support in the intrinsic evidence.

At the outset, before addressing the parties' competing constructions of this disputed claim term, it should be noted that there is no dispute as to how certain related terms are to be defined, or as to what functions are performed at the fourth Web site. The parties have agreed, for example, that "Web site" means "a collection of related web pages, content, or other digital assets or services that are accessed, for example, with a common domain name." Ex. D, at 1. Under this definition, therefore, a "Web site" is not limited to a collection of Web "pages" such as would appear in a user's browser. The inclusion in this definition of "content, or other digital assets or services" would also encompass Wexler's third party accounting and statistical service, which can perform all the claimed functions without being displayed as a Web page in the user's browser. In fact, the user in Wexler's claimed process may be unaware of going to the fourth Web site. *See* Ex. A., Col. 2, lines 55-56.

Further, there is no dispute regarding the functions that are performed at the fourth Web site/third party accounting and statistical service, which is the destination to which the users are" detoured" after the users click on the advertisement. *See,* Col. 5, lines 12-13. These functions include counting and tabulating users' clicks on advertisements, redirecting users from the publisher's Web site to an advertiser's Web site, and collecting other statistical information regarding the clicks on the advertiser's advertisement. *See, e.g.,* Ex. A., Col. 2, lines 43-61; Col. 4, line 54 - Col. 5, line 8. Since the fourth Web site/third party statistical and accounting service does not display a home

14

page or Web page to the users' browsers, the users' browsers are directed to the fourth Web site/third party statistical and accounting service without the users being aware of this "detour" to the fourth Web site. *See* Ex. A., Col. 5, lines 11-12 ("[the user] is not aware of the "detour" to the third party service"); *see also,* Col. 2, lines 55 through 56 ("as far as the user is aware, the banner takes him directly to the advertiser's Web site").

With these undisputed issues in mind, attention is now turned to the competing claim constructions.

1.    **"Owned and Operated by an Entity Independent From the Entity(s) That Own and Operate the First, Second and Third Web Sites" vs. "Owned and Operated Independently from the First, Second and Third Web Sites"**

As stated above, Plaintiffs' proposed construction, and the language emphasizing the need for separate and independent entities, finds direct support in the intrinsic evidence. This evidence makes clear that the entity that owns and operates the fourth Web site be an entity that is neither the publisher nor the advertiser. As explicitly stated in the prosecution history, "the present invention can be *operated by an independent entity that is neither the publisher nor the advertiser.*" Ex. B, at WTS 000070 (emphasis added). *See also, id.*, at WTS 000051, WTS 000070: "the present invention enables the accounting site to be *owned and operated by an independent entity – one that is not associated with either the publisher or the advertiser.*"  (emphasis added). A primary focus of this invention, therefore, is on the performance of the accounting functions by a third party Web site that is owned by neither the publisher nor the advertiser.

Indeed, one of the primary benefits of the invention was the manner in which it would overcome the disadvantages associated with Internet accounting systems in the

15

prior art where the accounting was performed by either the publisher or the advertiser. *See* Ex. B, at WTS 000051, WTS 000070: "A disadvantage with Internet accounting systems in the prior art is that the accounting is performed by either the publisher or by the advertiser." As long as these accounting functions are performed by an entity that is not either the publisher or the advertiser, the claim term is met.

Moreover, it is significant that Plaintiff's construction is consistent with the definition of "publisher" upon which the parties have agreed: "an entity that has advertisements displayed on its Web site on behalf of an advertiser and whose Web site is *owned and operated by an entity independent from the entity that owns the fourth Web site/third party accounting and statistical service.*" Ex. D, at 1 (emphasis added). This agreed-upon definition of "publisher" incorporates the language, proposed by Plaintiffs in their construction of "fourth Web site", that focuses on the different entities. There is simply no logical reason, therefore, for the definition of "fourth Web site" to utilize different language than the definition of "publisher" to which the parties have agreed.

Even Google's proposed construction would presumably require that the entity that owns and operates the fourth Web site be neither the publisher nor the advertiser. The difference, however, is that, unlike Plaintiff's construction, Google's proposed construction utilizes language that has no direct support in the intrinsic evidence.

### 2. **"That Performs the Function of a Third Party Accounting and Statistical Service" vs. "That Performs the Function of an *Unbiased* Third Party Accounting and Statistical Service**

The other primary dispute regarding this claim term concerns the description of the function performed at the fourth Web site. The single difference is that whereas

Plaintiffs' construction states that the fourth Web site "performs the function of a third party accounting and statistical service", Google's construction proposes that it "performs the function of an *unbiased* third party accounting and statistical service." This issue is closely related to the issue discussed above, regarding the requirement that the entity that owns and operates the fourth Web site be independent from the entities that own and operate the other Web sites.

The "Background of the Invention" section of the specification twice utilizes the word "unbiased," and states as follows:

> Regardless of the fee basis, both the advertiser and the administrator of the banner-publishing site will typically have an interest in knowing certain statistics pertaining to advertising effectiveness. For example, if the fee for the advertising is based on the number of clicks on the banner, then both parties will want this statistic. The advertiser can obtain this information by interrogating an access log maintained by the advertiser Web site. This information, however, is not directly available to the banner-publishing site. While it can be obtained from the advertiser, the publishing-site administrator would presumably prefer receiving the relevant statistics from an unbiased source.
>
> Further, since advertisers will often advertise at more than one location, both the advertisers and the publishers will typically have an interest in the statistics pertaining to the effectiveness of an individual publishing site at generating leads for the advertiser. . . . Currently, such information is not readily available. To obtain it requires that the appropriate expertise is available, and that the server at the advertiser Web site is appropriately configured.
>
> In view of the value of such statistics, and the relative inconvenience in obtaining such information, a need presently exists for an unbiased, readily available source of statistical/accounting information for Internet advertisers and advertising publishers.

Ex. A., Col. 2, lines 7-35. In the first instance, the use of the term "unbiased" refers to the preference of the publisher to obtain the statistical information from a source other than the advertiser. In the second instance, the use of the term "unbiased" refers to

nothing more than the need of both the publisher and the advertiser to be able to obtain

this information from a source other than each other.

The prosecution history further supports the conclusion that the source or provider

of the statistical information need only be "unbiased" in the sense that it is a third party,

that is neither the advertiser nor the publisher.  In distinguishing Wexler from the Kirsch

and Graber references, the prosecution history states as follows:

> For example, it is contemplated that the system of Kirsch is to be operated
> by a publisher. . . and the system of Graber . . . is to be operated by the
> advertiser . . . , but the present invention can be operated by an
> independent entity *that is neither the publisher nor the advertiser.*

Ex. B, at WTS 000070 (emphasis added).  *See also,* Ex. B, at WTS 000051, WTS

000070:  "the present invention enables the accounting site to be owned and operated by

an independent entity – *one that is not associated with either the publisher or the*

*advertiser."*  (emphasis added).

Moreover, Wexler does not purport to preclude every potential for bias.  Rather,

the focus is on the *perception* of bias if either the publisher or the advertiser is the source

of the accounting statistics.  As stated in the prosecution history:

> And because the amount of money paid by the advertiser to the publisher is
> dependent on the accounting statistics collected, there is, *or is perceived to be,* the
> temptation by the one doing the accounting to bias the statistics in its favor.  In
> other words, advertisers don't completely trust publishers to be honest and
> publishers don't completely trust advertisers either.

Ex. B, at WTS 000051, WTS 000070 (emphasis added).  Wexler reduces this perception

by disclosing a third party accounting service that both the publisher and advertiser

consider to be reliable.  As such, Wexler discloses a method that precludes the need for

the advertiser and publisher to trust or rely on each other to provide accurate statistical

information.

Plaintiffs' construction addresses the concern of bias by requiring that the fourth Web site be owned and operated by an entity that is neither the publisher nor the advertiser. To insert the term "unbiased" into this definition is redundant. Such redundancy injects significant potential for jury confusion, in that it may suggest that something more is required.

**Disputed claim term:** **"first Web site, second Web site and third Web site"**

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| "The terms **first Web site, second Web site,** and **third Web site** indicate that each of these Web sites is different from the others, and that the entity(s) that own and operate these Web sites are independent from the entity that owns and operates the fourth Web site / third party accounting and statistical service." | "The terms **first Web site, second Web site,** and **third Web site** indicate that each of these Web sites is different from the others, and each must be owned and operated independently from the fourth Web site / unbiased third party accounting and statistical service." |

In their respective constructions for this claim term, the parties agree that, as to each of these three Web sites (publishers' and advertiser's Web sites), the labels "first", "second" and "third" merely indicate that the Web sites are different from each other. The dispute relating to the parties' respective constructions arises in the remaining portion of the proposed constructions, and the issues are the same issues raised by the parties' competing constructions for "fourth Web site". Indeed, the parties' respective positions relating to "first Web site, second Web site, and third Web site" are simply the flip side of their positions relating to "fourth Web site".

First, Plaintiffs submit that, just like the entity that owns and operates the fourth Web site is to be independent from the entities that own and operate the other three Web sites, the entities that own and operate the other three Web sites are to be independent

from the entity that owns and operates the fourth Web site.  It is tautological that otherwise, the entity that owns and operates the one Web site could not be independent from the entity(s) that own and operate the other Web sites.[4]

Secondly, Google again inserts into its construction the term "unbiased" when referring to the third party accounting and statistical service.  For the same reasons stated above with respect to "fourth Web site", Plaintiffs assert that this term, extraneous to the claim language, is redundant and could lead to jury confusion.

**Disputed claim term:  "the first uniform resource locator is obtained by the first user's Web browser from the first Web site"**

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| "The first uniform resource locator is acquired as a result of interaction between the first user's Web browser and the first Web site (for example, as a result of downloading a Web page from the first Web site or as a result of clicking on a link or an advertisement on the first publisher's Web page as displayed in the first user's browser)." | "The first uniform resource locator is part of the Web page generated by the first Web site and downloaded from the first Web site to the first user's Web browser." |

The dispute over this claim term concerns the manner in which the first URL is obtained by the first user's Web browser from the first Web site, i.e., the first publisher's Web site.  It is Plaintiffs' position that this portion of the claim term is to be construed broadly.  Neither the claim language nor the intrinsic evidence requires that the first user's Web browser download the first URL directly from the first publisher's Web site.

---

[4] The "first Web site" and "second Web site" refer to the first and second publishers' Web sites.  Plaintiffs again note that the parties have agreed upon the definition of "publisher" to mean that it is an entity "owned and operated by an entity independent from the entity" that owns the third party accounting and statistical service. Ex. D, at 1.  When construing the claim term "first Web site, second Web site, and third Web site", therefore, there is no reason to attribute a definition that would be inconsistent with the agreed-upon definition of "publisher".

Rather, the breadth of the claim allows the first user's Web browser to download the first URL from any source, including a Web site other than the publisher's Web site, provided that it obtained the first URL as a result of interacting with the first publisher's Web site in the first instance. Google's construction, on the other hand, to the extent that it may require the first user's Web browser to download the first URL directly from the first publisher's Web site, would attempt to add limitations to the claim that are not supported by the claim language or any other portion of the intrinsic record.

Again, it should be noted initially that the parties have agreed upon the definition of other related claim terms that are relevant to this dispute. Specifically, the parties have agreed that "Uniform Resource Locator (URL)" is "a string of characters that includes the name, location, or any other characteristic of a network resource (for example, a Web page or other Web service) and that enables interaction with that resource." Ex. D, at 2. The parties have further agreed that the terms "first uniform resource locator" and "second uniform resource locator" simply mean that "each of these uniform resource locators may be different from one another." The only limitation contained in the claim language is that the first uniform resource locator be "associated with advertising for the advertiser." *See* Ex. A., Col. 6, lines 35-40. The parties have also agreed that "associated with advertising for the advertiser" means "related to an ad for the advertiser." Ex. D, at 2. It is also important to note, as discussed more fully below in connection with the next disputed claim term, that it is in response to the receipt of the first URL that the fourth Web site/third party accounting and statistical service redirects the first user's browser to the third Web site, i.e., the advertiser's Web site. *See* Ex. A, Col. 6, lines 45-47.

In light of these agreed-upon terms, Plaintiffs' proposed construction for this disputed claim term is as straightforward as it is broad.  It requires only that the first URL ultimately be acquired as a result of *interaction* between the first user's Web browser and the first publisher's Web site.  The form of interaction that results in the first user's Web browser ultimately obtaining the first URL may include, by way of example, the first user downloading a Web page from the publisher's Web site, or the first user clicking on an ad that is displayed as part of the publisher's Web page.

The claim language does not state that the first URL is "downloaded" from the first user's Web browser from the first Web site.  It states that the first URL is "obtained by" the first user's Web browser from the first Web site.  "Obtain" is a much broader term than "download."[5]  To "obtain" the first URL from the first Web site within the context of the claim language, it is only necessary that the first user's Web browser acquire the first URL through an effort of the first user to send a request to the first publisher's Web site, e.g., by accessing the first publisher's Web site, and/or by taking some other interactive step while already at the first publisher's Web site, e.g., by clicking on an advertisement displayed at the first publisher's Web site.

---

[5] *Compare* dictionary definition of these two terms:

obtain:  "1. *trans.*  To come into possession or enjoyment (of something) by one's own effort or by request; to procure or gain, as a result of purpose and effort; hence, generally, to acquire, get."

download:  "*trans.*  To transfer (esp. software) from the storage of a larger system to that of a smaller one."

*The Oxford English Dictionary,* Second Ed., © 1989, *reprinted* 1991, attached hereto as Ex. C.

The specification clearly supports the construction that it is not necessary for the first user's Web browser to download the first URL directly from the first publisher's Web site. As disclosed by Wexler, in response to a user logging onto a publisher's Web site, the Web site downloads *information* to the user's Web browser. *See* Ex. A., col. 4, lines 28-36 (emphases added). That information includes a copy of a hypertext source file *operable to generate a Web page having a banner. Id.* There is nothing in this specification that requires all the content of the Web page to be served by the publisher's server. Nor does the specification preclude the hypertext source file, downloaded from the publisher's Web site, from directing the user's Web browser to another entity's server to acquire the actual URL.

Accordingly, claim 1 only requires that, after the first user clicks on the advertisement, the first URL, regardless of when it was obtained, be received at the fourth Web site, and that in response thereto, the user's browser be ultimately redirected to the advertiser's Web site. *See, e.g.,* Ex. A, col. 4, lines 54-57: "If a user clicks on the banner forming a link to the third party, then . . . the third party accounting and statistical service receives a download request signal from the user's Web browser."; Ex. A, col. 5, lines 1-5: "The download request received by the third party service 13 is ultimately intended to obtain information from the advertiser. As such, the third party service 13 redirects the received download request signal to the advertiser' Web site. . . ."

Google would attempt to limit the scope of the claimed process by which the first user's Web browser obtains the first URL from the first Web site. It is well established, however, that in order to limit or disavow claim scope, "words or expressions of manifest exclusion" or "explicit" disclaimers in the specification are necessary. *See Gillette Co. v.*

*Energizer Holdings, Inc.,* 405 F.3d at 1374, *citing Housey Pharms., Inc. v. Astrazeneca UK Ltd.*, 366 F.3d 1348, 1352 (Fed Cir. 2004); *Liebel-Flarsheim v. Medrad, Inc.*, 358 F.3d at 906.  In the present case, no such manifest exclusion or explicit disclaimer exists in the context of the claims or other intrinsic evidence that would limit the scope of the claim so as to require only one method by which the first user obtains the first URL from the first Web site, i.e., to "download" the first URL directly from the first Web site.  To the contrary, the specification contemplates multiple methods for the first user's Web browser to "obtain" the first URL.

Plaintiffs' construction for this claim term, therefore, finds direct support in the claim language and in the intrinsic evidence.  Google's proposed construction, on the other hand, would impose limitations on this claim term that have no such support.  Accordingly, Plaintiffs' proposed construction should be adopted over Google's proposed construction.

**Disputed claim term:  "redirecting . . . to the third Web site in response to the receipt of the first uniform resource locator"**

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Either needs no construction, or should be construed according to the plain and ordinary meaning of claim language subject to the term "redirecting." | "Redirecting to the third Web site as the response to the first browser's request containing the first uniform resource locator" |

The parties have agreed that the term "redirecting" should be defined to mean "transferring or pointing from one place to another, for example from one Web site to another Web site or from one node to another node."  Ex. D, at 3.  In light of this agreed upon definition, it is Plaintiffs' position that the language of the remainder of this claim

term is clear and that no further construction is necessary.  If some further construction is deemed to be required, the term should be construed according to its plain and ordinary meaning subject to the term "redirecting."

Google, on the other hand, proposes a construction that, without any justification for doing so, alters the claim language.  Specifically, Google would rewrite the claim language to require that the redirection of the first user's Web browser be *the response* to the receipt of the first URL, presumably requiring that the first user's Web browser be sent directly to the advertiser's Web site, by way of a single redirect, without any intermediate redirects.  Once again, Google attempts to impose a limitation on a claim term that is not only unsupported, but contradicted, by the intrinsic evidence.

## 1.   Plaintiffs' Position Is Directly Supported by the Intrinsic Evidence and by General Claim Construction Principles

The agreed upon definition of "redirecting" is broad, in accordance with the teaching of the invention.  It simply requires "transferring or pointing from one place to another".  Ex. D, at 3.  No specific procedures or steps for transferring or pointing are required.  Any process that ultimately redirects the first user's Web browser to the advertiser's Web site, following receipt of the first URL at the fourth Web site/third party accounting service, meets this claim element.

Contrary to settled principles of claim construction, Google again attempts impermissibly to limit the scope of Claim 1, this time, by restricting the manner of redirecting the first user's Web browser to the advertiser's Web site upon receipt of the first URL at the third party accounting service Web site.  Google again fails, however, to meet the "manifest exclusion or explicit disclaimer" test enunciated by the Federal

Circuit. *See Gillette Co. v. Energizer Holdings, Inc.,* 405 F.3d at 1374, *citing Housey Pharms., Inc.*, 366 F.3d at 1352; *Liebel-Flarsheim v. Medrad, Inc.*, 358 F.3d at 906. Nowhere does the specification limit the redirecting step so as to require a single redirect to the advertiser's Web site, to the exclusion of any intermediate redirects.  In fact, the specification contemplates a much broader method of redirecting that would include intermediate redirects before the first user's browser is ultimately redirected to the advertiser's Web site.

The intrinsic evidence supports the conclusion that this claim term is to be construed in a broad manner.  Beginning with the Abstract, it is disclosed that "[a] third party accounting service receives a download request signal[6] *ultimately* intended for an advertiser Web site.  The download request signal is generated when a user clicks on a banner displayed on a Web page of a frequently-visited Web site."  *See* Ex. A, Abstract, lines 2-7 (emphasis added).  The specification further discloses that "[t]he download request received by the third party service 13 is *ultimately* intended to obtain information from the advertiser." *See* Ex. A, col. 5, lines 1-3 (emphasis added).  This language refutes any suggestion that a single redirect to the advertiser's Web site upon receipt of the download request signal by the third party accounting service Web site, without any intermediate redirects, is required.  It is only required that the receipt of the download request signal at the third party accounting service *ultimately* results in the user's Web browser being redirected to the advertiser's Web site.

---

[6] As discussed below, "download request signal" is one of the terms utilized in independent Claim 7, and the parties have agreed to the definition of this term.  As will be seen from the agreed upon definition, "download request signal" in Claim 7 is broader in scope than "uniform resource locator" in Claim 1.

The specification further discloses a specific method for redirecting in one embodiment of the invention.  The specification states that in "one embodiment," the redirect is accomplished by configuring at the third party's Web site a HTTP server program to issue a particular type of redirect response, a "302" redirect response, which redirects the user's Web browser to the advertiser's Web site when a specific URL is requested.  *See* Ex. A, col. 5, lines 14-24.[7]  By expressly stating that this specific kind of redirect method is disclosed in one embodiment, the specification makes clear that other embodiments, requiring no particular method of redirecting, are also within the scope of the invention.  *Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.").  *See also,* Ex. A, Col. 6, lines 21-25.

Accordingly, Google lacks any support for its attempt to limit the scope of this claim element.

### 2. The Principle of Claim Differentiation Further Precludes Google from Limiting the Scope of This Claim

The principle of claim differentiation provides further support that this claim term is to be construed in broad fashion.  This principle provides that a dependent claim further limits the claim scope of the independent claim from which it depends.  The claim scope of the independent claim, therefore, is necessarily broader than the scope of the dependent claim that directly or indirectly depends from the independent claim.  *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007).

---

[7] This specific embodiment is recited in dependent Claim 5, which is discussed immediately below in the context of the principle of claim differentiation.

Claim 5 of Wexler depends from Claim 1, as follows: "[t]he method of claim 1 further comprising configuring a Hypertext Transfer Protocol server program at the fourth Web site to issue a 302 redirect response when the first uniform resource locator is received." Ex. A, col. 7, lines 5-8.  A 302 redirect response is one of several methods of redirecting.  Claim 5, therefore, by its express terms, requires a specific method of redirecting, i.e., configuring a HTTP server program to issue a 302 redirect response.

By contrast, Claim 1 requires no specific method of redirecting.  Under the doctrine of claim differentiation, a presumption exists that the scope of Claim 5, depending from Claim 1, is narrower than the scope of Claim 1.  It follows, therefore, that Claim 1 is not limited to any single method of redirecting such as is claimed in Claim 5.  Rather, Claim 1 covers any method of redirecting, including multiple intermediate redirects, that ends in the first user's Web browser ultimately being pointed or transferred to the advertiser's Web site subsequent to the first URL being received at the third party accounting service Web site.

Claim 1 recites, in broad terms, a method for third party online accounting, by which a first user interacts with a first publisher's Web site, as a result of that interaction acquires the first URL related to advertising for an advertiser, is sent by the first publisher's Web site to a third party accounting server, and in response to the third party accounting server receiving the first URL, is ultimately transferred to the advertiser's Web site.  Nothing more is required to meet the claim elements of independent Claim 1.

By altering the claim language, Google attempts to exclude from the claimed method any intermediate redirect steps after the receipt of the first URL at the third party accounting service's Web site.  Again, this attempt to limit the scope of Claim 1 is

unsupported by either the claim language or the intrinsic evidence, and should be rejected.[8]

### Dependent Claim 2

**Disputed claim term:  "<u>banner</u>"**

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| "an area of a Web page that can be used to display logos, advertisements or other content to potentially entice a user to obtain further information pertaining to the banner or to connect to an advertiser's Web site." | "an area of a Web page used to display logos or other graphical images." |

The parties have agreed that "[f]irst banner that is associated with the first uniform resource locator" is to be construed as meaning "[t]he first uniform resource locator is related to the first banner."  The parties do not agree, however, as to the construction of the term "banner".

"Banner" is recited in dependent Claim 2.  As previously indicated, in general, a dependent claim further limits the scope of the independent claim from which it depends. For example, Claim 2 recites "wherein the advertising published by the first publisher is a first banner… and the advertising published by the second publisher is a second banner…".  Independent Claim 1, therefore, does not recite any limitation to the format of the "advertising" published by the first and second publishers.  Dependent Claim 2, however, further limits the term "advertising" recited in independent Claim 1, to provide for a specific format of advertising, i.e., a "banner".

---

[8] Google's construction would also change the claim language for this term from "the first uniform resource locator" to "the first browser's request containing the first uniform resource locator."  Such construction inexplicably adds claim language.  Nowhere does the redirecting step recite a first browser's request containing the first URL.  It simply recites the first URL.

Plaintiffs submit that the term "banner" is to be construed as "an area of a Web page that can be used to display logos, advertisements or other content to potentially entice a user to obtain further information pertaining to the banner or to connect to an advertiser's Web site."  This definition is supported by the specification, which states: "[t]he banner describes an area of a Web page that can be used to display logos, etc., that will hopefully entice the reader to obtain further information pertaining to the banner." Ex. A, col. 1, lines 49-51.  It is further disclosed that "[a] Web page is a single file of hypertext information, which may be text, graphics and even sound." *Id.,* Col. 1, lines 23-25.  It is explicit in the specification, therefore, that a banner, which is an area of a Web page, can include an equally wide variety of content to entice a reader.  The only limitation of dependent Claim 2 is that it provides for an *area* of a Web page at which to display a wide variety of content.

Google's construction would limit "banner" to an area of a Web page used only to display "logos or other graphical images."  It would specifically exclude text.  Google's construction, therefore, focuses "banner" not on the area of the Web page, but rather on the form of advertising displayed at that area of the Web page.

There is nothing in the specification or prosecution history that explicitly or implicitly teaches or discloses that only logos and graphics can be displayed at the "banner" area of the Web page, to the exclusion of text.  Moreover, Google's definition that would exclude text from the type of advertising content displayed at the banner area of the Web page directly conflicts with the language of the specification that the banner "will hopefully entice *the reader* to obtain further information pertaining to the banner."

*See,* Ex. A, Col. 1, lines 49-54.  Reference to the "reader" connotes that the banner

includes text as well as graphics.

**Independent Claim 7**

**Disputed claim term:  "fourth node"**

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| "a node that is owned and operated by an entity that is independent from the entity(s) that own and operate the first, second, and third nodes, and that performs the function of a third party accounting and statistical service." | "a node owned and operated independently from the first, second and third nodes, and that performs the function of an unbiased third party accounting and statistical service." |

Independent Claim 7 recites a method for third party accounting on a network that

comprises a plurality of "nodes".  The specification teaches that the term "nodes" as

recited in Claim 7 is broader than the term "Web site" disclosed in independent Claim 1.

*See, e.g.,* Ex. A, Col. 6, lines 11-19.  The "fourth node" in independent Claim 7

represents the third party accounting and statistical service.

In addition to reciting the "fourth node", independent Claim 7 recites the terms

"first node" (first publisher's node), "second node" (second publisher's node),  "third

node" (advertiser's node), "fifth node" (first user's node) and "sixth node" (second user's

node).  The parties agree that these terms are to be construed as indicating that each of

these nodes is different from the others, and from the fourth node that is the third party

accounting and statistical service.  Ex. D, at 7.  The parties do not agree, however, to the

construction of the term "fourth node".

Plaintiffs submit that "fourth node" means "a node that is owned and operated by

an entity that is independent from the entity(s) that own and operate the first, second, and

third nodes, and that performs the function of a third party accounting and statistical

service."  Google proposes that "fourth node" means "a node owned and operated independently from the first, second and third nodes, and that performs the function of an unbiased third party accounting and statistical service."  Other than substituting "node" for "Web site", these competing constructions are the same as the parties' competing constructions for "fourth Web site" in independent Claim 1.  The issues relating to "fourth node" in independent Claim 7, therefore, are the same two issues relating to "fourth Web site" (as well as to "first Web site, second Web site, and third Web site") in independent Claim 1:  1) "owned and operated by an entity independent from the entity(s) that own and operate" the other three nodes, vs. "owned and operated independently" from the other three nodes, and 2) "that performs the function of a third party accounting and statistical service" vs. "that performs the function of an unbiased third party accounting and statistical service."

Plaintiffs assert that the same reasoning that favors their construction over Google's construction of "fourth Web site" also favors their construction of "fourth node".  Accordingly, to avoid undue repetition, in support of their construction for "fourth node" in this claim, Plaintiffs incorporate the same arguments they asserted in support of their construction for "fourth Web site", as well as for "first Web site, second Web site, and third Web site", in independent Claim 1.

**Independent Claim 9**

**Disputed claim term:** **"first Web site, second Web site, and third Web site"**

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| "The terms **first Web site, second Web site,** and **third Web site** indicate that each of these Web sites is different from the others, and that the entity(s) that own and operate these Web sites are independent from the entity that owns and operates the fourth Web site / third party accounting and statistical service." | "The terms **first Web site, second Web site,** and **third Web site** indicate that each of these Web sites is different from the others, and each must be owned and operated independently from the fourth Web site / unbiased third party accounting and statistical service." |

Independent Claim 9 recites a method that comprises the steps of receiving multiple URLs from multiple users' browsers, and in response, logging the receipt of those URLs and transmitting to the users' browsers additional URLs that are associated with an advertiser's Web site. Claim 9 recites the terms "first Web site" (first publisher's Web site), "second Web site" (advertiser's Web site) and "third Web site" (second publisher's Web site). The parties dispute the construction of these claim terms for purposes of Claim 9.[9]

Once again, the issues raised by the parties' competing constructions for this claim term in independent Claim 9 are the same as those raised by their competing constructions for the same claim term in independent Claim 1. In turn, they are the same issues raised by the parties' respective constructions for "fourth Web site" in independent Claim 1 and "fourth node" in independent Claim 7. As such, Plaintiffs incorporate their

---

[9] The only difference in the references to the first, second and third Web sites in the language of Claim 1 and Claim 9 is in the juxtaposition of "second Web site" and "third Web site" in Claim 9, i.e., Claim 1 refers to the "second Web site" as the second publisher's Web site and the "third Web site" as the advertiser's Web site, whereas Claim 9 refers to the "second Web site" as the advertiser's Web site and the "third Web site" as the second publisher's Web site. This juxtaposition, however, has no bearing on the parties' respective positions with respect to the construction of "first Web site, second Web site, and third Web site" in Claim 9.

prior arguments in support of their constructions for "fourth Web site" and "first Web site, second Web site, and third Web site" in independent Claim 1, and "fourth node" in independent Claim 7.

**Disputed claim term:** <u>**"transmitting, in response to the receipt of the first uniform resource locator, a second uniform resource locator to the first browser"**</u>

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| "The term **transmitting, in response to the receipt of the first uniform resource locator, a second uniform resource locator to the first browser** needs no construction, and if it is to be construed, should be construed as its 'plain and ordinary meaning.'" | "**transmitting, in response to the receipt of the first uniform resource locator, a second uniform resource locator to the first browser**: "transmitting as the response to the first browser's request that contains the first uniform resource locator, a second uniform resource locator to the first browser." |

In Claim 9, the parties also disagree as to the construction of the term "transmitting, in response to the receipt of the first uniform resource locator, a second uniform resource locator to the first browser." Plaintiffs assert that this term needs no construction and should be given its plain and ordinary meaning. Indeed, the claim language is unambiguous: a first URL is received from the first browser, and in response thereto, a second URL is transmitted to the first browser. It is equally unambiguous from the language reciting the transmitting step that the second URL is associated with the advertiser's Web site. Google, however, asserts a construction that, by providing that the transmitting of the second URL is "*the* response" to the receipt of the first URL, again would add a limitation to the claim language that finds no support in the intrinsic evidence.

To be clear, it would appear that Google does not dispute the meaning of the term "transmitting", since obviously, Google utilizes that term in its construction. Rather, the only dispute is whether transmitting the second URL to the user's browser is *the* response to the receipt of the first URL, excluding any intermediate steps.

There is nothing in the claim language itself, the specification, or the prosecution history that requires only a single redirect in response to the receipt of the first URL. "In response to" does not mean "*the* response to". Google would limit the scope of the claim even though it cannot point to any language in the specification that would constitute "words or expressions of manifest exclusion" or "explicit" disclaimers. *See Gillette Co. v. Energizer Holdings, Inc.,* 405 F.3d at 1374, and cases cited therein.

This issue is essentially the same as the issue relating to the disputed claim term "redirecting . . . to the third Web site in response to the receipt of the first uniform locator" in independent Claim 1. Therefore, Plaintiffs incorporate their argument and cited references relating to that claim term in further support of its position that nothing more than plain and ordinary meaning is required to construe this claim term in Claim 9.[10]

---

[10] Like its proposed construction for "redirecting . . . to the third Web site in response to the receipt of the first uniform resource locator" in independent Claim 1, Google's construction "transmitting, in response to the receipt of the first uniform resource locator, a second uniform resource locator to the first browser" also changes the claim language for this term from "the first uniform resource locator" to "the first browser's request containing the first uniform resource locator." *See* n. 6, *infra.* As before, there is no basis for changing the claim language in this way.

IV.   **CONCLUSION**

For all the reasons stated above, Plaintiffs respectfully submit that the claim terms in dispute in this matter should be construed in accordance with their proposed constructions over the constructions proposed by Google.

Respectfully submitted,

WEB TRACKING SOLUTIONS, INC., and
DANIEL WEXLER,

By their attorneys,

SIMMONS BROWDER GIANARIS ANGELIDES
& BARNERD LLC

Dated:  March 17, 2010          By:  /s/ Paul A. Lesko
                                     Paul A. Lesko (*pro hac vice*)
                                     Stephen C. Smith (*pro hac vice*)
                                     Jo Anna Pollock (*pro hac vice*)
                                     707 Berkshire Blvd.
                                     P.O. Box 521
                                     East Alton, IL 62024
                                     (618) 259-2222
                                     (618) 259-2251 – facsimile
                                     E-mail: plesko@simmonscooper.com

                                HANLY CONROY BIERSTEIN & SHERIDAN LLP

                                By:  /s/ Steven M. Hayes
                                     Steven M. Hayes
                                     Paul J. Hanly, Jr.
                                     Jayne Conroy
                                     112 Madison Ave.
                                     New York, NY 10016-7416
                                     (212) 784-6400 Telephone
                                     (212) 784-6420 Facsimile
                                     E-mail: shayes@hanlyconroy.com

ECKERT SEAMANS CHERIN & MELLOTT,
LLC

By: <u>/s/ Edward C. Flynn</u>
    Edward C. Flynn (*pro hac vice*)
    Paul D. Steinman (*pro hac vice*)
    600 Grant Street, 44th Floor
    Pittsburgh, PA 15219
    (412) 566-2063 Telephone
    (412) 566-6099 Facsimile
    E-mail: eflynn@eckertseamans.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2010, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the United States District Court for the Eastern District of New York's Local Rules, and/or the United States District Court for the Eastern District of New York's Local Rules on Electronic Service upon the following parties and participants:

Edward DeFranco
Patrick Curran
Aaron S. Kaufman
Thomas D. Pease
Alexander Rudis
QUINN EMANUEL URQUHART
   OLIVER & HEDGES, LLP
51 Madison Avenue
22nd Floor
New York, NY 10010
(212) 849-7000
(212) 849-7100 - facsimile
eddefranco@quinnemanuel.com
patrickcurran@quinnemanuel.com
aaronkaufman@quinnemanuel.com
thomaspease@quinnemanuel.com
alexanderrudis@quinnemanuel.com

*Attorneys for Google, Inc.*

By: /s/ Edward C. Flynn
    Edward C. Flynn (*pro hac vice*)
    ECKERT SEAMANS CHERIN &
    MELLOTT, LLC
    600 Grant Street, 44th Floor
    Pittsburgh, PA 15219
    (412) 566-2063 Telephone
    (412) 566-6099 Facsimile
    E-mail: eflynn@eckertseamans.com

    *Attorneys for Web Tracking*
    *Solutions, LLC and Daniel Wexler*