# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK
### BROOKLYN DIVISION

| | |
|---|---|
| WEB TRACKING SOLUTIONS, LLC. and DANIEL WEXLER, <br><br>        Plaintiffs/Counterclaim Defendants, <br><br> v. <br><br> GOOGLE, INC., <br><br>        Defendant/Counterclaim Plaintiff. | Case No. 1:08-cv-03139 (RRM) (RER) <br><br> REDACTED PUBLIC VERSION PORTIONS FILED UNDER SEAL |

## GOOGLE INC.'S OPENING BRIEF ON CLAIM CONSTRUCTION

Dated:  March 17, 2010

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     FACTUAL BACKGROUND ................................................................................3

    A.      The Parties To This Lawsuit ....................................................................3

    B.      The Asserted Patent .................................................................................4

        1.      The '409 Specification and Claims...............................................4

        2.      Mr. Wexler Specifically Amended His Claims During Prosecution
            to Require an Independent, Unbiased Third-Party Accounting
            Service..........................................................................................10

        3.      The '409 Patent Allegedly Discloses and Claims New Methods For
            Using Existing Technology – Not New Hardware or Software ...............13

    C.      The Accused Technology ........................................................................14

III.    THE LAW OF CLAIM CONSTRUCTION........................................................16

IV.     ARGUMENT – THE DISPUTED CLAIM TERMS .........................................17

    A.      "Fourth Web site" (Claim 1) / "Fourth Node" (Claim 7) .......................17

        1.      The '409 Specification Requires "Unbiased" Accounting Services..........18

        2.      To Overcome Prior Art, Mr. Wexler Told the Patent Office That
            His Claims Enable the Use of "Unbiased" Accounting Services .............19

        3.      Plaintiffs Disclaimed Accounting Services That Are Not
            Financially Independent of the Statistics They Collect ............................20

    B.      "First / Second / Third Web site" (Claims 1 and 9)...............................24

    C.      "The first uniform resource locator is obtained by the first user's Web
        browser from the first Web site" (Claim 1) .........................................25

        1.      Claim 1 Plainly Requires That the URL Come "From" the First
            Web Site......................................................................................26

        2.      The Browser Obtains the URL as Part of the Web Page
            Downloaded From the Publisher's Web Site.............................................27

3.      Mr. Wexler Narrowed Claim 1 During Prosecution to Require A URL Received From the Publisher's Web Site .........................................28

D.      "Redirecting … to the third Web site in response to the receipt of the first uniform resource locator" (Claim 1).....................................................................29

1.      The Patent Incorporates Network Protocols, Including Request – Response Pairings .....................................................................................29

2.      The Plain And Ordinary Meaning Does Not Trump The Specification ....................................................................................................31

E.      "Transmitting, in response to the receipt of the first uniform resource locator, a second uniform resource locator to the first browser" (Claim 9) ..........32

F.      "Banner" (Claims 2, 8, 11) ...............................................................................33

V.      CONCLUSION.....................................................................................................36

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*AK Steel Corp. v. Sollac and Ugine,*
344 F.3d 1234 (Fed. Cir. 2003).................................................................................40

*Angelo Mongiello's Children, LLC v. Pizza Hut, Inc.,*
70 F. Supp. 2d 196 (E.D.N.Y. 1999) ......................................................................30

*Bell Atl. Network Servs. Inc. v. Covad Commc'n Group, Inc.,*
262 F.3d 1258 (Fed. Cir. 2001) ..............................................................................27

*Bd. of Regents of the University of Texas Sys. v. BENQ et al.,*
533 F.3d 1362 (Fed. Cir. 2008)..........................................................................19, 25

*Chimie v. PPG Indus., Inc.,*
402 F.3d 1371 (Fed. Cir. 2005).........................................................................19, 25

*Computer Docking Station Corp. v. Dell, Inc.,*
519 F.3d 1366 (Fed. Cir. 2008)................................................................24, 25, 26, 36

*Ekchian v. Home Depot, Inc.,*
104 F.3d 1299 (Fed. Cir. 1997)..........................................................................20, 25

*Free Motion Fitness, Inc. v. Cybex Int'l,*
423 F.3d 1343 (Fed. Cir. 2005).................................................................................19

*Lydall Therman/Accustical, Inc. v. Federal-Mogul Corp.,*
344 Fed. Appx. 607 (Fed. Cir. 2009) .......................................................................24

*Markman v. Westview Instruments,*
52 F.3d 967 (Fed. Cir. 1996), aff'd, 517 U.S. 370 (1996)...................................3, 19

*Medrad, Inc. v. MRI Devices Corp.,*
401 F.3d 1313 (Fed. Cir. 2005)................................................................................36

*PC Connector Solutions LLC v. SmartDisk Corp.,*
406 F.3d 1359 (Fed. Cir. 2005)................................................................................38

*Phillips v. AWH Corp.,*
415 F.3d 1303 (Fed. Cir. 2005)..........................................................3, 19, 32, 36

*Pitney Bowes, Inc. v. Hewlett-Packard Co.,*
182 F.3d 1298 (Fed. Cir. 1999).................................................................................30

*SciMed Life Sys. v. Advanced Cardiovascular Sys., Inc.,*
242 F.3d 1337 (Fed. Cir. 2001).................................................................................26

*Southwall Techs., Inc. v. Cardinal IG Co.,*
54 F.3d 1570 (Fed. Cir. 1995)............................................................................19, 32

*Symantec Corp. v. Computer Assocs. Int'l, Inc.*,
   522 F.3d 1279 (Fed. Cir. 2008)................................................................................30

*TorPham, Inc. v. Ranbaxy Pharmaceuticals*,
   336 F.3d 1322 (Fed. Cir. 2003)..........................................................................25, 19

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
   503 F.3d 1295 (Fed. Cir. 2007)................................................................................26

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996)..................................................................................36

## NOTE ON CITATIONS

1.     The patent-in-suit, U.S. Patent 5,960,409 ("the '409 patent"), is attached to the Declaration of Edward J. DeFranco dated March 15, 2009 ("DeFranco Declaration") as Exhibit A.  References to the '409 patent are indicated by column and line number. A reference to "Ex. A, col. 3:15" means column 3, line 15 of the '409 patent.

2.     The cited portions of the prosecution history of the '409 patent are attached to the DeFranco Declaration as Exhibit B.  Citations to individual pages are indicated using document identification numbers (*e.g.*, WTS000093).

4.     Other exhibits are attached to the DeFranco Declaration as Exhibits C through F, and are referred to with the prefix "Ex. __."

5.     The full text of the asserted claims is attached to this brief at Appendix A.  The Parties' Joint Claim Construction Chart is attached at Appendix B.

In this patent case, Plaintiffs Web Tracking LLC ("Web Tracking") and Daniel Wexler ("Wexler") (collectively, "Plaintiffs") assert that defendant Google, Inc. ("Google") infringes U.S. Patent No. 5,960,409, entitled "Third-Party On-line Accounting System and Method Therefor."

## I.   INTRODUCTION

The '409 Patent claims a business method – one that uses a third-party accounting service to track "clicks" on Internet advertisements. According to the claims, advertisements appear on publishers' web sites (such as CNN.com), Internet users click on those advertisements, and those clicks are tracked and used for accounting purposes to determine how much compensation is paid by the advertiser to the publisher. The '409 Patent's specification and prosecution history admit that before the alleged invention, advertisers and publishers could track clicks. But given that these parties had a financial interest in the tracking figures, the patent explains that "a need presently exists for an <u>unbiased</u>, readily available source of statistical/accounting information for Internet advertisers and advertising publishers." (Ex. A, col. 2:31-35.) The patent allegedly provides a method for both advertisers and publishers to use a trusted and independent "third party accounting/statistic service" to track and log "clicks" on advertisements. (*Id.*)

The creation of an unbiased, independent third-party accounting web site, without any financial incentive to bias its statistics in favor of the publisher or the advertiser, was the alleged key point of novelty in the patent. Mr. Wexler set out to solve the problem of trust between publishers and advertisers: "because the amount of money paid by the advertiser to the publisher is dependent on the accounting statistics collected [by the publisher or advertiser], there is, or is perceived to be, the temptation by the one doing the accounting to bias the statistics in its favor." (Ex. B, WTS000070.) Thus, "advertisers don't completely trust publishers to be honest and publishers don't completely trust advertisers either." (*Id.*) Mr. Wexler's approach to this

problem was a third-party website "owned and operated by an independent entity -- one that is not associated with either the publisher or the advertiser." (*Id.*)  Separating the accounting service from the financial incentives of the publisher and the advertiser would eliminate the temptation to bias the number of "clicks" in either party's favor, resulting in statistics that both publishers and advertisers would perceive as "unbiased."  (Ex. A, col. 2:8, 2:32.)

Despite the plain disclosure in the patent specification and claims, as well as the statements Mr. Wexler made to the Patent Office in order to obtain his claims, Plaintiffs Web Tracking and Mr. Wexler now urge constructions of the disputed terms in the claims that would *not* require a statistical service owned and operated by an independent entity with no incentives to bias statistics in favor of publishers or advertisers.  This dispute centers on the parties' competing constructions for the terms "fourth Web site" (the third-party accounting site in claim 1) and "fourth node" (the same site in claim 7).  Plaintiffs also improperly advance constructions that eliminate the patent's separation of the publishing, advertising, and click-tracking functions.

Plaintiffs' constructions are plainly crafted in an effort to cover the Google products accused of infringement.  But Google is simply not a "third party" to the statistics it collects, nor does Google operate "independent" of publishers and advertisers.  Plaintiffs' claim constructions are designed to gloss over these core distinctions between Google's products and the system disclosed and claimed in the '409 Patent.

Google respectfully submits that because its constructions pay heed to the actual disclosures of the '409 Patent and the other relevant evidence, they should be adopted.

## II.  FACTUAL BACKGROUND

### A.  The Parties To This Lawsuit

Plaintiff Web Tracking is a patent holding company. ████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

Plaintiff Daniel Wexler is the sole named inventor on the '409 patent. ███████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████

████████████████████████████████████

Defendant Google was founded in 1998 and is a public company based in Mountain

View, California. Google's mission statement is "to organize the world's information and make

it universally accessible and useful." (*See* http://www.google.com/corporate/facts.html.)  Google

---

[1]  Acacia has repeatedly acquired patents, and created subsidiary patent holding
companies, for the purpose of suing Google. *Performance Pricing, Inc. v. Google Inc. et al.*, No.
2:2007-cv-00432 (E.D. Tex.) (filed Sept. 27, 2007); *IP Innovation LLC et al. v. Google, Inc.*, No.
2:2007-cv-00503 (E.D. Tex.) (filed Nov. 16, 2007); *WebMap Technologies LLC v. Google Inc.
et al.*, No. 2:2009-cv-00343 (E.D. Tex.) (filed Nov. 3, 2009).

revenue principally comes from its online advertising products.  For example, a Google group of products known generally as the "AdSense" products,  displays advertisements at various Internet locations, such as on publishers websites.  As a result of the revenues generated from its advertising products, Google also offers a variety of free services, including its search engine, email, and mapping products.  Plaintiffs apparently intend to assert that a subset of Google's AdSense products infringe the '409 patent, but they have not yet identified any specific products.

**B.      The Asserted Patent**

**1.      The '409 Specification and Claims**

The '409 Patent contains eleven claims: three independent claims (claims 1, 7 and 9), and eight dependent claims (dependent claims 2-6 depend from claim 1, claim 8 depends from claim 7, and claims 10 and 11 depend from claim 9).[2]  As described in more detail below, the asserted claims were significantly amended and narrowed by the patentee, Mr. Wexler, during the course of prosecution, in view of prior art rejections from the Patent Office.  Most of the disputed claim terms were added during prosecution to distinguish the claims over the prior art.[3]

The specification of the '409 patent discloses a method for using an independent third-party accounting service to track "clicks" on Internet advertisements.  The "Summary of the Invention" section states that "[a] system and method for providing on-line third party accounting and statistical information is disclosed."  (Ex. A, col. 2:38-39.)  It further states that

---

[2]  A trial on all eleven claims would unnecessarily burden the jury and the Court. Google has asked Plaintiffs to identify a reasonable number of asserted claims for trial, but they have not yet done so.  The parties agreed to further discuss this issue after claim construction.

[3]  Google has substantial invalidity defenses, and it does not concede that the patentee's statements regarding the scope of the prior art are accurate or that the claims are in fact valid over the prior art discussed during prosecution.  In addition, much of the prior art Google is relying on was not before the Patent Office during prosecution.  All of the art considered by the Patent Office was located by the Patent Office itself – Mr. Wexler and his patent attorney did not bring any art to the Patent Office's attention during prosecution.

"[a]ccording to the invention, a banner, displayed for the purpose of enticing a [user] to visit a [advertiser] Web site, is served to the user's Web browser by a [publisher]," and that this banner points to "the address of a third-party (accounting and statistical service)." (*Id.*, col. 2:40-46.)

The third-party accounting service "maintains a count" of how many times an ad displayed by particular publishers has been clicked on. (*Id.*, col. 2:46-51.) It keeps track of this information using a record of each publisher's "Web site address." (*Id.*)[4] The third-party accounting service then "redirects" the user's Web browser to the advertiser's Web site. (*Id.*, col. 2:51-56.) As the patent later explains, "[t]his method is transparent to the user; i.e., as far as the user is aware, the banner takes him directly to the advertiser's Web site." (*Id.*, col. 2:54-56.)

The patent's "Background of the Invention" section explains that the goal of Mr. Wexler's invention was to address the need for unbiased accounting statistics. As the specification explains, this need was created by the fees associated with online advertising:

> [A]dvertising for a banner is typically provided for a fee. The cost of advertising at [a publisher's] site may be based, for example, on the number of times the site displays the banner or on the number of times a user clicks on the banner linked to the advertiser Web site. . . . [I]f the fee for the advertising is based on the number of clicks on the banner, then both parties will want this statistic. . . . While it can be obtained from the advertiser, the publishing-site administrator would presumably *prefer receiving the relevant statistics from an unbiased source*. . . .
>
> In view of the value of such statistics, and the relative inconvenience in obtaining such information, *a need presently exists for an unbiased, readily available source of statistical/accounting information* for Internet advertisers and advertising publishers.

(*Id.*, col. 1:49-2:35 (emphases added).)

These independent, third-party accounting figures were the alleged point of novelty in Mr. Wexler's application. As the patent explains, Internet advertising was already well-known:

---

[4] A "Web site address" is also referred to as a "Uniform Resource Locator" or "URL." For example, http://www.google.com is the URL for Google's search engine.

"knowledge of the Internet, and its use, are ubiquitous," and "[b]usinesses have recognized the benefits of establishing a presence on the Internet." (*Id.*, col. 1:12-15.) The patent also acknowledges that the network protocols underlying the Internet were also already established and well-known. (*Id.* col. 3:11-22 ("Details concerning [Web pages, Web browsers, and Web servers], and the process of establishing communication links are known to those skilled in the art"); *id.* col. 5:14-23 (discussing HTTP server programs and redirect response messages).[5]) Finally, the patent explains that the number of "clicks" on a banner could already be recorded: "[t]he advertiser can obtain this information by interrogating an access log maintained by the advertiser Web site." (*Id.*, col. 2:12-14.) Mr. Wexler also admitted to the Patent Office that publishers could track "clicks" on the ads they displayed. (Ex. B, WTS000070-71.) The goal of the invention was to create an "unbiased" third-party accounting service to collect the same information advertisers and publishers could already collect themselves. (*Id.* col. 2:18-19, 2:33.)

Figure 1 of the patent illustrates the "prior art" configurations that Mr. Wexler purportedly improved upon (labels in yellow added by Google for ease of reference):

---

[5] The HTTP protocol, or "Hypertext Transfer Protocol," is a set of rules for sending and receiving information over the Internet. In the HTTP protocol, requests for information are identified using URLs (see note 6 above). For example, in the HTTP protocol the Web address http://www.google.com represents a request information from the Google search engine.

A "Web server" or "HTTP server program" is software configured to receive and respond to HTTP requests. A Web server could be configured to receive the Web address http://www.example.com and respond by sending back a Web page. As '409 Patent notes (col. 2:12-14.), Web servers automatically maintain a log of HTTP requests and their responses.



In this example, a user's web browser [3] connects to a publisher's web site [5] by sending a request to download information [11a]. The web site responds by sending information [11b] to the user's web browser [3]. The browser displays the information as a web page [7] including a banner advertisement [9]. (*Id.* col. 3:35-53.) If the user "clicks" on the ad, the link associated with the ad causes the user's browser to send a request [19a] to the advertiser's web site [17]. (*Id.*, col. 4:10-18.)

Figure 2 depicts the claimed method for inserting an additional party into the transaction:



Here, the publisher [5] edits the web page [7] and banner ad [9] to link to the third-party statistical service [13], rather than to the advertiser [17]. (Ex. A, col. 4:47-53 & Fig. 3.) The

user [3] receives those edited materials from the publisher's web site [5] as part of the information [11b] its browser downloads from the publisher. (*Id.*) If a user clicks on the advertisement, the link associated with that ad causes the user's browser to send a request [15a] to the third-party statistical service [13], rather than to the advertiser [17]. (*Id.* col. 4:37-53.) The statistical service receives the user's request [15a], logs that request (*i.e.*, tracks that click), and then sends the user's browser a response [15b] redirecting the browser to the advertiser's web site [17]. (*Id.*, col. 4:54-5:10.)

With respect to the claims themselves, independent claims 1, 7, and 9 each recite the same basic method for configuring multiple parties in an advertising transaction. Claim 1 is representative, and for the Court's convenience, Google has inserted in brackets an identification of the different entities referred to in the claim:[6]

> 1. A method for accounting, wherein a first publisher having a first Web site and a second publisher having a second Web site each publish advertising for an advertiser having a third Web site, the method comprising:
>
> (a)  receiving, at a fourth Web site [the accounting site], a first uniform resource locator from a first user's Web browser, wherein the first uniform resource locator is obtained by the first user's Web browser from the first Web site [a first publisher] and wherein the first uniform resource locator is associated with advertising for the advertiser;
>
> (b)  logging, at the fourth Web site [the accounting site], the receipt of the first uniform resource locator, in response to the receipt of the first uniform resource locator;
>
> (c)  redirecting, at the fourth Web site [the accounting site], the first user's Web browser to the third Web site [the advertising site] in response to the receipt of the first uniform resource locator;
>
> (d)  receiving, at the fourth Web site [the accounting site], a second uniform resource locator from a second user's Web browser, wherein the second uniform resource

---

[6]  The asserted claims are reproduced in full in Appendix A. In that Appendix, and throughout this brief, letters are added to the clauses of Claims 1, 7, and 9 for convenience.

locator is obtained by the second user's Web browser from the second Web site [a second publisher] and wherein the second uniform resource locator is associated with advertising for the advertiser;

(e)     logging, at the fourth Web site [the accounting site], the receipt of the second uniform resource locator, in response to receiving the second uniform resource locator; and

(f)     redirecting, at the fourth Web site [the accounting site], the second user's Web browser to the third Web site [the advertiser's site] in response to the receipt of the second uniform resource locator.

As claim 1 shows, the invention requires a specific division of publishing, advertising, and accounting functions.  The two publishers are called the "first" and the "second Web site"; the two users are represented by the "first user's Web browser" and "second user's Web browser"; the advertiser is the "third Web site"; and the accounting service is the "fourth Web site."  To reflect that multiple parties participate, the claims repeat the same operation twice.  The first group – steps 1(a), (b), and (c) – recite the steps performed with a first publisher and a first user, and the second group – steps 1(d), (e), and (f) – reiterate the same steps for a second publisher and second user.

In claim 7, Mr. Wexler used the word "node".  The two publishers are called the "first" and "second node"; the two users are the "fifth" and "sixth node"; the advertiser is the "third node"; and the accounting service is called the "fourth node."   As in claim 1, the steps of the method are repeated to reflect a first publisher (steps 7(a), 7(b), and 7(c)) and a second publisher (steps 7(d), 7(e), and 7(f)). (Ex. A, col. 7:12-34.)

In claim 9, the two publishers are called the "first Web site" and "third Web site"; the two users are called the "first browser" and "second browser"; the advertiser is called the "second Web site"; and the claim recites the interplay of these parties with the accounting service.  Again, the claims repeat steps for the first publisher (claims 9(a), 9(b), and 9(c)) and the second publisher (claims 9(d), 9(e), and 9(f)). (Ex. A, col. 8:6-19.)

### 2.   Mr. Wexler Specifically Amended His Claims During Prosecution to Require an Independent, Unbiased Third-Party Accounting Service

Mr. Wexler significantly amended and narrowed his patent claims during the course of prosecution. As explained more fully below, the prosecution history consists of the original application, two Office Actions from the Patent Office Examiner, one in-person interview with the Examiner, and two Amendments in response to the Office Actions and interview. In the two Office Actions, the Patent Office rejected the claims as "clearly anticipated" by several prior art references. In response to each of these rejections, Mr. Wexler made narrowing amendments to his claims, and also argued that his claims were different from the prior art because they required "an <u>independent</u> accounting Web site" (Ex. B, WTS000052, WTS000071 (emphasis in original).) He repeatedly and unequivocally stressed that his claims were directed to a problem that the prior art did not solve: the use of an accounting site that is "owned and operated by an independent entity – one that is not associated with the publisher or the advertiser." (*Id.*, 51, 70.) In fact, he twice analogized his alleged invention to the Neilson rating system used in television: "[i]n the same way that television advertising needed an independent entity to tally ratings, the Internet needs an independent entity to account for the referrals from publishers to advertisers." (*Id.*) These repeated statements illustrate the nature and limits of Mr. Wexler's claims.

*Application and first rejection.* Mr. Wexler filed his patent application in the U.S. Patent Office on October 11, 1996. (Ex. B, WTS000006.) As originally filed, the application contained nine claims. In an Office Action dated July 13, 1998, the Patent Office rejected all 9 claims as "clearly anticipated by any single one" of three prior art references. (*Id.*, WTS00040.) The Patent Office Examiner found that each reference disclosed using a "third-party" to collect accounting data and then redirecting the user to the advertisement they originally clicked on:

> Each of the references discloses a third-party which logs specific data concerning the path which a user took to get to that location, and a redirection operation

which sends the user to their preferred location based on the advertisement which they "clicked" in the first place.

(*Id.*)

***First amendment***.  To overcome this rejection, Mr. Wexler amended his claims in an Amendment dated November 18, 1998.  In the remarks to the Amendment, Mr. Wexler explained that his claims had been amended "to clarify the distinction between the present invention and the prior art."  (*Id.* WTS000050.)  Mr. Wexler identified several distinctions between the prior art and "the present invention, as recited in the claims."  (*Id.* , WTS000051.) For example, Mr. Wexler noted that the amended claims recited a specific "interplay" between six parties (one advertiser, one accounting service, two publishers, and two users), and argued that this interplay "is neither taught nor suggested by" the prior art.  (*Id.*)

Mr. Wexler also emphasized that his invention also "enables the accounting site to be owned and operated by an independent entity – one that is not associated with either the publisher or the advertiser."  (*Id.*)  In the prior art, according to Mr. Wexler, "the accounting is performed by either the publisher or by the advertiser."  The invention recited in the claims would, unlike the prior art, address the need for third-party accounting services:

> Second, the present invention enables the accounting site to be owned and operated by an independent entity – one that is not associated with either the publisher or the advertiser. A disadvantage with Internet accounting systems in the prior art is that the accounting is performed by either the publisher or by the advertiser.  And *because the amount of money paid by the advertiser to the publisher is dependent on the accounting statistics collected, there is, or is perceived to be, the temptation by the one doing the accounting to bias the statistics in its favor*. In other words, advertisers don't completely trust publishers to be honest and publishers don't completely trust advertisers either.

> The situation is analogous to that in television advertising. *Because television advertising fees are based on ratings, television stations don't trust advertisers to tally the ratings and advertisers don't trust television stations*.  Therefore, the need existed for <u>an independent entity</u> to tally television ratings, which has been filled by the well-known A.C. Nielson Company.

> In the same way that television advertising needed an independent entity to tally ratings, the Internet needs an independent entity to account for the referrals from publishers to advertisers. The present invention enables that independent entity.

(*Id.*, WTS000051-52, underline in original; italics added). Thus, Mr. Wexler asserted that "because the independent claims, claims 1, 7, and 9, recite the interplay between <u>multiple publishers</u>, an advertiser, and an <u>independent</u> accounting web site . . . the claims, as amended, overcome the rejection and are now allowable." (*Id.*, WTS000052. )

*Second rejection*.  On February 9, 1999, the Examiner again rejected the claims.  The rejection cited additional prior art references that disclosed "a third-party which logs specific data concerning the path which a user took to get to that location, and a redirection operation which sends the user to their preferred location based on the advertisement which they 'clicked' in the first place." (*Id.*, WTS000059.)  Moreover, the Examiner rejected Mr. Wexler's assertion that the prior art did not enable independent accounting services, or that the claims as drafted reflected such a service.  (*Id.*)

*In-person meeting and second amendment*.  On April 29, 1999, Mr. Wexler and his attorney met with the Examiner at the Patent Office to object to the Examiner's characterization of the claims and the prior art.  (*Id.*, WTS000062.)  One week later, on May 3, 1999, the applicant submitted a second amendment and "remarks which summarize the discussion at the interview." (*Id.*, WTS000068.)  Those remarks show Mr. Wexler argued for allowance by repeating and emphasizing the exact same argument cited above: he argued that his claims were in fact allowable because his alleged invention "enables the accounting site to be owned and operated by an independent entity – one that is not associated with either the publisher or the advertiser." (*Id.*, WTS000070.)

Again, Mr. Wexler stressed that the prior art did not address the divergent financial incentives of the publisher and advertiser: "A disadvantage with Internet accounting systems in the prior art is that the accounting is performed by either the publisher or by the advertiser. And *because the amount of money paid by the advertiser to the publisher is dependent on the accounting statistics collected, there is, or is perceived to be, the temptation by the one doing the accounting to bias the statistics in its favor*." (*Id.*, WTS000070 (emphasis added).) Mr. Wexler again analogized the problem to television advertising: "*Because television advertising fees are based on ratings, television stations don't trust advertisers to tally the ratings and advertisers don't trust television stations.*" (*Id.* (emphasis added).) And again, Mr. Wexler asserted that his claims recited a solution to this problem not found in the prior art: "In the same way that television advertising needed an independent entity to tally ratings, the Internet needs an independent entity to account for the referrals from publishers to advertisers. The present invention enables that independent entity." (*Id.*.) Mr. Wexler's remarks closed by stressing that, notwithstanding the Examiner's statements in the prior rejection, these characteristics of the invention were in fact present in his claims: "claims 1, 7 and 9, recite the interplay between four sites: <u>multiple publishers' sites</u>, <u>an advertiser's site</u>, and an <u>independent</u> accounting site." (*Id.*, WTS000071 (emphases in original)).

*Allowance*. Following the meeting and the second amendment, the Patent Office allowed the applicant's claims. The patent issued on September 28, 1999. (*Id.*, WTS000006.)

### 3.    The '409 Patent Allegedly Discloses and Claims New Methods For Using Existing Technology – Not New Hardware or Software

Notably, the '409 Patent purported to disclose a novel business purpose for *existing* technologies; it did *not* purport to disclose any *new* technology. For example, Mr. Wexler did not invent the Internet. When the application was filed in October 1996 "knowledge of the

Internet, and its use, [were] ubiquitous," and "details concerning [servers and browsers] and software, and the process of establishing communication links [on the Internet] [we]re known to those skilled in the Art." Ex. A, 1:12-13, 3:15-21.  Mr. Wexler did not invent online advertising. When the application was filed in October 1996 "many frequently-visited Web sites" were already publishing advertising online. *Id.* 1:45.  Mr. Wexler did not invent the first method for tracking clicks on Internet advertisements.  When the application was filed in October 1996 both advertisers and publishers could, and already were, tracking clicks on ads.  *Id.* 2:11-14 (in the prior art, "the number of clicks on the banner" "can be obtained . . . by interrogating an access log maintained by the advertiser Web site"); Ex. B, WTS000070-71 (acknowledging that publishers could track clicks on advertisements using well-known HTTP redirect methods).

Thus, the essential *technical* elements of the claimed method existed long before the patent was filed.  The purported inventive step was using these existing technologies to split the publishing, advertising, and accounting functions between multiple parties in a specific way, so that the resulting statistics could not be perceived as biased.  (*See* Ex. B, WTS000069-71.)

Plaintiffs constructions that eliminate this aspect of the invention not only depart from the text of the claims and the prosecution history; they ignores the nature of the claimed methods and the very advantages over the prior art that were touted in order to secure the claims that issued.

## C.   The Accused Technology

Plaintiffs' proposed constructions are improperly crafted to cover the Google products accused of infringement.  But Google simply does not use a third-party tracking service.  Google itself tracks and reports clicks on ads that Google itself selects for publication and displays to end-users, and Google itself charges advertisers for "clicks" on those advertisements.

Specifically, Plaintiffs assert that certain of Google's "AdSense" products infringe the '409 Patent claims.  "AdSense" is a program whereby Google contracts with web site publishers

(such as CNN.com) for the right to display ads to Internet viewers visiting those web sites. Google contracts with advertisers, deploys its proprietary algorithms to select the best ads to display on a given publisher's site, and then serves those ads directly to users who visit the publisher's site.  Google bills advertisers directly for the display of their ads, and Google books that income as revenue.  Publishers are paid directly by Google (typically a percentage of the revenue generated by their site).

Google's AdSense revenues are typically "pay-per-click" revenues.  When a user clicks on an ad Google selected for display, Google charges the advertiser for that click.  Google then shares a percentage of that revenue with the publisher of the website where the ad appeared. Thus, Google and the website publisher have the same financial incentive – to show ads that will be "clicked" by users, leading to revenues for Google and the publisher.[7]

Google tracks clicks on all the ads it serves.  It uses its own tracking statistics to invoice advertisers and pay publishers.  Because Google's own numbers are used to bill advertisers and pay publishers, Google's revenues are tied directly to its own accounting statistics.

Google devotes significant resources to its click-tracking efforts and strives to ensure that its invoices are accurate.  But some advertisers are skeptical of how Google handles click fraud. In fact, Google has on occasion been sued by advertisers claiming Google charged them for too many "clicks," because high click volumes work to Google's financial benefit.[8]  Google believes

---

[7]  *See* https://www.google.com/adsense/support/bin/answer.py?answer=32725.  Google also serves some ads on a "cost per impression" basis where advertisers are charged each time an ad is displayed.  For these ads, Google tracks how many times an ad has been displayed, as well as where the ad has been displayed, and uses its own statistics to bill advertisers and pay publishers. *See* https://www.google.com/adsense/support/bin/answer.py?answer=18196.

[8]  *See Click Defense Inc. et al. v. Google, Inc.*, No. 05-CV-20579 (C.D. Cal.), Complaint ¶ 34 ("Google has an inherent conflict of interest in preventing click fraud since it derives the same amount of income from each fraudulent click as it does from each legitimate click.");

that its click-tracking methods are appropriate, and a special master agreed.  (*See* Ex. E, Report

of Alexander Tuzhilin: *Lane's Gifts v. Google*, at 1.)  But the lawsuits illustrate that Google does

not use the '409 Patent to establish a third-party accounting service with no financial incentives

tied to its "click" statistics.  Indeed, the special master's report acknowledged that Google does

the opposite – it maintains a financial incentive in the number of "clicks" it records.  *See* Ex. E at

29-30 ("Since Google does not charge advertisers for invalid clicks, this means that it loses

money by filtering out these clicks.  Thus, *there is a financial incentive* for Google not to forgo

some of these revenues and simply be 'easy' on filtering out invalid clicks.") (emphasis added).

## III.   THE LAW OF CLAIM CONSTRUCTION

Claim construction is an issue of law.  *Markman v. Westview Instruments,* 52 F.3d 967,

978 (Fed. Cir. 1996) (en banc), *aff'd,* 517 U.S. 370 (1996).  The Federal Circuit explained the

claim construction process at length in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005)

(*en banc*).  For example, *Phillips* recognized that courts should "consider the patent's

prosecution history," which "inform[s] the meaning of the claim[s] by demonstrating how the

inventor understood the invention" and aids the court in excluding "any interpretation that was

disclaimed during prosecution."  *Id.* (quote omitted).  Another claim construction principle worth

noting here is that the Federal Circuit has cautioned that "any reliance on dictionaries [must]

accord[] with the intrinsic evidence: the claims themselves, the specification, and the prosecution

history."  *Free Motion Fitness, Inc. v. Cybex Int'l*, 423 F.3d 1343, 1348 (Fed. Cir. 2005).

---

*Lane's Gifts and Collectibles, L.L.C. et al. v. Google Inc. et al.*, No. CV-2005-52-1 (Arkansas
Circuit Court, Miller County), Second Amended Complaint ¶¶ 4, 47-49 (alleging that Google
"collected revenue for [pay-per-click] advertising from Plaintiffs . . . which was not generated by
actual consumer click through advertising," as part of an "industry wide conspiracy" to conceal
the number of fraudulent clicks on Internet advertisements).

In addition, the Federal Circuit has emphasized that "[c]laims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995). Thus, the prosecution history deserves "substantial weight in construing a term where that term was added by amendment." *Bd. of Regents of the University of Texas Sys. v. BENQ et al.,* 533 F.3d 1362, 1369 (Fed. Cir. 2008); *see also TorPham, Inc. v. Ranbaxy Pharmaceuticals*, 336 F.3d 1322, 1329 (Fed. Cir. 2003) (patentee may not "adopt a position contradictory to that adopted before the PTO and expect to be believed"). Where a patentee characterizes claims during prosecution to distinguish them from invalidating prior art, the patentee cannot later assert that the claims have a broader meaning. *See, e.g., Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1385 (Fed. Cir. 2005) (where patentee "was required to distinguish . . . claims from [cited prior art] and it did so by focusing on [aspects of the invention]," it was "evident that [the patentee] disclaimed products" lacking those aspects); *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997) ("[B]y distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover.").

## IV.   ARGUMENT – THE DISPUTED CLAIM TERMS

The parties have agreed on the construction for many of the terms in the claims of the '409 patent, and terms that remain in dispute are addressed below in Sections A-F.

### A.   "Fourth Web site" (Claim 1) / "Fourth Node" (Claim 7)

The parties agree that the "fourth Web site" in claim 1 and the "fourth node" in claim 7 each represent the third-party accounting service. The parties also agree this service must be "independent" of the publisher and the advertiser. The parties' dispute regarding these terms concerns *how* independent the accounting service must be.

| Google's Construction | Plaintiffs' Construction |
|---|---|
| **Fourth Web site**: A Web site owned and operated independently from the first, second and third Web sites, and that performs the function of an unbiased third party accounting and statistical service. | **Fourth Web site**: A collection of resources (for example, content, accounting services, logging services, etc.) that is owned and operated by an entity that is independent from the entity(s) that own and operate the first, second and third Web sites, and that performs the function of a third party accounting and statistical service. |
| **Fourth node**: A node owned and operated independently from the first, second and third nodes, and that performs the function of an unbiased third party accounting and statistical service. | **Fourth node**: A node that is owned and operated by an entity that is independent from the entity(s) that own and operate the first, second, and third nodes, and that performs the function of a third party accounting and statistical service. |

Google maintains that the accounting service must operate independently of the publisher and advertiser, with no incentive to bias its statistics in either party's favor. Plaintiffs apparently contend that the legal ownership of these websites or nodes is the only issue that matters – and thus two websites owned by two legal entities are "independent" even if there is an incentive for the accounting service to bias its statistics in favor of the publisher or advertiser.

### 1.       The '409 Specification Requires "Unbiased" Accounting Services

Prior to the claimed invention, click-tracking methods were already being used by publishers and advertisers. (Ex. A, 2:7-10.) This was particularly true when "the fee for the advertising [wa]s based on the number of clicks on the banner." (*Id.* 2:10-11.) In those circumstances, although the parties could track performance themselves, they "would presumably prefer receiving the relevant statistics from an *unbiased* source," rather than from a party with a financial interest in the statistics. (*Id.* 2:17-18 (emphasis added).)

The patent purports to solve this problem. It describes a method for configuring parties to interact with a third-party "accounting and statistical service" (*id.* 2:44-45), that will "accumulate and tabulate . . . the number of clicks on the advertiser's banner." (*Id.* 2:57-61.)

The specification claims that this method creates "an *unbiased*, readily available source of statistical/accounting information for Internet advertisers and advertising publishers." (*Id.* 2:33-35 (emphasis added).)  Google's construction mirrors this requirement in the specification: the fourth Web site acts as an unbiased third-party accounting and statistical service.

### 2. To Overcome Prior Art, Mr. Wexler Told the Patent Office That His Claims Enable the Use of "Unbiased" Accounting Services

In several responses to rejections by the Patent Office, the patentee represented that his invention was "an <u>independent</u> accounting site." (Ex. B., WTS000071 (emphasis in original).) This accounting site did not share the same financial incentives as the advertiser or publisher, and as a result, ostensibly solved problems seen in the prior art:

> A disadvantage with Internet accounting systems in the prior art is that the accounting is performed by either the publisher or by the advertiser.  And ***because the amount of money paid by the advertiser to the publisher is dependent on the accounting statistics collected, there is, or is perceived to be, the temptation by the one doing the accounting to bias the statistics in its favor***.  In other words, advertisers don't completely trust publishers to be honest and publishers don't completely trust advertisers either.

(*Id.* WTS000070 (emphasis added).)  In attempting to argue how the claimed methods were different than the prior art, the applicant used the example of television ratings:

> The situation is analogous to that in television advertising.  ***Because television advertising fees are based on ratings, television stations don't trust advertisers to tally the ratings and advertisers don't trust television stations***.  Therefore, the need existed for <u>an independent entity</u> to tally television ratings, which has been filled by the well-known A.C. Nielson Company.
>
> In the same way that television advertising needed an independent entity to tally ratings, the Internet needs an independent entity to account for the referrals from publishers to advertisers.  The present invention enables that independent entity.

(*Id.* (underline in original; bold and italics added)).)

Google's construction mirrors these statements to the Patent Office.  The patented methods require an independent accounting service, whose statistics are not tainted by a

"perceived . . . temptation . . . to bias the statistics in its favor." (*Id.*)  This means the accounting service is a true "third party" to the transaction, with no incentive to increase or decrease the number of "clicks" it records.  Plaintiffs' construction simply disregards this aspect of the claims. It would cover precisely the type of system Mr. Wexler argued was already present in the prior art – *i.e.*, a system where "the amount of money paid by the advertiser to the [system] is dependent on the accounting statistics collected, [such that] there is, or is perceived to be, a temptation by the one doing the accounting to bias the statistics in its favor." (*Id.*)

### 3.   Plaintiffs Disclaimed Accounting Services That Are Not Financially Independent of the Statistics They Collect

Plaintiffs concede that the accounting service must be owned by an entity "independent" from the other Web sites.  But Plaintiffs fail to explain what, exactly, an "independent" service entails.  For example, Plaintiffs omit any requirement that the accounting services be paid independently of its tracking statistics, such that the accounting service is financially independent and has no incentive to bias the statistics in favor of the advertiser or publisher.

These omissions are designed to broaden the claims, so that they cover accounting services that are not independent from the publisher and advertiser in the method required by the patented method – including accounting services that are separately *owned* but have the same *financial incentives* as either the publisher or the advertiser.  For example, Plaintiffs' construction would cover an accounting Web site that shared a publisher's profits from pay-per-click ads.  This accounting service would increase its revenues every time it counted an additional "click."  Thus, the accounting service would not use the method claimed in the '409 patent to ensure that its click-tracking statistics were trusted by the publisher or the advertiser;

the service would have the same financial incentives as the publisher, and would (or would apparently) have an incentive to bias the statistics in the publisher's favor.[9]

The specification and prosecution show that the patentee did not claim to invent accounting services that share the financial incentives of the publisher or advertiser. The specification states that the patent satisfies the "need . . . for an *unbiased*, readily available source of statistical/accounting information." (Ex. A, 2:31-34 (emphasis added).) Likewise, in prosecution the patentee **disclaimed** such an accounting service at least **three times** – in the November 1998 narrowing amendment, the April 1999 meeting, and the May 1999 narrowing amendment. On each occasion the applicant told the Patent Office that "the present invention" had "characteristics that give it advantages over the prior art." (Ex. B, WTS000069.) One of these "advantages" was operation "by an independent entity," which addressed "[a] disadvantage with Internet accounting systems in the prior art" where "***there is, or is perceived to be, the temptation by the one doing the accounting to bias the statistics in its favor***." (*Id.* WTS000070 (emphasis added).) The applicant repeatedly claimed his application should be granted because the invention would solve problems created when "***the amount of money paid . . . is dependent on the accounting statistics collected***." (*Id.* (emphasis added).)

A patentee is not allowed to play "bait-and-switch" with the patent office and the public; "[c]laims should not be construed one way in order to obtain their allowance and in a different way against accused infringers." *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366,

---

[9]   This does not mean that the accounting service could not overcome a perception of potential bias, but doing so would require measures not described in the '409 patent.

1374 (Fed. Cir. 2008) (quote and citation omitted).[10]  Where a patentee distinguishes claims from

invalidating prior art by pointing to specific supposed "advantage[s]" of the claims, the patentee

disclaims later interpretations of the claims that do not include those supposed advantages. *See,

e.g., Chimie*, 402 F.3d at 1385; *Ekchian* , 104 F.3d at 1304 ("[B]y distinguishing the claimed

invention over the prior art, an applicant is indicating what the claims do not cover.").

     *Computer Docking Station* is illustrative.  There the Federal Circuit construed the claim

term "portable computer" as "a computer *without a built-in display or keyboard* that is capable

of being moved or carried about," because statements in the prosecution history "clearly and

unambiguously disavowed computers with built-in-displays and keyboards – that is, laptops." *Id.*

at 1375-76.  In responses to the Patent Office, the applicants "contrasted the advantages of their

invention with the limitations of [a prior art] laptop." *Id.* at 1376.  The applicants "emphasized"

those differences in an effort to overcome a rejection over prior art laptops. *Id.*  The Federal

Circuit explained that claims can be narrowed by statements made during prosecution, including

statements "clearly characterizing the invention in a way to try to overcome rejections based on

prior art." *Id.* at 1374.  On that basis, it concluded that "the sum of the patentees' statements

during prosecution would lead a competitor to believe that the patentee had disavowed coverage

of laptops," creating a disclaimer. *Id.* at 1379.  Although plaintiffs noted that they "distinguished

their invention from the prior art in multiple ways," and not solely through emphasizing

advantages over laptops, the disclaimer was still appropriate because the statements addressing

laptops were clear. *Id.* at 1377-78 ("a disavowal, if clear and unambiguous, can lie in a single

distinction" included among multiple distinctions).

---

    [10]  *See also BENQ,* 533 F.3d at 1369 (prosecution history deserves "substantial weight in
construing a term where that term was added by amendment"); *TorPham*, 336 F.3d at 1329 (patentee
may not "adopt a position contradictory to that adopted before the PTO and expect to be believed").

Mr. Wexler similarly characterized his alleged invention to overcome rejections over prior art. He offered that characterization to point out features that distinguished his alleged invention and the prior art. (Ex. B, WTS000070 ("A disadvantage with Internet accounting systems in the prior art is that the accounting is performed by either the publisher or by the advertiser. And *because the amount of money paid by the advertiser to the publisher is dependent on the accounting statistics collected, there is, or is perceived to be, the temptation by the one doing the accounting to bias the statistics in its favor*.").)  Mr. Wexler's statements are clear, and they create a disclaimer. Mr. Wexler cannot escape those statements by now asserting that the alleged key point of novelty is optional. (*Id.*, WTS000068-71 (requesting "reconsideration" of Examiner's rejection because "claims 1, 7, and 9 recite [interactions with] . . . an independent accounting Web site" such that "the claims, as amended, overcome the rejection and are now allowable") (emphasis in original).)

Mr. Wexler's repeated statements equating "the present invention" to an independent accounting service further support Google's construction. "When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007).  Mr. Wexler repeatedly and consistently stated that the "present invention" was as an independent accounting Web site. (Ex. B, WTS000051-52, WTS000070-71.)  By repeatedly and consistently characterizing the "present invention" as an "independent," "unbiased" "third-party" accounting service with financial incentives that differed from the publisher and advertiser, Mr. Wexler defined his accounting service – represented either as the "fourth Web site" or "fourth node" – by implication. Indeed, in his recent deposition Mr. Wexler reaffirmed that his claims recite an

independent, third-party accounting service.[11]  Plaintiffs cannot alter the nature of the alleged

invention to further their litigation objectives and broaden the '409 Patent's claims.[12]

**B.**  **"First / Second / Third Web site" (Claims 1 and 9)**

The parties agree that the steps in claims 1 and 9 are recited from the perspective of the third-

party accounting service that must be "independent" of the first, second, and third Web sites.  But as

with the terms "fourth Web site" and "fourth node," the parties' dispute turns on how "independent"

the accounting service must be.

| Google's Construction | Plaintiffs' Construction |
|---|---|
| The terms first Web site, second Web site, and third Web site indicate that each of these Web sites is different from the others, and each must be owned and operated independently from the fourth Web site / unbiased third party accounting and statistical service. | The terms first Web site, second Web site, and third Web site indicate that each of these Web sites is different from the others, and that the entity(s) that own and operate these Web sites are independent from the entity that owns and operates the fourth Web site / third party accounting and statistical service. |

---

[11]

[12]   *See Honeywell Intern., Inc. v. ITT Industries, Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (construing a term to include fuel filter because "[o]n at least four occasions, the written description refers to the fuel filter as 'this invention' or 'the present invention'"); *SciMed Life Sys. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001) ("[T]he characterization of the coaxial configuration as part of the 'present invention' is strong evidence that the claims should not be read to encompass the opposite structure."); *Lydall Therman/Accustical, Inc. v. Federal-Mogul Corp.*, 344 Fed. Appx. 607, 612 (Fed. Cir. 2009) ("Lydall's consistent description 'the present invention' as including a three-layered batt makes clear that the claimed 'fibrous batt of fibers' must have three layers"); *see also Bell Atl. Network Servs. Inc. v. Covad Commc'n Group, Inc.*, 262 F.3d 1258, 1268, 1271 (Fed. Cir. 2001) (courts must "examine the prosecution history to determine whether the patentee has relinquished a potential claim construction in an amendment to the claim or in an argument to overcome or distinguish a reference," and "when a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication'").

The points made above in Section IV.A regarding the unbiased third-party accounting service all apply to this dispute.  The third-party service must provide the independent accounting services Mr. Wexler described in his patent and in his statements to the Patent Office (*See, e.g.*, Ex. B, WTS000070-71 (representing that "claims 1, 7 and 9, recite . . . an <u>independent</u> accounting site" that offers advantages over prior art accounting systems) (emphases in original).)  For all the reasons discussed in Section IV.A, the methods of claim 9 requires more than ownership by two legally distinct entities.  Claim 9 is limited to an accounting service that fills the "need . . . for an unbiased, readily available source of statistical/accounting information." (Ex. A, col. 2:31-34.)

### C.   "The first uniform resource locator is obtained by the first user's Web browser from the first Web site" (Claim 1)

The parties agree that the "first Web site" in claim 1 is the first publisher's Web site.[13] The parties also agree that the "first uniform resource locator" in claim 1 is the target address of the advertisement – *i.e.*, the Web browser's destination following a "click" on the ad displayed by the publisher.  The parties' dispute turns on how the Web browser obtains this target address.

| Google's Construction | Plaintiffs' Construction |
|---|---|
| The first uniform resource locator is part of the Web page generated by the first Web site and downloaded from the first Web site to the first user's Web browser. | The first uniform resource locator is acquired as a result of interaction between the first user's Web browser and the first Web site (for example, as a result of downloading a Web page from the first Web site or as a result of clicking on a link or an advertisement on the first publisher's Web page as displayed in the first user's browser). |

---

[13]   As noted in Part I.A, the asserted claims each require at least two publishers and two users, and the patent refers to two "uniform resource locators," or "URLs," that are used to distinguish between clicks that originate from the first publisher and from the second publisher. Disputed constructions for the second publisher, user, and uniform resource locator are identical to those involving the first publisher, first user, and first uniform resource locator, and therefore are not discussed separately by the parties.

Google contends that the first uniform resource locator is obtained from the first Web site, as part of the Web page the user downloads from the publisher. Plaintiffs contend that the first uniform resource locator can be obtained from anywhere, including Web sites other than the first Web site, so long as the Web browser obtains the uniform resource locator "as a result" of some earlier "interaction" between the user's Web browser and the publisher's Web site.

### 1. Claim 1 Plainly Requires That the URL Come "From" the First Web Site

The "starting point for any claim construction must be the claims themselves." *Pitney Bowes, Inc. v. Hewlett-Packard Co.,* 182 F.3d 1298, 1305 (Fed. Cir. 1999). The language of Claim 1 clearly states where the first URL comes from – the browser obtains that URL "from the first Web site." Google's construction is consistent with the claim language, requiring that the URL is "downloaded from the first Web site."

Plaintiffs' construction ignores the claim language. It disregards *where* the URL comes from and focuses on *why* it was obtained. This is impermissible; where the intrinsic evidence does not "reveal any special definition for the terms," a court "must construe [those] terms according to their ordinary meaning." *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1291 (Fed. Cir. 2008); *Angelo Mongiello's Children, LLC v. Pizza Hut, Inc.*, 70 F.Supp.2d 196, 203 (E.D.N.Y. 1999) ("Where the plain import of the language is clear [from a review of text, specification, and prosecution history], the court will not engage in speculative interpretation."). Nothing suggests that "from" does not mean "from" in this patent. To the contrary – as shown below, the specification accords with that term's ordinary meaning.

2.    **The Browser Obtains the URL as Part of the Web Page Downloaded From the Publisher's Web Site**

The specification explains in detail how the browser obtains the first URL: the browser

downloads a Web page from the publisher, and the first URL is part of that Web page.

(a)    The browser downloads a Web page from the publisher.

When the user "enter[s] the URL of the [publisher's Web site] into the Web browser,"

Ex. A, 4:29-30, that act causes the browser to download the publisher's Web page:

> [T]he Web browser 3 sends a download request signal 11a to the Web site 5. In
> response, the Web site 5 downloads information, indicated by the reference
> numeral 11b, to the user's Web browser 3. The downloaded information includes
> a copy of the requested hypertext source file operable to generate a Web page 7
> having a banner 9.

*Id.* 4:28-36. This download process is illustrated 11a and 11b in Figure 2:

<table>
<tr><td align="center">**REQUEST**</td><td align="center">**RESPONSE**</td></tr>
</table>





*See also id.* 2:40-43 (ad is "served to the user's Web browser by a . . . banner publisher").

(b)    The URL is part of the publisher's Web page.

Before the user downloads the Web page, the publisher generates a Web page with an

advertisement, and inserts code linking that ad to the accounting service – not to the advertiser.

(Ex. A, 4:47-51 ("the hypertext file that generates the Web page 7 and the banner 9 is edited or originally coded so that the banner 9 is operable . . . to form a hypertext link to the third party Web site 13 when clicked upon."); *see also id.* Fig. 3, operation block 101.) This hypertext file is then downloaded from the publisher's Web site. (*See id.* Fig. 2, at 11b.) That file "***includes the URL*** pointing to the third party site 13." (*Id.* 4:52-53 (emphasis added).)

The specification thus confirms that Google's construction is correct. The first uniform resource locator is part of the publisher's Web page (*id.* 4:54-53), which is generated by the publisher (*id.* 4:47-51; Fig. 3, at operation block 101) and then downloaded from the publisher's Web site to the user's Web browser (*id.* Fig. 2, at 11b). There can be no stronger support for a construction. *Philips*, 415 F.3d at 1315 ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.") (quote omitted).

### 3. Mr. Wexler Narrowed Claim 1 During Prosecution to Require A URL Received From the Publisher's Web Site

As originally drafted, claim 1 only required a "download request signal" that was "ultimately intended for the advertiser's Web site." (Ex. B WTS000027 (emphasis added).) Thus, the original claim did not limit itself based on the origin of the network signal.

The Patent Office rejected the original claim as anticipated by prior art. (*Id.* WTS000038.) Mr. Wexler then narrowed the claim to require "a first uniform resource locator" that was "obtained by the first user's Web browser from the first Web site." (*Id.* WTS000046 (emphasis added).) The applicant represented that this amendment, and others, were made "to clarify the distinction between the present invention and the prior art." (*Id.*, WTS000050.)

Plaintiffs' construction tries to undo this narrowing amendment and broaden the claim. It extends the claim to systems where the first URL is ***not*** received "from" the publisher's Web

site, and is instead received from some *other* Web site "as a result of interaction between the first

user's Web browser and the first Web site." This is not allowed. Claims cannot be narrowed in

order to obtain a patent, and then broadened when asserting it. *Southwall Techs.*, 54 F.3d at 1576.

### D.   "Redirecting ... to the third Web site in response to the receipt of the first uniform resource locator" (Claim 1)

Again, the parties agree the "third Web site" is the advertiser Web site, and further agree

that "redirecting" as used in the claims means "transferring or pointing from one place to

another, for example from one Web site to another Web site or from one node to another node."

The parties disagree on *when* and *how* the browser is redirected to the advertiser's Web site.

| Google's Construction | Plaintiffs' Construction |
|---|---|
| Redirecting to the third Web site as the response to the first browser's request containing the first uniform resource locator. | Either needs no construction, or should be construed according to the plain and ordinary meaning of claim language subject to the term "redirecting." |

Google contends that the redirection occurs as the accounting service's response to a

user's "click" on the advertisement. The patent assumes the use of network protocols that

operate in "request-response" pairs. It further discloses the use of a "redirect response" as the

network message paired to a specific request message. Plaintiffs' construction ignores this.

### 1.   The Patent Incorporates Network Protocols, Including Request – Response Pairings

The patent builds on existing technology to perform the business method described in the

claims, which includes "a network such as the Internet . . . using ***various standard protocols***"

that are "known to those skilled in the art." (Ex. A 1:12-22 (emphasis added).) These protocols

are referenced throughout the specification. For example, the patent discusses specific

instructions in the "Hypertext Transfer Protocol (HTTP)" protocol. (*Id.* 5:15-16.) Among these

are "a '302' redirect response," a specific network message in the HTTP protocol. (*Id.* 5:17.)

The patent discloses an embodiment where a server is configured to "issue a '302' redirect response when a specific URL is requested." (*Id.* 5:15-17; *see also id.* 5:18-21 ("When the specific URL is requested, the request itself . . . is recorded, and the redirect to the intended URL, i.e., the advertiser's Web site, is issued.").)

The patent discusses "request-response" pairings elsewhere in the specification. For example, it references multiple "download request signals," including the "request signal 11a" (*id.* 3:51), the "request signal 15a" (*id.* 4:57), and the "request 19a" (*id.* 5:8). These "requests" to download information are each paired with specific "responses" providing that information. (*Id.* 3:52-54 ("In response [to download request signal], the Web site 5 downloads information, indicated by the reference numeral 11b, to the users Web browser 3"); *id.* 4:32-34 (same).) Those pairings are illustrated graphically in 11a/b, 15a/b, and 19a/b of Figure 2:



FIG. 2

(*Id.*; *see also* Fig. 1.) The patent's numbering scheme and description of the request and response messages is telling. Each network communication is referenced by a single number with two parts: the request and the response. For example, request 11a has only one response, 11b. As the diagram acknowledges, the different pair elements cannot be mixed and matched

(*e.g.*, 11a paired with 15b), and a request cannot be paired with two different responses. Mr. Wexler acknowledged the fact that a single request signal, such as the signal generated by a "click," is paired with one and only one response message. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

The patent's "Abstract" likewise states that a "third party receives" a "download request signal [] generated when a user clicks on a banner," and then "sends a redirect signal to the user Web browser." (*Id.*, Abstract.) The specification further explains that the accounting service redirects the user's Web browser when "the redirect request 15b is sent to the user's Web browser 3 from the third party Web site 13." (*Id.* 5:5-7.)

In light of the specification's multiple references to request-response pairings, and the patent's incorporation of "network[s] such as the Internet . . . using various standard protocols" that are "known to those skilled in the art" (*id.* 1:12-22), references to "requests" and "responses" must be interpreted as network messages. *See Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("absent some particular reason to do otherwise, the claim terms must be interpreted as would one of ordinary skill in the art").

## 2. The Plain And Ordinary Meaning Does Not Trump The Specification

Plaintiffs encourage the "plain and ordinary" meaning of the term "response to the receipt of the first uniform resource locator." But terms should not receive a broad dictionary definition if the specification uses them in a specific way. *See Computer Docking Station Corp.*, 519 F.3d at 1374 ("repeated and definitive remarks in the written description" refine a term's meaning in the claims). If the specification uses specialized meanings "that differ[] from the meaning [a

term] would otherwise possess," the specification's specialized "lexicography governs." *Phillips*, 415 F.3d at 1316.  Accordingly, the "response to the receipt of the first uniform resource locator" discussed in claim 1 should be construed as a response message pursuant to a network protocol – specifically, the response message paired with the request message that sends the first URL.[14]

E.     **"Transmitting, in response to the receipt of the first uniform resource locator, a second uniform resource locator to the first browser" (Claim 9)**

As noted above in Section IV.B, the parties agree that claim 9 involves the same parties as claim 1.  The parties agree that claim limitations refer to the process whereby a user's browser is redirected from the third-party accounting Web site to the advertiser's Web site.  The parties disagree on *when* and *how* the browser is redirected to the advertiser's Web site.

| Google's Construction | Plaintiffs' Construction |
|---|---|
| Transmitting, as the response to the first browser's request that contains the first uniform resource locator, a second uniform resource locator to the first browser. | Needs no construction, and if it is to be construed, should be construed as its "plain and ordinary meaning." |

The arguments made above in Section IV.E all apply here.  The specification explains the use of request messages and response messages, and claim 9's reference to a "response to the receipt of the first uniform resource locator" incorporates this notion of request-response pairings.  Google's construction more accurately reflects the transmission required in this step – the network message sent as the accounting service's response to the user's "click" on the ad.

---

[14]  Google does not contend that the response message in claim 1 must be a "302 redirect response" message.  The patent explicitly requires this specific response message in two dependent claims, but does not do so in claim 1.  (*See id.* claims 5 & 6.)  The response message in claim 1 could therefore be any form of redirect response message, including but limited to a "302" redirect response.  For example, other response message recognized by the "various standard protocols" that are "known to those skilled in the art" (*id.*, col. 1:12-22), including the HTTP protocol, include a "301" redirect response message, a "303" redirect response message, and a "307" redirect response message.  Claims 5 and 6 narrow claim 1 by limiting the range of acceptable response messages to "302," one specific response message in the HTTP protocol.

F.    "Banner" (Claims 2, 8, 11)

As used in the '409 specification and claims, a "banner" is an area showing a graphical advertisement.  Plaintiffs contend that "banner" can describe any area of a page potentially used to display any type of ad, including text ads or "other content" that may "potentially entice a user to obtain further information pertaining to the banner or to connect to an advertiser's Web site."

| Google's Construction | Plaintiffs' Construction |
|---|---|
| An area of a Web page used to display logos or other graphical images. | An area of a Web page that can be used to display logos, advertisements or other content to potentially entice a user to obtain further information pertaining to the banner or to connect to an advertiser's Web site. |

The parties' dispute turns in part on timing.  Google does not contest that in 2009, a "banner" can refer to any type of ad, including text ads.  Google itself uses the term in this fashion.[15]  But the claim terms do not reflect the meaning of "banner" in October 2009.  They reflect the meaning of "banner" as used *in October 1996*, when the application (including the specification, which informs the meaning of the term) was filed.  *See PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1363 (Fed. Cir. 2005) ("A claim cannot have different meanings at different times.  Its meaning must be interpreted as of its effective filing date.").

In October 1996, and through at least 2001, "banner" referred to *image* advertisements, as distinct from other types of ads.  (*See* Ex. F, *Computer Glossary: Complete Illustrated Dictionary*, 9th ed. 2001, defining "banner ad" as "a graphic image used on Web sites to advertise a product or service").  The specification accords with this definition.  It repeatedly describes a "banner" as an area used to display graphics, such as a company's logo.  (Ex. A, col.

---

[15] *See, e.g.*, https://google.com/adsense/adformats (discussing formats for advertisements served by Google, including "banner" ads that include text, images, or other media).

3:54-58 ("[t]he banner 9 is an area of the Web page 7 that can be used to *display logos*, etc.") (emphasis added); *see also id.* col. 1:49-50, "[t]he banner describes an area of a Web page that can be used to *display logos*, etc.")



The claims are structured to reflect this differentiation between image and non-image advertisements. The phrase "banner" is used in three dependent claims (claims 2, 8, and 11) to restrict the scope of three independent claims (claims 1, 7, and 9) that include any form of ad, "banner" or otherwise. Yet Plaintiffs' construction fails to restrict the scope of claims 2, 8, or 11 at all. Any type of advertisement – text, image, or otherwise – qualifies as a "banner" using Plaintiffs' construction. This is impermissible. It is black-letter law that "dependent claims are presumed to be of narrower scope than the independent claims from which they depend." *AK Steel Corp. v. Sollac and Ugine*, 344 F.3d 1234, 1242 (Fed. Cir. 2003).

Plaintiffs' construction would also lead to absurd results, because it captures *any* area of *any* web page. It does not require that advertising is actually displayed; it merely requires an area *capable* of being used to display some kind of content, including content other than advertisements, that might entice the reader to "obtain further information pertaining to the banner." For example, Plaintiffs' construction would cover a news story published in an online

newspaper; the text of that story is "content" displayed in an area of the online newspaper's web page, and that text could "potentially entice" the reader to "obtain further information pertaining to the [text]." Google's construction more accurately reflects the meaning of "banner" as used in 1996, and as used in the dependent claims to narrow the independent claims.

## V.    CONCLUSION

Google respectfully requests that the Court adopt Google's claim constructions.

Dated:  March 17, 2010                          Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By: /s/ Edward J. DeFranco

CHARLES K. VERHOEVEN
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700
Email: charlieverhoeven@quinnemanuel.com

EDWARD J. DEFRANCO
PATRICK D. CURRAN
AARON KAUFMAN
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849 7000
Facsimile: (212) 849-7100
Email: edwarddefranco@quinnemanuel.com

ATTORNEYS FOR DEFENDANT
GOOGLE, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2010, I caused to be served the foregoing ***Google's Inc.'s Opening Brief on Claim Construction*** by electronic means, on the following persons at the identified addresses:

Steven Hayes
HANLY CONROY BIERSTEIN
FISHER & HAYES
112 Madison Avenue, 7th Floor
New York, NY 10016
shayes@hanlyconroy.com

Edward C. Flynn
ECKERT SEAMANS CHERIN &
MELLOTT LLC
600 Grant Street, 44th Floor
Pittsburgh, PA 15219
eflynn@eckertseamans.com

Paul A. Lesko
SIMMONS COOPER LLC
707 Bershire Blvd.
East Alton, IL 62024
plesko@simmonscooper.com

Dated:  March 17, 2010                              /s/  Patrick D. Curran