**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
WEB TRACKING SOLUTIONS, L.L.C.,
and DANIEL WEXLER,

                  Plaintiffs/Counterclaim         **REPORT &**
                  Defendants,                 **RECOMMENDATION**

      -against-                     08-CV-03139 (RRM) (RER)

GOOGLE, INC.,

                  Defendant/Counterclaim
                  Plaintiff.
----------------------------------------------------------X

**RAMON E. REYES, JR., U.S.M.J.:**

Plaintiffs Web Tracking Solutions, L.L.C. ("Web Tracking") and Daniel Wexler

("Wexler") (collectively, "Plaintiffs") allege that defendant Google, Inc.'s ("Google" or

"Defendant") AdSense advertising service infringes Plaintiffs' patent, which provides a "system

and method for providing on-line third-party accounting and statistical information" to track the

number of clicks on Internet advertisements. (*See* attached U.S. Patent 5,960,409 ("'409

Patent"), col.2:38–39.) As explained below, the parties' dispute centers on three terms in Claim

One and one term in Claim Two.[1]

On August 7, 2009, the Honorable Roslynn R. Mauskopf referred this matter to me for a

Report and Recommendation. (Docket Order Dated 8/7/2009.) On March 17, 2010, Web

Tracking and Google filed their claim construction briefs. (Docket Entry Nos. 49–52.) On April

---

[1] The parties have not yet determined which asserted claims will be disputed at trial, but apparently do not intend to dispute all eleven claims. (Google Inc.'s Opening Brief on Claim Construction ("Def.'s Br."), 4 n.2.)

19, 2010, both parties filed their responsive claim construction briefs.  (Docket Entry Nos. 56,

57.)  Technology tutorials were submitted on April 26, 2010.  (Docket Entry Nos. 59, 60.)  On

April 29, 2010, this Court held a day-long *Markman* hearing.  (Docket Entry No. 63, Transcript

of Proceedings ("Tr.").)

For the reasons explained below, I respectfully recommend that the Court construe the

following claim terms accordingly:

(1)     "Fourth Web site" in Claim One as "a Web site owned and
        operated independently from the first, second, and third Web sites,
        and that performs the function of an unbiased third-party
        accounting and statistical service;"

(2)     "Fourth node" in Claim Seven as "a node owned and operated
        independently from the first, second, and third nodes, and that
        performs the function of an unbiased third-party accounting and
        statistical service;"

(3)     "First Web site, Second Web site, and Third Web site" in Claims
        One and Nine as "these terms indicate that each of these Web sites
        is different from the others, and each must be owned and operated
        independently from the fourth Web site / unbiased third-party
        accounting and statistical service;"

(4)     "The first URL is obtained by the first user's Web browser from the first
        Web site" in Claim One as "the first URL is part of the Web page
        generated by the first Web site and acquired by the first user's Web
        browser as a result of interaction between the first user's Web browser
        and the first Web site;"

(5)     "Redirecting . . . to the third Web site in response to the receipt of the first
        URL" in Claim One according to its "plain and ordinary meaning"
        because it needs no construction;

(6)     "Transmitting, in response to the receipt of the first URL, a second
        URL to the first browser" in Claim Nine according to its "plain
        and ordinary meaning" as it needs no construction; and

(7)     "Banner" in Claims Two, Eight and Eleven as "an area of a Web page
        used to display logos or other graphical images."

**BACKGROUND**

### I.     Internet Advertising

Internet browsing was first made available to the public in April of 1993. (Docket Entry

No. 59, Plaintiffs' Technology Tutorial ("Pl.s' Tutorial"), 3.) By the end of 1994, about 10

million users were on the internet; two years later, over 36 million users and 500,000 Web sites

were online. (*Id.*) This period of rapid growth was bolstered by Amazon's introduction of

e-commerce in July 1995 and the resulting explosion in Web advertisements. (*Id.*) Wexler filed

his patent in October 1996 during this boom in internet advertising, about six months after

Yahoo! went public and about two years before Google's incorporation. (*Id.*)

An internet user who saw a banner advertisement displayed on a Web site could "click"

on that advertisement and "visit" the advertiser's Web site to see more about the featured

product or service. Clicking on the advertisement triggered a series of Hypertext Transfer

Protocol ("HTTP") commands that resulted in the user's Web browser displaying the

advertiser's Web site. Internet advertising had this interactivity advantage over traditional print

or TV advertising.[2] (Pl.s' Tutorial 5.) After Procter & Gamble set a new industry standard in

1996 by agreeing to pay advertisement agencies only at click-based rates, advertisement pricing

shifted from impression-based to click-based pricing.[3] With impression-based pricing,

---

[2] "Banners are powerful because they can effectively deliver an unlimited amount of marketing material to their audiences . . . because unlike traditional media advertisements . . . banners can transport audience members to their sponsors' worlds." Robert H. Reid, 220 *Architects of the Web: 1,000 Days that Built the Future of Business* (John Wiley & Sons, Inc. 1997) (hereinafter "Architects of the Web").

[3] *See* Joan Voight, "Beyond the Banner," *Wired* (Apr. 12, 1996), http://www.wired.com/wired/archive/4.12/esadvertising.html (last visited on July 26, 2010) (hereinafter "Beyond the Banner"); *Architects of the Web*, 224.

3

publishers had charged advertisers on how often a publisher displayed the particular advertisement, regardless of whether a user ever saw it or clicked on it. (Pl.s' Tutorial, 6.) With click-based pricing, publishers charge by how often an advertisement was actually clicked. (*Id.*) This pricing method lets advertisers determine advertisement effectiveness by tracking the relative number of clicks per advertisement per publisher. (*Id.*)

Cost-per-click advertising, however, had its own problems. For example, a user might click on an advertisement and trigger an increment count, but never reach the advertiser's Web site if she lost her connection to the internet. (Pl.s' Tutorial, Ex. A, 6.) Or she might mistakenly double-click an advertisement, triggering two increment counts, before being redirected to the advertiser's web site. (*Id.*) If the publisher was responsible for counting clicks-per-advertisement, the advertiser might view with distrust any disparity between the publisher's accounting and its own accounting of how many people actually arrived at its web site. These disparities between the publisher's click records and the advertiser's visitation records inspired the need for Wexler's patent.

## II.    The '409 Patent

Wexler filed his patent application on October 11, 1996. (Declaration of Edward J. DeFranco, Exhibit B, Prosecution History ("Def.'s Ex. B" or "Prosecution History"), WTS000001–93.) On July 13, 1998, the U.S. Patent and Trademark Office ("Patent Office") rejected his application for the first time because three prior patents "clearly anticipated" the nine claims in Wexler's application.[4] (*Id.*, WTS000038–42.) Wexler amended his claims on

---

[4] The prior art cited included U.S. Patents 5,712,979 ("Graber I"); 5,717,860 ("Graber II"), and 5,751,956 ("Kirsch"). (Prosecution History, WTS000040.)

4

November 13, 1998, to distinguish his invention from prior art. (*Id.*, WTS000046–52.) The

Patent Office rejected his amended claims on February 9, 1999.[5] (*Id.*, WTS000053–61.) On

April 29, 1999, Wexler and his attorney met with an examiner at the Patent Office to object to

comparisons of his patent with the prior art. (*Id.*, WTS000062.) Wexler then submitted his final

amendments on May 3, 1999. (*Id.*, WTS000066–71.) The Patent Office ultimately allowed

Wexler's amended claims and issued the '409 patent on September 28, 1999. (*Id.*,

WTS000006–12.)

The '409 patent describes an invention for tracking the number of clicks on a banner Web

advertisement. According to the invention, a publisher's Web site displays a banner linked to an

advertiser's Web site. (Patent, col.2:40–42.) From an Internet user's perspective, clicking on

the banner takes her directly to the advertiser's Web site.[6] (*Id.*, col.2: 54–56.) Behind the

scenes, clicking on the banner triggers the downloading of the address of a third-party

accounting service to the user's browser and establishes a link between the accounting service

and the browser. (*Id.*, col.2:44–45.) The browser then sends a download request signal to the

accounting service, which counts the received request signal and logs the publisher's Web site

address. (*Id.*, col.2:47–50.) The accounting service then redirects the user's browser's download

request signal to the advertiser's Web site, which serves a Web page to the user's browser. (*Id.*,

col.2:52–56.) The accounting service tabulates this accumulated statistical information,

including the number of clicks on an advertiser's banner, and provides data indicating how

---

[5] In the second rejection, the Patent Office added U.S. Patent 5,812,769 ("Graber II") as another prior art. (*Id.*, WTS000056.)

[6] "The method is transparent from the user's point of view; he is not aware of the 'detour' to the third party service." (Patent, col.5:12–13.)

effective a particular publisher's Web page is as an advertising medium.  (*Id*., col.2:57–61.)

**ANALYSIS**

## I.     Law of Claim Construction

The resolution of a patent infringement case involves two steps.  First, the court must construe the patent's claims as a matter of law to determine their proper scope.  Second, a jury must then determine the factual issue of whether infringement has occurred.  *See Markman v. Westview Instruments, Inc*., 517 U.S. 370, 372 (1996).  While the court must be mindful to "not prejudge the ultimate infringement analysis by construing claims with an aim to include or exclude an accused product or process, knowledge of that product or process provides meaningful context for the first step of the infringement analysis, claim construction."  *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1326–27 (Fed. Cir. 2006) ("[T]he legal function of giving meaning to claim terms always takes place in the context of a specific accused infringing device.").  Accordingly, the court's *Markman* order "is an explanation to the parties of the reasoning behind its claim construction."  *MercExchange, LLC v. eBay, Inc*., 401 F.3d 1323, 1329 (Fed. Cir. 2005), *vacated on other grounds*, 547 U.S. 388 (2006).

Claim terms should be given their ordinary and customary meaning as understood by "a person of ordinary skill in the art in question at the time of the invention."  *Infosint S.A. v. H. Lundbeck A/S*, 603 F. Supp. 2d 748, 752 (S.D.N.Y. 2009) (citing *Phillips v. AWH Corp*., 415 F.3d 1303, 1312 (Fed. Cir. 1995)); *see, e.g., TBC Consoles, Inc. v. Forecast Consoles, Inc.*, 665 F. Supp. 2d 266, 270 (S.D.N.Y. 2009) (defining claim construction as "simply a way of elaborating the normally terse claim language in order to understand and explain, but not to

change, the scope of the claims.") (citing *Embrex, Inc. v. Service Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000)).  The court determines ordinary and customary meaning by first consulting the intrinsic evidence: the patent's claims, specification, and prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *see also Kumar v. Ovonic Battery Co., Inc.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003) ("[P]rior art cited in a patent [or its] prosecution history . . . constitutes intrinsic evidence.").  As the patent's public record, intrinsic evidence is more relevant and probative than extrinsic evidence because it puts potential competitors on notice.  *See generally, e.g., PSC Computer Prods., Inc. v. Foxconn Intern., Inc.*, 355 F.3d 1353, 1359 (Fed. Cir. 2004) ("[C]laims serve the important notice function of informing the public that anyone who makes, uses, or sells the claimed invention infringes the patent."); *Johnson & Johnson Assoc., Inc. v. R.E. Service Co.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002) (en banc) ("The claims give notice both to the examiner at the U.S. Patent and Trademark Office during prosecution, and to the public at large, including potential competitors, after the patent has issued.").  The court should consult extrinsic evidence only if the ordinary meaning of the claim terms remains ambiguous after considering the intrinsic evidence.  *See, e.g., Markman*, 52 F.3d at 980 ("Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."); *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 ("When the intrinsic evidence is unambiguous, it is improper for the court to rely on extrinsic evidence . . . . for purposes of claim construction.").

Finally, a *Markman* court should keep in mind two audiences when construing claims. First, the claims must be interpreted not from the view of the inventor, but of "a person of

ordinary skill in the art . . . as of the effective filing date of the patent application." *Phillips*, 415

F.3d at 1313 ("The inquiry into how a person of ordinary skill in the art understands a claim term

provides an objective baseline from which to begin claim interpretation.").  Second, a juror

asked to apply the claim terms to the accused technology to determine infringement needs a

workable definition of what those claim terms mean.  The *Markman* court should construe the

claims to provide language from which to draft clear jury instructions and avoid future litigation

over the scope of the instructions.  *See, e.g., Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356,

1366 (Fed. Cir. 2004) ("[T]he district court must instruct the jury on the meanings to be

attributed to all disputed terms . . . so that the jury [can] intelligently determine the questions

presented.") (internal quotations omitted).

## II.    Claims At Issue

The parties dispute the construction of seven separate terms found in six different

Claims.  However, because the Claims are worded similarly and should be interpreted in the

same manner, the parties' dispute essentially revolves around the construction of four core

terms[7]: three terms in Claim One: (1) "fourth Web site,"  (2) "the first URL is obtained by the

first user's Web browser from the first Web site," and (3) "redirecting, at the fourth Web site, the

first user's Web browser to the third Web site in response to the receipt of the first URL," and

one term in Claim Two: "banner."

Claim One recites:

---

[7] "[I]ndependent Claims 1, 7, and 9 each recite the same basic method for configuring
multiple parties in an advertising transaction.  Claim 1 is representative . . . ."  (Google Inc.'s
Opening Brief on Claim Construction ("Def.'s Br."), 8.)  Plaintiffs agreed: "[W]e're only going
to be talking about four of them because of the combination of the issues.  So fourth website,
fourth no[de]; the same issue." (Tr., 28:1–3.)

"**1.** A method for accounting, wherein a first publisher having a first Web site and a second publisher having a second Web site each publish advertising for an advertiser having a third Web site, the method comprising:

receiving, at a fourth Web site,[8] a first URL from a first user's Web browser, wherein the first URL is obtained by the first user's Web browser from the first Web site and wherein the first URL is associated with advertising for the advertiser;

logging, at the fourth Web site, the receipt of the first URL, in response to the receipt of the first URL;

redirecting,[9] at the fourth Web site, the first user's Web browser to the third Web site in response to the receipt of the first URL;

receiving, at the fourth Web site, a second URL from a second user's Web browser, wherein the second URL is obtained by the second user's Web browser from the second Web site and wherein the second URL is associated with advertising for the advertiser;

logging, at the fourth Web site, the receipt of the second URL, in response to receiving the second URL; and

redirecting, at the fourth Web site, the second user's Web browser to the third Web site in response to the receipt of the second URL."  (Patent, col.6:30–59.)

Claim Two recites:

"**2.** The method of Claim **1** wherein the advertising published by the first publisher is a first banner that is associated with the first URL and the advertising published

---

[8] The parties agree that (1) their disputes over "fourth Web site" in Claim One and "fourth node" in Claim Seven are identical, and (2) their proposed constructions of "first Web site, second Web site, and third Web site" in Claims One and Nine mirror their constructions of "fourth Web site." (Plaintiffs Web Tracking Solutions, LLC's And Daniel Wexler's Response to Google Inc.'s Claim Construction Brief ("Pl.s' Resp."), 2 n.2) (Def.'s Br., 17, App. B, 2.)  Thus, no separate analysis of "fourth node" or "first Web site, second Web site, and third Web site" is needed.

[9] The parties propose identical constructions for "redirecting, at the fourth Web site, the first user's Web browser to the third Web site in response to the receipt of the first URL" in Claim One and "transmitting, in response to the receipt of the first URL, a second URL to the first browser" in Claim Nine.  (Pl.s' Response, 19 n.14) (Def.'s Br., 32.)  Accordingly, no separate analysis of Claim Nine is needed.

by the second publisher is a second banner that is associated with the second URL." (*Id.*, col.6:60–64.)

## A.     **"Fourth Web Site" — Claim One**

The parties agree that "fourth Web site" in Claim One represents the third-party accounting and statistical service and that the accounting service must be "independent" of the publisher ("first Web site" or "second Web site") and advertiser ("third Web site").[10]  (Pl.s' Br., 14) (Def.'s Br., 17–18.)  The parties propose the following constructions for "fourth Web site":

| Web Tracking's Proposal | Google's Proposal |
|---|---|
| "a Web site that is owned and operated by an entity that is independent from the entity(s) that own and operate the first, second and third Web sites, and that performs the function of a third party accounting and statistical service." | "a Web site owned and operated independently from the first, second and third Web sites, and that performs the function of an unbiased third party accounting and statistical service." |

Thus, the parties' dispute centers on *how* independent the fourth Web site must be from the other Web sites.  Plaintiffs argue that the accounting service must only be owned and operated by an entity that is independent from the publisher and advertiser.  In other words, Plaintiffs argue, "[a]s long as these accounting functions are performed by an entity that is not either the publisher or the advertiser, the claim term is met."  (Pl.s' Br., 16.)  Google counters that the existence of an independently owned and operated accounting service is not enough— the accounting service must be operated in such a way that there is "*no incentive to bias its*

---

[10] Plaintiffs' argument that the Court should adopt their proposed construction because it is consistent with the parties' agreed-upon definition of "publisher" is unavailing.  (*See* Pl.s' Br., 16.)  The Court must look to the intrinsic evidence in the '409 Patent, not the parties's agreement over the course of this litigation that a "publisher" is "an entity that has advertisements displayed on its Web site on behalf of an advertiser and whose Web site is owned and operated by an entity independent from the entity that owns the fourth Web site/third party accounting and statistical service."  (Def.'s Br., App. B, 1.)

*statistics in either party's favor*." (Def.'s Br., 18) (emphasis added.) In other words, Google argues that for the patent to fulfill its intended purpose, the third-party accounting service must be independent in form *and* function. For the reasons explained below, the Court should adopt Google's construction of "fourth Web site."

The starting point for claim construction is an examination of the claim language itself. *See, e.g., Phillips*, 415 F.3d at 1313 ("[H]ow a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation."); *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999) ("The starting point for any claim construction must be the claims themselves."). Nowhere does Claim One discusses independence, ownership, or bias. (Patent, col.6:30–59.) Similarly, Claims Two through Eleven do not elaborate on the fourth Web site. (*Id.*, col.6:60–col.8:36.) The claim language indicates only that the first, second, third, and fourth Web sites are distinct sites, and that a first publisher has the first Web site, a second publisher has the second Web site, an advertiser has the third Web site, and finally, that the fourth Web site has the capacity to receive, log, and redirect a URL from a user's Web browser. (*Id.*, col.6:30–34.) Because the claim language is silent on the issue of independence and bias, the patent specification and prosecution history must be examined. *See Phillips*, 415 F.3d at 1315 ("[T]he specification is always highly relevant to the claim construction analysis . . . [u]sually, it is dispositive; it is the single best guide to the meaning of a disputed term."); *AquaTex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1380 (Fed. Cir. 2005) ("The specification is of central importance in construing claims.").

Like the claim language, the specification does not directly reference the "independence"

of the accounting service. It does, however, address the concept of bias. (Patent, col.2.) In the

"Background of the Invention" section, the specification explains how the '409 Patent addresses

advertisers' and publishers' need for accurate and unbiased banner-click statistics. Both parties

need these statistics to determine advertising effectiveness and the fee for placing the banner on

a publisher's web site:

> [A]dvertising with a banner is typically provided for a fee. The cost of advertising
> . . . may be based, for example, on the number of time the site displays the banner or
> on the number of times a user clicks on the banner linked to the advertiser Web site.
> Regardless of the fee basis, both the advertiser and the administrator of the banner-
> publishing site will typically have an interest in knowing certain statistics pertaining
> to advertising effectiveness.
>
> ***
>
> For example, if the fee for the advertising is based on the number of clicks on the
> banner, then both parties will want this statistic. The advertiser can obtain this
> information by interrogating an access log maintained by the advertiser Web site.
> This information, however, is not directly available to the banner-publishing site.
> While it can be obtained from the advertiser, the publishing-site administrator would
> presumably prefer receiving the relevant statistics from an *unbiased* source.

(*Id.*, col.1:62–66, 2:10–18) (emphasis added.) After elaborating on both the publisher's and the

advertiser's interests, the specification reiterates:

> In view of the value of such statistics, and the relative inconvenience in obtaining
> such information, a need presently exists for an *unbiased*, readily available source of
> statistical/accounting information for Internet advertisers and advertising publishers.

(*Id.*, col.2:31–34) (emphasis added.) Plaintiffs acknowledge that the specification uses the term

"unbiased," but argue that it merely refers to the publisher's preference and the advertiser's need

to get statistics from a third-party entity. (Pl.s' Br. 17–18.)

However, Google's proposed construction of "fourth Web site" reflects the problems to

which the '409 patent was addressed, namely, the need for independent ownership *and* operation

by an unbiased, third-party accounting service. *See, e.g., MBO Lab. v. Becton, Dickinson & Co.*,

474 F.3d 1323, 1329–30 (Fed. Cir. 2007) (construing claim term to fulfill the purpose described in the specification).  Google proposes a construction that furthers the purpose of the '409 patent because its construction incorporates concerns raised in the specification and prosecution history.  Plaintiffs' contention that Google's proposed construction of "fourth Web site" uses language "that has no direct support in the intrinsic evidence" is, therefore, incorrect.  (Pl.s' Br., 16.)

Plaintiffs argue that the discussion of "unbiased" in the specification referred to the mere existence of an independent third party because of "the problems that arise when advertisers and publishers must obtain click statistics from each other[] without the ability to access each other's Web sites."  (Pl.s' Resp., 3.)  Plaintiffs protest that including "unbiased" in the construction of "fourth Web site" is a "prohibitively restrictive definition . . . [that] would preclude the third party entity from having any financial incentive related to its performance of the accounting function."  (*Id*.)  In support of their argument, Plaintiffs cite the amendments Wexler submitted to the Patent Office after his patent was initially rejected:

> The present invention enables the accounting site to be owned and operated by an *independent entity*–one that is not associated with either the publisher or the advertiser.  A disadvantage with the Internet accounting systems in the prior art is that the accounting is performed by either the publisher or by the advertiser.

(Prosecution History, WTS000051) (emphasis added.)  Thus, in Plaintiffs' view, the mere act of "agreeing upon an independent third party to be the provider of the accounting and statistical information" remedies the problem of distrust between the advertisers and the publishers.  (Pl.s' Resp., 8.)  As Plaintiffs repeat, "the *fact* that the third party was independent, not acting on behalf of either the publisher or the advertiser, was *all* that was required to solve the inherent distrust that the publisher and the advertisers had for each other in a two party transaction."

(Pl.s' Resp., 5) (emphasis added.)

Although Plaintiffs are correct that their proposed construction takes the "independent entity" language from the prosecution history, they ignore the balance of Wexler's amendment, which states:

> And because the amount of money paid by the advertiser to the publisher is dependent on the accounting statistics collected, there is, or is perceived to be, the temptation by the one doing the accounting to *bias* the statistics in its favor. In other words, advertisers don't completely trust publishers to be honest and publishers don't completely trust advertisers either.

(Prosecution History, WTS000051) (emphasis added.)[11] This payment aspect was critical to Wexler's ability to overcome the Patent Office's two rejections of his application on the grounds that his invention was "clearly anticipated" by prior art.[12] Wexler overcame these rejections based on the accounting service's ability to *operate* independently from the publisher and advertiser:

> [I]t is contemplated that the system of Kirsch is to be *operated by a publisher* (e.g., Infoseek, Yahoo, etc.) and the system of Graber I, Graber II and Graber III is to be *operated by the advertiser* (e.g., Amazon.com, ebay.com, etc.), but the present invention can be *operated by an independent entity* that is neither the publisher nor the advertiser.

---

[11] Wexler emphasized this payment aspect in both of the amendments he submitted to the Patent Office. (*Id.*, WTS000051, 70.) In light of the prosecution history, Plaintiffs' argument that Wexler did "not purport to preclude every potential for bias" because the '409 Patent aimed to reduce only "the *perception* of bias" is unconvincing. (Pl.s' Br., 18.) Plaintiffs' related argument that "at no time during prosecution did Wexler refer to the third party accounting service as 'unbiased'" because he discussed the perception of bias only "when referring to when it was either the publisher or the advertiser that was doing the accounting" is strained. (Pl.s' Resp., 4.)

[12] At the time Wexler filed his application, it was already feasible for a user to click on a banner on a publisher's Web site, send a download request signal to an advertiser's Web site, and have that Web site download information to the user's browser. (Patent, col.4:11–16.) It was also already possible for the publisher's site to redirect the user to the advertiser's site.

(*Id.*, WTS000070) (emphasis added.) Because Wexler distinguished the '409 Patent from prior art based on its independent *operation*, and not merely its independent existence, he may not now ignore its operation and limit "independence" to the legal nature of the entity. *See, e.g., Gillespie v. Dywidag Sys. Intern., USA*, 501 F.3d 1285, 1291 (Fed. Cir. 2007) ("The patentee is held to what he declares during the prosecution of his patent."); *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers."). Similarly, Wexler cannot now disclaim his comparison of the '409 patent to the Nielsen television ratings:

> Because television advertising fees are based on ratings, television stations don't trust advertisers to tally the ratings and advertisers don't trust television stations. Therefore, the need existed for an independent entity to tally television ratings, which has been filled by the well-known A.C. Niels[e]n Company.
>
> In the same way that television advertising needed an independent entity to tally ratings, the Internet needs an independent entity to account for the referrals from publishers to advertisers.

(Prosecution History, WTS000070) (cited in Google Inc.'s Response Brief on Claim Construction ("Def.'s Resp."), 5.) Again, Plaintiffs argue that this analogy focused solely on the fact that "Nielsen is a third party, whom both advertisers and television stations would view as providing credible ratings information" and was "without regard for who pays Nielsen or the manner in which Nielsen's compensation is calculated." (Pls.' Resp., 5 n.4.) Although Wexler's analogy supplied the "independent entity" language used in Plaintiffs' proposed construction, it ultimately supports Google's construction because Nielsen does not have a financial interest in the numbers it reports.

Plaintiffs further contend that their proposed construction "finds direct support in the

intrinsic evidence" because the prosecution history "explicitly state[s]" that "the present invention can be *operated by an independent entity that is neither the publisher nor the advertiser*." (Prosecution History, WTS 000070) (emphasis in Pl.s' Br., 15.) There are two problems with Plaintiffs' contention: first, as Google indicates, Wexler touted independent operation as a critical feature of his invention: "the present invention enables the accounting site to be owned *and operated* by an independent entity." (Prosecution History, WTS000059) (emphasis in Def.'s Resp., 11.) This statement belies Plaintiffs' argument that "[a]s long as these accounting functions are performed by an entity that is not either the publisher or the advertiser, the claim term is met." (Pl.s' Br., 16.) Second, the prosecution history does not mandate that a legally independent entity perform the third-party accounting function because Wexler repeatedly used permissive language in his amendments: for example, **"**the present invention *can* be operated by an independent entity that is neither the publisher nor the advertiser," and "[t]he present invention *enables* that independent entity." (*Id*., WTS000059, 70) (emphasis added.) Thus, after considering the relevant prosecution history, the Plaintiffs' proposal requiring independent legal ownership without requiring that the accounting service operate independently is too broad, while Google's construction appropriately limits "fourth Web site" to ownership by an accounting service that is owned independently and operates in an unbiased manner.

In conclusion, Google's construction captures the spirit of "owned and operated by an independent entity" by focusing on the method of operation, not just the identity of the operator. Unless the "fourth Web site" is construed to mean "a Web site owned and operated independently from the first, second and third Web sites" that functions as "an unbiased third party accounting and statistical service," as Google proposes, the fourth Web site could be

16

operated by a legally independent entity that is nonetheless "associated with either the publisher or the advertiser" by other means. For example, as Google suggests, an independently owned and operated accounting service could contract with a publisher to share the publisher's profits from pay-per-click advertisements, thus increasing its revenues every time it counted an additional click. (Def.'s Br., 20.) Such an arrangement would fit within the Plaintiffs' proposed construction of "fourth Web site," yet fly in the face of the purpose of the '409 Patent. Such an anomalous result should be avoided. *See, e.g., Bass Pro Trademarks, LLC v. Cabela's, Inc.*, 485 F.3d 1364, 1369 (Fed. Cir. 2007) (construing claims to "implement the invention described in the specification and prosecution history"); *see generally, e.g., U.S. v. Dauray*, 215 F.3d 257, 264 (2d Cir. 2000) ("A statute should be interpreted in a way that avoids absurd results.").

**B.      "[T]he first URL is obtained by the first user's Web browser from the first Web site" — Claim One**

The parties agree that "Uniform Resource Locator (URL)" is a "string of characters that includes the name, location, or any other characteristic of a network resource (for example, a Web page or other Web service) and that enables interaction with that resource." (Def.'s Br., App. B, 2.) The parties further agree that the terms "first URL" and "second URL" are distinguished to indicate only that "each of these URLs may be different from one another." (Pl.'s Br., 21.) They dispute *how* the user's Web browser obtains the first URL from the publisher's Web site and propose the following constructions:

| Web Tracking's Proposal | Google's Proposal |
|---|---|
| "The first URL is acquired as a result of interaction between the first user's Web browser and the first Web site (for example, as a result of downloading a Web page from the first Web site or as a | "The first URL is part of the Web page generated by the first Web site and downloaded from the first Web site to the first user's Web browser." |

| result of clicking on a link or an advertisement on the first publisher's Web page as displayed in the first user's browser.") | |
|---|---|

Plaintiffs argue that the user's Web browser may obtain that URL by multiple methods, as long as the user first interacts with the publisher's Web site. (Pl.s' Resp., 13.) Google contends that the user's Web browser can only directly download the URL from the publisher's Web site. (Def.'s Br., 25.) The Court should construe the claim as "the first URL is part of the Web page generated by the first Web site and acquired by the first user's Web browser as a result of interaction between the first user's Web browser and the first Web site." Under this construction, (1) the user's browser may acquire the URL by means other than direct downloading, and (2) the URL must come from the publisher's Web site (that is, "the Web page generated by the first Web site"), but it may come in the form of instructions.

Claim One describes a three-step method that occurs at an accounting service's Web site, where a user's browser receives and logs the URL before being redirected to the advertiser's Web site. (Patent, col.6:31–59.) The first step—receipt of the URL from the user's browser—triggers the second logging step and third redirecting step. Claim One's preamble states:

> A method for accounting, wherein a first publisher having a first Web site and a second publisher having a second Web site each publish advertising for an advertiser having a third Web site, the method *comprising*:

(*Id.*, col.6:31–33) (emphasis added.) No further description of the first step is provided in Claim One. A claim that uses the open-ended transition phrase "comprising" after its preamble instead of the close-ended "consisting" allows implementations beyond those explicitly stated. *See, e.g.,*

*CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007) ("'comprising' is well understood to mean 'including but not limited to'"); *Vehicular Techs. Corp. v. Titan Wheel Int'l*, 212 F.3d 1377, 1382 (Fed. Cir. 2000) ("The phrase 'consisting of' is a term of art in patent law signifying restriction and exclusion, while, in contrast, the term 'comprising' indicates an open-ended construction.") (citation omitted).  Thus, on its face, Claim One permits various implementations, lending support to Plaintiffs' suggested construction that "obtain" allows the user's Web browser to obtain the key URL by multiple methods.

The claim language further suggests that "obtain" means more than just "download" because "download" is used in other claims.  Courts are entitled to presume that using two different terms in a claim means that each term has a distinct meaning.  *See, e.g., Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 (Fed. Cir. 2006).  As Plaintiffs argue, the claim language states that the first URL is "obtained by," not "downloaded to" the first user's Web browser from the publisher's Web site.  (Pl.s' Br., 22.)  Furthermore, "obtain" is a broader term than "download."  (*Id.*)  Although Google may be correct that Plaintiffs did not need to cite to outdated dictionary definitions to make their argument (Def.'s Resp., 13), the intrinsic evidence nonetheless provides abundant support for Plaintiffs' proposed construction.  While Wexler chose to use the general word "obtain" in Claim One, he selected the specific term "download" in Claims Seven and Eight.[13]  In contrast to Claim One, Claim Seven uses the

---

[13] I recognize that Claims Seven and Eight use "download" to describe the kind of request signal being received, logged, and transmitted, not necessarily to describe *how* the first node and fifth node interact.  Nevertheless, the use of different words carries the presumption of different meanings.  *See, e.g., CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings.").

specific term "download" to describe how each step in the method is implemented.[14]  (*Id.*, col.7:19–33.)  Claim Eight elaborates on Claim Seven by describing the request signal associated with each banner advertisement as a "download request signal."[15]  Claim One could have stated that the "first URL is *downloaded* by the first user's Web browser from the first Web site" if the method of acquiring was so limited.  *See, e.g., Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 807 (Fed. Cir. 2007) ("[the patentees] could have used the word 'perpendicular' [in their claims], as they did in discussing their preferred embodiment. Instead, they chose a different term that implies a broader scope"); *Primos, Inc. v. Hunter's Specialities, Inc.*, 451 F.3d 841, 848 (Fed. Cir. 2006) ("[T]he terms 'engaging' and 'sealing' are both expressly recited in the claim and therefore 'engaging' cannot mean the same thing as 'sealing'; if it did, one of the terms would be superfluous.").  Instead, Claim One recites that the "first URL is *obtained* by the first user's Web browser from the first Web site."  (Patent, col.6:36–37.)  Accordingly, as Plaintiffs suggest, "obtain" has a distinct and broader meaning than "download."  Google further tries to narrow the definition of "obtain" to mean only "download" by pointing to the exclusive use of the term "downloading" in the specification.  (Def.'s Br., 27–28.)  Although the claim language itself may use the general term "obtain," Google argues, the specification repeatedly suggests that the URL is obtained by "downloading," both in its detailed description of the invention and in the

---

[14] Claim Seven describes the first step in the method as "receiving, at a fourth node, a first *download* request signal from a fifth node, which first *download* request signal is received by the fifth node from the first node."  (*Id.*, col.7:16–18) (emphasis added.)

[15] "[T]he advertising published by the first node for the third node is a first banner that is associated with the first *download* request signal and the advertising published by the second node for the third node is a second banner that is associated with the second *download* request signal."  (*Id.*, col.7:35–38, col.8:1–2) (emphasis added.)

accompanying illustrations: a *download* request signal is sent from the first user's browser to the publisher's Web site (*Id.*, col.4:31–32), in response, the publisher's Web site *downloads* information to the browser (*Id.*, col.4:33–34), and the *downloaded* information contains the operable hypertext source file to generate a Web page with a banner. (*Id.*, col.4:34–36.) Because the patent discloses no other method of obtaining the URL, Google contends, the term "obtain" in the claims must mean "download." (Def.'s Br., 27–28.)

The Court recognizes the important role of the specification in interpreting claim language. *See, e.g., Tap Pharm. Prods., Inc. v. Owl Pharms., L.L.C.*, 419 F.3d 1346, 1354 (Fed. Cir. 2005) ("In light of the two different possible meanings for the term 'containing,' it was entirely reasonable for the district court to look to the specification . . . to determine [how] the term was used in the three patents."); *Watts v. XL Sys.*, 232 F.3d 877, 883 (Fed. Cir. 2000) ("[E]ven if [the claim terms] were clear on their face, we must consult the specification to determine if the patentee redefined any of those terms."). Still, a court must not import limitations from the specification into the claim language without a clear indication that the specification has redefined the claim terms. *See Bell Atl. Network Servs. v. Covad Communs. Group*, 262 F.3d 1258, 1271 (Fed. Cir. 2001) ("[W]hen a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term by implication.") (internal quotations omitted). To define a term by implication, the patentee must use that term in a way that it can have only one meaning.

Although Wexler repeatedly used the term "downloading" in the specification, he did not use it in such a way to require that "obtain" only mean "directly download from." The specification uses general language such as "the banner **9** is operable, in conjunction with the

user's Web browser **3**, to form a hypertext link to the third party Web site **13**," much as Claim One uses the general "obtain" language to describe the operation. (Patent, col.4:49–51.) Nor may Google use the illustrations to limit the scope of the claims. *See generally Ccs Fitness v. Brunswick Corp*., 288 F.3d 1359, 1366 (Fed. Cir. 2002) (prohibiting "pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history" to narrow a claim term's ordinary meaning). Each illustration is clearly designated as an embodiment of the '409 Patent: Figure Two is "an exemplary embodiment," and Figure Three is "an illustrative method." (Patent, col.3:3, 6.) Accordingly, the first user's Web browser may obtain the first URL by means other than direct download from the publisher's Web site.

As for the second half of its argument, Google contends that the source for the URL must be the publisher's Web site, which Plaintiffs do not dispute.[16] The specification describes in detail how a user's browser gets the first URL. First, a user enters a Web site's address (or URL) into her browser to establish a link to the Web site. (Patent, col.3:48–49.) After the link is established, the browser sends a download request signal to the desired Web site, which downloads information including a Web page with a banner, to the user's browser**.** (*Id.*, col.3: 51–54.) A Web page is defined as a hypertext file or source that "includes text as well as instructions for the user's browser as to how to display such text." (*Id.*, col.3:61–63.) The hypertext file that generates the Web page and banner is coded so the banner is "operable, in conjunction with the user's Web browser **3**, to form a hypertext link to the third party Web site

---

[16] Google misconstrues Plaintiffs' statement that "the claim allows the first user's Web browser to download the first URL from any source," which is clearly followed with the caveat "*provided* that it obtained the first URL as a result of interacting with the first publisher's Web site in the first instance." (Pl.s' Br., 21) (emphasis added.)

**13** when clicked upon. The aforementioned coding *includes the URL* pointing to the third party

site **13**. (Patent, col.4:47–53) (emphasis added.)

Google argues that this language requires its proposed construction that the "first URL is

a part of the Web page generated by the first Web site." (Def.'s Resp., 13) (citing Patent,

col.4:52–53.) However, Google overlooks the possibility that the HTML file could *include* the

key URL within a set of instructions, much as the hypertext source includes text and instructions

on how to display that text. The specification requires that the publisher's Web site's hypertext

file include the URL, but it does not dictate where in that coding the URL must be located.

Thus, the claim term should be construed to mean that the URL must be included in the

information acquired from the publisher's Web site, but that it may be acquired by more ways

than direct download. Accordingly, the Court should construe this claim term as "the first URL

is part of the Web page generated by the first Web site and acquired by the first user's Web

browser as a result of interaction between the first user's Web browser and the first Web site."

**C.** **"[R]edirecting . . . to the third Web site in response to the receipt of the first URL" — Claim One**

The parties agreed to define "redirecting" as "transferring or pointing from one place to

another, for example from one Web site to another Web site or from one node to another node."

(Pl.s' Br., 24) (Def.'s Br., 29.) They also agree that "third Web site" refers to the advertiser's

Web site. (Def.'s Br., 29.) They disagree whether the scope of "redirecting" includes

intermediate redirects or is limited to a single redirect and propose the following constructions:

| Web Tracking's Proposal | Google's Proposal |
|---|---|
| Either needs no construction, or should be construed according to the plain and ordinary meaning of claim language subject to the term | "Redirecting to the third Web site as the response to the first browser's request containing the first URL." |

| "redirecting." | |
|---|---|

Plaintiffs argue that the plain meaning of "redirecting" is broad and that "[a]ny process that ultimately redirects the first user's Web browser to the advertiser's Web site" meets the Claim, as long as the redirecting process follows the accounting service's receipt of the first URL. (Pl.s' Br., 25.) Google contends that the patent specification narrows the claim language by requiring that the user's Web browser be sent by a single redirect directly to the advertiser's Web site. (Def.'s Resp., 15–17.) I recommend that the Court construe this term according to the plain and ordinary meaning of the claim language, which contemplates multiple intermediate redirects.

As just explained in the previous section and noted at the *Markman* hearing,[17] Claim One's preamble uses the broadening phrase "comprising" instead of the narrowing phrase "consisting of." (Patent, col.6:31–33.) Thus, on its face, Claim One supports Plaintiffs' proposed construction that a user may be redirected to several intermediate Web sites. *See, e.g., Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1368 (Fed. Cir. 2003) ("The transition 'comprising' . . . indicates that the claim is open-ended and allows for additional steps.") (citations omitted). Claim One further supports permitting multiple redirects because the accounting service redirects the user's browser "in response to" the receipt of the first URL—not

---

[17] MR. FLYNN: "Because it is a comprising claim, the addition of other steps to those that are recited can't be relied upon to defeat the infringement, so long as the recited steps are met. So that if there are additional redirecting steps as long as the ultimate redirect of the user's browser to the advertiser's website is met, the addition of those additional steps does not take it outside the claim scope. That's the significance of using the word comprising in that claim." (Tr., 199:3–13.)

"as *the* response to." A definite article might have limited redirection to a single step, but the general language used does not. *See generally Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1356 (Fed. Cir. 2003) ("[I]t is a rule of law well established that the definite article 'the' particularizes the subject which it precedes. It is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'") (quotations omitted). Although Plaintiffs' position would be stronger if the claim had recited "as *a* response to," a *Markman* court is not charged with revising claim language. *See, e.g., Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 493 F.3d 1358, 1368 (Fed. Cir. 2007) (Plager, J., dissenting) ("[I]t is not the province of the courts to salvage poorly—or incorrectly—drafted patent claims."). The ordinary meaning of the claim term nonetheless supports Plaintiffs' construction.

After determining the ordinary meaning of the disputed terms, the Court "examines the written description and the drawings to determine whether [the patent's] use of that term is consistent with the ordinary meaning of the term," or whether the patentee has redefined the term. *Benetton Sportsystem U.S. v. First Team Sports*, 38 Fed. Appx. 599, 602 (Fed. Cir. 2002); *see Day Int'l*, 260 F.3d at 1348 (limiting claim scope when the patentee explicitly defines a term "contrary to its ordinary meaning or "has disclaimed subject matter"). The Court acknowledges the fine line between permissibly reading a claim term in the context of the entire patent and improperly reading limitations from the specification into a claim term. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 904 (Fed. Cir. 2004); *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.* 381 F.3d 1111, 1117 (Fed. Cir. 2004) ("The longstanding difficulty is the contrasting nature of the axioms that (a) a claim must be read in view of the specification and (b) a court may not read a limitation into a claim from the specification."). As discussed in Section

II(B) above, without a clear indication that the specification has redefined the claim terms, the Court cannot import limitations from the specification into the claim language. *See Vitronics*, 90 F.3d at 1582 ("The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.")

Google contends that the specification gives a specialized meaning to the otherwise-broad "dictionary definition" of "redirecting . . . to the third Web site in response to the receipt of the first URL." Because the '409 patent does not involve new technology, Google argues, its terms must be construed according to the standard internet protocols disclosed in the specification. (Def.'s Resp., 15–17.) Standard protocols achieved redirection by sending network messages as paired requests and responses. The specification consistently describes "redirecting" as a two-part exchange: a user's browser sends a request signal and the accounting service responds with a 302 redirect command. (*See, e.g.,* Patent, col.3:52–54.) The drawings also disclose a method of redirecting as "two halves of a single exchange": Figures One and Two both illustrate a request (referenced as **11***a*, **15***a*, and **19***a*) arrow from the user's Web browser to various Web sites, followed by a response (referenced as **11***b*, **15***b*, and **19***b*) arrow back to the user's browser. (*Id.*, Figs.1, 2) (cited in Def.'s Br., 30.) Every embodiment disclosed in the '409 patent describes redirection as a request-response pairing. Thus, in Google's view, the claim term should be construed consistent with the specification's implicit definition of redirection. (Def.'s Br., 32.)

Despite the specification's "multiple references to request-response pairings," (Def.'s Br., 31) the specification neither explicitly nor implicitly defines "redirecting . . . in response to the receipt of the first URL." To the contrary, the specification explains that:

> The download request received by the third party service **13** is *ultimately* intended to obtain information from the advertiser. As such, the third party service **13** redirects the received download request signal to the advertiser's Web site **17**, as indicated in operation block **107**.[18]

(Patent, col.5:1–5) (emphasis added.) The word "ultimately" suggests that the download request must eventually reach the advertiser's Web site, but does not indicate how it will reach the site. Although the specification repeatedly describes request-response pairings, Wexler did not clearly state that the claim term "in response to" was "consistent with only a single meaning." *See Microthin.com, Inc. v. SiliconeZone USA, LLC*, No. 10-cv-1079, 2010 U.S. App. LEXIS 10275, at *7–8 (Fed. Cir. May 20, 2010) ("To be his own lexicographer, a patentee must use a *special definition* of the term that is *clearly stated* in the patent specification or file history.") (internal quotations omitted) (emphasis added); *contra Bell Atl. Network Servs.*, 262 F.3d at 1270–71 (defining the term "mode" by implication because of the term's consistent use throughout the specification and figures). A single redirect and a redirect followed by subsequent redirects are both reasonable interpretations of the general claim term "redirecting . . . in response to . . ." when there are no clear statements in the specification that "in response to," as used in the Claims, meant "a single response to."

There is no support for Google's leap from the "general premise that for each request, there is a single response" to its conclusion that "the one and only one response to the request" is for the accounting site to redirect the user's browser to the advertiser's Web site. (Pl.s' Resp., 19–20.) Google's criticism of Plaintiffs' claim differentiation arguments are correct, but this

---

[18] Operation block **107** simply states "redirect download request signal to advertiser." (*Id.*, Fig. 3.)

analysis does not help Google's position.[19]

Nor does Google cite any examples in the prosecution history of Wexler disclaiming intermediate redirects as subject matter covered by the patent. *See Ccs Fitness*, 288 F.3d at 1366–67 (constricting a term's ordinary meaning if "the patentee distinguished that term from prior art on the basis of a particular embodiment . . . or described a particular embodiment as important to the invention"). Google identifies one statement in Wexler's deposition which purportedly indicates that "redirect . . . in response to" is limited to a single redirect: "You only get one shot to direct where that person is going to go. You have to work within the confines of the vocabulary . . . that has been furnished [by the network protocol]." (Def.'s Ex. C, Wexler Dep., 138:7–14) (cited in Def.'s Br., 31.) This statement is unavailing because Wexler was referring to the innovative way the '409 patent used error codes as redirect commands, not describing the redirection step. (Pl.s' Resp., 22–23); *contra, e.g., Computing Docking Station*, 519 F.3d at 1376–77 (distinguishing the present invention from computers with built-in display or keyboard that could not fit vertically into a docking station); *Bell Atl. Network Servs.*, 262 F.3d at 1273–74 (distinguishing conventional bandwidth distribution from the present invention's selective changing of bandwidth). Without words of deliberate exclusion or specific disclaimer, a patent covers more implementations than those described and illustrated in the

---

[19] Plaintiffs argue that Claim One must be broader than Claim Five because Claim Five depends from Claim One. (Pl.s' Br., 27–28; Pl.s' Resp., 19 n. 15.) Because Claim Five requires a specific redirection method, Plaintiffs reason, it therefore follows that Claim One is not limited to any single redirection method, but instead permits *any* redirection method that ultimately points the user's Web browser to the advertiser's Web site after the accounting service receives the URL. (*Id.*) This is not a logical inference. As Google indicates, if Claim One allows multiple redirects, then they are also allowed in Claim Five, because Claim Five does not purport to reduce the number of redirect messages that could be issued. (Def.'s Resp., 19.)

specification.  *See, e.g., Astrazeneca AB v. Mylan Labs., Inc.*, 490 F. Supp. 2d 381, 417 (S.D.N.Y. 2007) ("[P]referred embodiments like those often present in a specification are not claim limitations.") (citations omitted) ; *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) ("[A]lthough the specifications may well indicate that certain embodiments are preferred, particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments.") (citations omitted). Accordingly, "redirecting . . . to the third Web site in response to the receipt of the first URL" should be construed according to its plain and ordinary meaning, which may include multiple intermediate redirects.

### D. "Banner" — Claim Two

The parties agree that the claim term "first banner that is associated with the URL" in Claim Two means "the first URL is related to the first banner."  (Pl.s' Br., 29) (Def.'s Br., App. B, 4.)  As discussed at the *Markman* hearing, the parties' disagreement centers on the format of the advertisement, not the meaning of "advertisement."[20]  (Tr., 68:24–25, 69:1–2.)  The parties propose the following constructions:

| Web Tracking's Proposal | Google's Proposal |
|---|---|
| "an area of a Web page that can be used to display logos, advertisements or other content to potentially entice a user to obtain further information pertaining to the banner or to connect to an advertiser's Web site." | "an area of a Web page used to display logos or other graphical images." |

---

[20] MR. VERHOEVEN:     . . . I don't think the parties have really gotten into a dispute about what is or isn't advertising; is that right?

MR. FLYNN:     There's no dispute.

Plaintiffs argue that a "banner" may be in either a text or a graphical format, while Google contends it is limited to a graphical format.[21] (Tr. 60:20–25, 61:25–62:1–2.) After considering both parties' arguments, I recommend that the Court adopt Google's proposal and construe "banner" to mean "an area of a Web page used to display logos or other graphical images." By "graphical images," I mean that a banner's content may include either text or graphics as long as the banner itself takes a graphical format, such as a "JPEG" or "GIF" file.

Claim Two does not define "banner." (Patent, cols.6–8.) Claims Eight and Eleven, which also refer to banners, do not elaborate on whether a banner must be graphical. (*Id.*, cols.7:36–38, 8:1–2, 31–36.) After consulting the remaining intrinsic evidence, I note that Plaintiffs take their construction directly from the text of the specification: "The banner **9** is an area of the Web page **7** that can be used to display logos, etc., that will hopefully entice a user reading the banner to obtain further information pertaining to the banner." (*Id.*, col.3:55–58.) However, Plaintiffs' argument that the term "etc." in "logos, etc." implies that the covered materials are not limited to graphical images such as logos, is unavailing because it is unclear whether "etc." extends to include text or simply includes other logo-like items.[22] (Pl.s' Resp.,

---

[21] MR. VERHOEVEN:    You could have a logo for example, that had the image of lettering but it would be an actual picture . . .

THE COURT:    Yes, I understand. So it's not–the presence of a logo is not determinative. It's the type of file.

             ***

MR. VERHOEVEN:    [Exactly]. . . a difference in the attributes of the actual file itself and not so much the content of the file.

[22] Plaintiffs' related argument that a banner can include a "wide variety of content" because the specification describes a Web page as "a single file of hypertext information, which

25.)  There is no further discussion of the meaning of "banner."  Similarly, the prosecution history does not discuss banner formats.  It is therefore appropriate to consult extrinsic evidence. *Phillips*, 415 F.3d at 1317 (including inventor testimony and dictionaries); *Interactive Gift Exp., Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1332 (Fed. Cir. 2001).

Although the Court must be careful not to equate an inventor's subjective understanding with the term's objective meaning, the inventor is presumed to be a person of ordinary skill in the art.  *See Searfoss v. Pioneer Cons. Corp.*, 374 F.3d 1142, 1149 (Fed. Cir. 2004) (deeming what the claim terms would mean to a layperson "irrelevant"); *Engel Indus. Inc. v. Lockformer Co.*, 96 F.3d 1398, 1405 (Fed. Cir. 1996) ("[An inventor's] subjective intent is of little or no probative weight in determining the scope of the claims, except as documented in the prosecution history."); *Phillips*, 415 F.3d at 1313 ("[I]nventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art.").  In this case, Wexler's understanding of the term comports with Google's proposed construction:

Q:     When you used the term "banner" back then, what did you mean?

A:     The advertising banner.

Q:     And what's an advertising banner?

A:     That would be an advertisement.

Q:     And do you distinguish a banner from a text file in any way at this point in time?

A:     I'm not sure which text file.

---

may be text, graphics and even sound," and a banner is an area of a Web page, is unconvincing. (Pl.s' Br., 20.)  Although Claim Two depends on Claim One, it does not follow that the only limitation in Claim Two is that it "provides for an area of a Web page," as Plaintiffs argue.  (*Id.*)

| Q: | From just having text on the screen versus a banner, those two different things, are they the same thing? |
|---|---|
| A: | If it is an advertisement and someone is clicking on it, then it's an advertisement. |
| Q: | If it is an advertisement and somebody is clicking on it, it is an advertisement. And what's a banner? |
| A: | In my understanding? |
| Q: | Yes. |
| A: | My understanding of the banner was the graphic, the [G]IF file, that was part of the advertisement. |

(Def.'s Ex. C, Wexler Dep., 242:2–25, 243:2–3.)  Accordingly, to at least one person of ordinary skill in the art, the term "banner" meant a graphical file.

In further support of its construction limiting "banner" to graphical formats, Google submits the following dictionary definition:

> banner ad
> A graphic image used on a Web site to advertise a product or service.  Banner ads (ad banners) are typically 460 pixels wide by 60 pixels high

(Def.'s Ex. F, *The Computer Glossary: Complete Illustrated Dictionary* (9th ed. 2001), 25.)  The Court may consult dictionaries to help it understand the underlying technology or how "one of skill in the art might use the claim term."  *See Phillips*, 415 F.3d at 1318 (recognizing "technical dictionaries . . . as among the many tools that can assist the court"); *Vitronics*, 90 F.3d at 1584 ("so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents").  Mindful not to over-rely on dictionaries, I consulted the previous edition of *The Computer Glossary*—the one in effect when the '409 Patent was approved.  The 1998 edition did not define "banner," "banner ad," "advertisement," or "ad," but defined the following related terms:

<u>graphics based</u>
The display of text and pictures as graphic images; typically bitmapped images. Contrast with <u>text based</u>.

<u>text based</u>
Also called character based, the display of text and graphics as a fixed set of predefined characters.  For example, 25 rows of 80 columns.
Contrast with <u>graphics based</u>.

Although inconclusive as to the meaning of "banner," these definitions suggest that as of 1998, text and pictures could be displayed as either "graphic images" or as "a fixed set of predefined characters."  This distinction reinforces the dispute between the parties as one over format, not content.  Accordingly, Plaintiffs' argument that Google's proposed definition "would exclude text from the type of advertising content" mischaracterizes Google's position.[23]

In addition to the dictionary definitions provided by the parties, I consulted other extrinsic evidence, including current technical dictionaries and currently available versions of Web sites from the late 1990s, when the '409 Patent was filed.  These sources support Google's proposed construction.  The glossary at MarketingTerms.com, for example, include a definition for "beyond the banner," as "online advertising not involving standard GIF and JPEG banner ads."[24]  Sample web sites from the years 1996 through 1998 also support Google's proposal.[25]

---

[23] Plaintiffs' related argument that the banner must include text because the specification describes the banner as addressing a "reader" is equally misplaced.  (Pl.s' Br. 30–31.)  Google does not dispute that text may be included in a banner's content.

[24] *See* Glossary, http://www.marketingterms.com/dictionary/beyond_the_banner/ (last visited July 26, 2010).

[25] The Internet Archive's Web site lets users browse Web pages archived since 1996.  *See* Internet Archive, "Wayback Machine," http://www.archive.org/web/web.php (last visited July 23, 2010).  The Court recognizes that litigants seeking to submit these archived images as evidence run into authentication problems.  *See, e.g., Chamilia, LLC v. Pandora Jewelry, LLC*, No. 04-cv-6017, 2007 WL 2781246, at *6 (S.D.N.Y. Sept. 24, 2007) ("This putative evidence suffers from fatal problems of authentication under Fed. R. Evid. 901."); *Novak v. Tucows, Inc.*,

For example, on November 28, 1996, Yahoo.com displayed a banner for Prodigy Internet containing text, images, and logos.[26] All of this varied content was contained in a single GIF file. From the Yahoo! home page, clicking on the "Sports" link under the "Recreation and Sports" subheading delivers another banner advertisement in GIF format.[27] This SportsLine USA advertisement includes text, images, and a logo as content even though it is technically a single, graphical file. Even the February 10, 1998 version of Yahoo.com[28] shows banners in graphical formats: for example, clicking on the "Health" sub-category on the Yahoo! home page brings the reader to a Web page displaying a banner advertisement for "Buzz: The Talk of Los Angeles," a JPEG image. These Web sites are instructive, despite being a limited sample size.

The Court must construe "banner" consistent with its meaning at the time Wexler filed his patent. *See, e.g., Kopykake Enters., Inc. v. Lucks Co.*, 264 F.3d 1377, 1383 (Fed. Cir.2001) ("[W]hen a claim term understood to have a narrow meaning when the application is filed later acquires a broader definition, the literal scope of the term is limited to what it was understood to mean at the time of filing."). Accordingly, "banner" should be construed to mean "an area of a

---

No. 06-cv-1909, 2007 WL 922306, at *5 (E.D.N.Y. March 26, 2007) (striking Wayback Machine evidence "in the absence of any authentication of plaintiff's internet printouts, combined with the lack of any assertion that such printouts fall under a viable exception to the hearsay rule"). Nevertheless, the federal courts are familiar with this internet resource.

[26] *See* Yahoo.com, http://web.archive.org/web/19961128070641/http://www8.yahoo.com/ (last visited July 26, 2010).

[27] *See* Yahoo.com, http://web.archive.org/web/19961220155359/www.yahoo.com/Recreation/Sports/ (last visited July 26, 2010).

[28] *See* Yahoo.com, http://web.archive.org/web/19980210180004/www.yahoo.com/Health/ (last visited July 26, 2010).

Web page used to display logos or other graphical images" because in 1996 a banner's content could include either text or graphics as long as the banner itself took a graphical format.

## <u>CONCLUSION</u>

For the foregoing reasons, I respectfully recommend that the Court construe the following claim terms accordingly:

(1)     "Fourth Web site" as "a Web site owned and operated independently from the first, second, and third Web sites, and that performs the function of an unbiased third-party accounting and statistical service;"

(2)     "Fourth node" as "a node owned and operated independently from the first, second, and third nodes, and that performs the function of an unbiased third-party accounting and statistical service;"

(3)     "First Web site, Second Web site, and Third Web site" as "these terms indicate that each of these Web sites is different from the others, and each must be owned and operated independently from the fourth Web site / unbiased third-party accounting and statistical service;"

(4)     "The first URL is obtained by the first user's Web browser from the first Web site" as "the first URL is part of the Web page generated by the first Web site and acquired by the first user's Web browser as a result of interaction between the first user's Web browser and the first Web site;"

(5)     "Redirecting . . . to the third Web site in response to the receipt of the first URL" according to its "plain and ordinary meaning" because it needs no construction;

(6)     "Transmitting, in response to the receipt of the first URL, a second URL to the first browser" according to its "plain and ordinary meaning" as it needs no construction; and

(7)     "Banner" as "an area of a Web page used to display logos or other graphical images."

Any objections to the recommendations made in this Report must be filed with the Clerk of the Court and the Honorable Roslynn R. Mauskopf within fourteen days of receipt hereof—by

August 10, 2010. Failure to file timely objections may waive the right to appeal the District

Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72 (amended Dec. 1, 2009).


**Dated: July 27, 2010**
      **Brooklyn, New York**

                        *Ramon E. Reyes Jr.*
                        **Ramon E. Reyes, Jr.**
                        **United States Magistrate Judge**