**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**BROOKLYN DIVISION**

WEB TRACKING SOLUTIONS, LLC. and
DANIEL WEXLER,

        Plaintiffs/Counterclaim
        Defendants,

    v.

GOOGLE, INC.,

        Defendant/Counterclaim
        Plaintiff.

Case No. 1:08-cv-03139 (RRM) (RER)

<u>**GOOGLE INC.'S RESPONSE TO PLAINTIFFS WEB TRACKING SOLUTIONS LLC'S
AND DANIEL WEXLER'S OBJECTIONS TO MAGISTRATE JUDGE REYES'
REPORT AND RECOMMENDATION**</u>

QUINN EMANUEL URQUHART
  & SULLIVAN, LLP

Charles K. Verhoeven
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700
Email: charlesverhoeven@quinnemanuel.com

Edward J. DeFranco
Patrick D. Curran
Aaron S. Kaufman
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: eddefranco@quinnemanuel.com

Dated: September 30, 2010

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................... 1

II.     BACKGROUND ....................................................................................................... 3

        A.     The Asserted Patent ..................................................................................... 3

        B.     Mr. Wexler Narrowed His Patent Claims During Prosecution ............................ 8

        C.     The Report & Recommendation ................................................................. 11

III.    THE LAW OF CLAIM CONSTRUCTION ............................................................. 13

IV.     ARGUMENT – PLAINTIFFS' OBJECTIONS LACK MERIT ................................... 14

        A.     Claim Scope Is An Issue Of Law, Not Fact ................................................ 15

        B.     Plaintiffs Improperly Request Permission To Argue Claim Scope To The
               Jury ........................................................................................................... 17

        C.     Plaintiffs Omit Critical Portions Of The *Markman* Hearing Transcript .............. 20

        D.     Magistrate Judge Reyes Did Not Inappropriately Consider The Accused
               Product During Claim Construction ................................................................ 22

V.      CONCLUSION ....................................................................................................... 24

# TABLE OF AUTHORITIES

**Page**

### Cases

*Computer Docking Station Corp. v. Dell, Inc.*,
  519 F.3d 1366 (Fed. Cir. 2008) ..................................................................... 16

*Ekchian v. Home Depot, Inc.*,
  104 F.3d 1299 (Fed. Cir. 1997) ..................................................................... 14

*Graham v. John Deere Co.*,
  383 U.S. 1 (1966).......................................................................................... 15

*Markman v. Westview Instruments*,
  517 U.S. 370 (1996) ....................................................................... 3, 13, 14, 18

*MercExchange, LLC v. eBay, Inc.*,
  401 F.3d 1323 (Fed. Cir. 2005), *vacated on other grounds*, 547 U.S. 388 (2006) ................ 13

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008) .............................................................. passim

*Omega Eng'g Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ..................................................... 2, 15, 16, 17

*Rheox Inc. v. Entact, Inc.*,
  276 F.3d 1319 (Fed. Cir. 2002) ..................................................................... 16

*Southwall Techs., Inc. v. Cardinal IG Co.*,
  54 F.3d 1570 (Fed. Cir. 1995) ....................................................................... 14

*Springs Window Fashions LP v. Novo Indus., L.P.*,
  323 F.3d 989 (Fed. Cir. 2003) ......................................................................... 2

*Standard Oil Co. v. Am. Cyanamid Co.*,
  774 F.2d 448 (Fed. Cir. 1985) ....................................................................... 15

*Sulzer Textil A.G. v. Picanol N.V.*,
  358 F.3d 1356 (Fed. Cir. 2004) ..................................................................... 13

*U.S. Surgical Corp. v. Ethicon, Inc.*,
  103 F.3d 1554 (Fed. Cir. 1997) ..................................................................... 13

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
  442 F.3d 1322 (Fed. Cir. 2006) ............................................................... 22, 23

**NOTE ON CITATIONS**

1.     The patent-in-suit, U.S. Patent 5,960,409 ("the '409 patent"), is attached to the Declaration of Edward J. DeFranco dated September 30, 2010 ("DeFranco Declaration") as Exhibit A.  References to the '409 patent are indicated by column and line number.  A reference to "Ex. A, col. 3:15" means column 3, line 15 of the '409 patent.

2.     The prosecution history of the '409 patent is attached to the DeFranco Declaration as Exhibit B.  Citations to individual pages are indicated using document identification numbers (*e.g.*, Ex. B at WTS000093).

3.     Magistrate Judge Reyes' Report and Recommendation dated July 27, 2010 is attached to the DeFranco Declaration as Exhibit C and referred to herein as "R&R."  Citations to individual pages of the R&R are indicated by page number (*e.g.*, R&R at 17).

Defendant Google, Inc. ("Google") submits this response to the objections filed August 31, 2010 (Dkt. 71) ("Obj.") by Plaintiffs Web Tracking LLC ("Web Tracking") and Daniel Wexler ("Wexler") (collectively, "Plaintiffs") to Magistrate Judge Reyes' Report and Recommendation dated July 27, 2010.  For the reasons set forth below, this Court should adopt the Report and Recommendation in its entirety.

## I.   INTRODUCTION

Magistrate Judge Reyes' Report and Recommendation ("R&R") on claim construction was the result of a thorough process agreed upon by the parties and ratified by the court.  The parties filed voluminous claim construction briefs on March 17, 2010 and again on April 19, 2010 (Dkts. 49, 50, 56, 57), and also submitted detailed tutorials on the technology at issue. (Dkts. 59 & 60.)  After studying those materials, Magistrate Judge Reyes conducted a claim construction hearing on April 29, 2010 that lasted an entire day.  (Dkt. 63.)  During that lengthy hearing, the parties each presented detailed evidence and argument on the disputed claim terms, and addressed all of the questions raised by the court.  (Dkts. 61 & 62.)

Following that hearing, Magistrate Judge Reyes issued a report that resolved the disputed claim construction issues.  The report did not adopt Plaintiffs' or Defendant's positions wholesale, but instead recommended that this Court adopt Plaintiffs' proposed constructions for certain terms and Defendant's constructions for others.  (R&R at 2.)

Plaintiffs now object to the Magistrate Judge's analysis of the proper construction for one disputed term.  Magistrate Judge Reyes recommended construing the term "fourth web site" as "a Web site owned and operated independently from the first, second and third Web sites, and that performs the function of an unbiased third-party accounting and statistical service." (R&R at 2, 16-17.)  Plaintiffs do *not* assert that this construction is incorrect, and in fact request that this Court adopt the R&R's proposed construction of "fourth web site" word-for-word.  (Obj. at

4, 9.)  Rather, Plaintiffs assert that the R&R improperly made "factual" determinations by explaining that this claim construction requires financially unbiased accounting services.  (Obj. at 9.)  According to Plaintiffs, "the Magistrate Judge has acted as both judge and jury" by "construing the claim term and applying the claim construction to a particular factual scenario limited to method of payment."  (Obj. at 15.)

Plaintiffs are incorrect; the R&R makes no factual findings at all about any accused product.  The R&R merely defines the scope of the claims, and recognizes that the inventor's statements to the Patent Office during prosecution limit the claims.  Specifically, the R&R determines *as a matter of law* – not fact – that Mr. Wexler limited his patent to financially-neutral accounting services, in order to overcome the Patent Office's determination that his claims were clearly anticipated by prior art.[1]  Courts routinely identify and enforce claim limitations added during prosecution in order to overcome a Patent Office rejection.  Indeed, this is one of the primary goals of the claim construction process.[2]  Plaintiffs are wrong to allege that the R&R erred by using prosecution disclaimer to define the scope of the claims.

Plaintiffs likewise ask this Court to ignore the R&R's thorough and detailed analysis so that ***the jury*** may decide the scope of the asserted claims.  (Obj. at 8-9 ("it should be for the jury, not the judge during the claim construction process, to determine whether a third-party accounting service that is paid on the number of clicks is 'unbiased' within the meaning of the

---

[1]    *See Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003) ("A patentee may not state during prosecution that the claims do not cover a particular device and then change position and later sue a party who makes that same device for infringement.  The prosecution history constitutes a public record of the patentee's representations concerning the scope and the meaning of the claims. . . .").

[2]    *See Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) ("The doctrine of prosecution disclaimer is well established in Supreme Court precedent, precluding patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution.").

claim term").)  This is legal error.  The court – not the jury – must resolve disputes over claim

scope.  *See Markman v. Westview Instruments,* 517 U.S. 370, 388-89 (1996) ("judges, not juries,

are the better suited to find the acquired meaning of patent terms," a process requiring use of

"special doctrines relating to the proper form and scope of claims that have been developed by

the courts and the Patent Office"); *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d

1351, 1360 n.3 (Fed. Cir. 2008) ("the court, and not the jury, should resolve claim construction

disputes").  Indeed, Plaintiffs invite error by suggesting that the jury – not the Court – should

decide the scope of Mr. Wexler's claims.  *See O2 Micro* , 521 F.3d at 1360 (vacating and

remanding where Court held jury could resolve scope of disputed claim term; "when the parties

raise an actual dispute regarding the proper scope of [asserted] claims, the court, not the jury,

must resolve that dispute.").

Because Plaintiffs' objections fail to identify any error in the R&R's analysis, Defendant

respectfully requests that this Court adopt the R&R in full.

## II.    BACKGROUND

### A.    The Asserted Patent

The '409 patent claims a business method – one that uses a third-party accounting service

to track "clicks" on Internet advertisements.  According to the claims, advertisements appear on

publishers' web sites (such as CNN.com), Internet users click on those advertisements, and those

clicks are tracked and used for accounting purposes to determine how much compensation is

paid by the advertiser to the publisher.

The '409 patent's specification and prosecution history admit that before the alleged

invention, advertisers and publishers could track clicks.  (Ex. A, col. 2:12-14; Ex. B,

WTS000070-71.)  But given that these parties had a financial interest in the tracking figures, the

patent explains that "a need presently exists for an <u>unbiased</u>, readily available source of

statistical/accounting information for Internet advertisers and advertising publishers." (Ex. A, col. 2:31-35.) The patent allegedly provides a method for both advertisers and publishers to use a trusted and independent "third party accounting/statistic service" to track and log "clicks" on advertisements. (*Id.*)

The creation of an unbiased, independent third-party accounting web site, without any financial incentive to bias its statistics in favor of the publisher or the advertiser, was the alleged key point of novelty in the patent. Mr. Wexler told the PTO that his alleged invention would solve the problem of trust between publishers and advertisers: "because the amount of money paid by the advertiser to the publisher is dependent on the accounting statistics collected [by the publisher or advertiser], there is, or is perceived to be, the temptation by the one doing the accounting to bias the statistics in its favor." (Ex. B, WTS000070.) Thus, "advertisers don't completely trust publishers to be honest and publishers don't completely trust advertisers either." (*Id.*) Mr. Wexler's approach to this problem was a third-party website "owned and operated by an independent entity – one that is not associated with either the publisher or the advertiser." (*Id.*) Separating the accounting service from the financial incentives of the publisher and the advertiser would eliminate the temptation to bias the number of "clicks" in either party's favor, resulting in statistics that both publishers and advertisers would perceive as "unbiased." (Ex. A, col. 2:8, 2:32.)

The specification of the '409 patent discloses a third-party accounting service that "maintains a count" of how many times an ad displayed by particular publishers has been clicked. (*Id.*, col. 2:46-51.) It keeps track of this information using a record of each publisher's "Web site address." (*Id.*) The third-party accounting service then "redirects" the user's Web browser to the advertiser's Web site. (*Id.*, col. 2:51-56.) As the patent later explains, "[t]his

method is transparent to the user; i.e., as far as the user is aware, the banner takes him directly to the advertiser's Web site." (*Id.*, col. 2:54-56.)

The '409 patent admits that Internet advertising was already well-known at the time of the alleged invention: "knowledge of the Internet, and its use, are ubiquitous," and "[b]usinesses have recognized the benefits of establishing a presence on the Internet." (*Id.*, col. 1:12-15.) The patent also acknowledges that the network protocols underlying the Internet were also already established and well-known before the alleged invention. (*Id.* col. 3:11-22 ("Details concerning [Web pages, Web browsers, and Web servers], and the process of establishing communication links are known to those skilled in the art"); *id.* col. 5:14-23 (discussing HTTP server programs and redirect response messages).) Finally, the patent explains that the number of "clicks" on a banner could already be recorded by advertisers and by publishers before Mr. Wexler's invention. (*Id.*, col. 2:12-14; Ex. B, WTS000070-71.) Thus, the supposedly novel element of the patent was an "unbiased" third-party accounting service that could collect the same information advertisers and publishers could already collect themselves. (*Id.* col. 2:18-19, 2:33.)

Figure 1 of the patent illustrates the prior art configurations that Mr. Wexler purportedly improved upon (labels in yellow added by Google, and certain numeric references in the patent removed for clarity):



In this example, a user's web browser connects to a publisher's web site by sending a request to download information [11a]. The web site responds by sending information [11b] to the user's web browser. The browser displays the information as a web page, which includes a banner advertisement. (*Id*. col. 3:35-53.) If the user "clicks" on that ad, the link associated with the ad causes the user's browser to send a request [19a] to the advertiser's web site, which returns the advertiser's webpage [19b]. (*Id*., col. 4:10-18.) According to the patent, the accounting (click-tracking) performed in the prior art was done by either the publisher or the advertiser, and not by an independent third party.

Figure 2 depicts the claimed method for inserting an additional party into the transaction:



FIG. 2

Here, the banner ad is linked to the third-party accounting service, rather than to the advertiser. (Ex. A, col. 4:47-53 & Fig. 3.)  When a user clicks on the advertisement, the user's browser first sends a request [15a] to the third-party accounting service.  (*Id*. col. 4:37-53.)  The accounting service logs that request (*i.e.*, tracks that click), and then sends the user's browser a "redirect" response [15b] that causes the browser to send a request [19a] to the advertiser's web site, which again returns the advertisers webpage [19b].  (*Id.*, col. 4:54-5:10.)

The '409 patent's eleven claims each recite the steps of a multi-party accounting method. For example, Claim 1 recites "receiving, at a fourth Web site [i.e., the accounting website], a first uniform resource locator from a first user's Web browser [i.e., the party that clicked on advertising] . . . logging, at the fourth Web site, the receipt of the first uniform resource locator . . .

. [and] redirecting, at the fourth Web site, the first user's Web browser to the third Web site [i.e.,

the advertiser's site]. . . ."  Ex. A, claim 1.  It is undisputed that the "fourth Web site" in this

claim represents the allegedly novel third-party accounting service Mr. Wexler characterized as

his invention.

### B.      Mr. Wexler Narrowed His Patent Claims During Prosecution

Mr. Wexler significantly amended and narrowed his patent claims during the course of

prosecution in order to overcome the Patent Office's multiple rejections of his application as

anticipated by prior art.  As explained more fully below, the prosecution history consists of the

original application, two Office Actions from the Patent Office Examiner, one in-person

interview with the Examiner, and two Amendments in response to the Office Actions and

interview.  In the two Office Actions, the Patent Office rejected the claims as "clearly

anticipated" by several prior art references.  In response to each of these rejections, Mr. Wexler

made narrowing amendments to his claims, and also argued that his claims were different from

the prior art because they required "an independent accounting Web site" (Ex. B, WTS000052,

WTS000071 (emphasis in original).)  He repeatedly and unequivocally stressed that his claims,

unlike the prior art, were directed to an accounting site that is "owned and operated by an

independent entity – one that is not associated with the publisher or the advertiser."  (*Id*., 51, 70.)

In fact, he twice analogized his alleged invention to the Neilson rating system used in television:

"[i]n the same way that television advertising needed an independent entity to tally ratings, the

Internet needs an independent entity to account for the referrals from publishers to advertisers."

(*Id*.)  These repeated representations to the Patent Office directly bear on the nature and limits of

the claims in Mr. Wexler's patent.

*Application and first rejection*.  Mr. Wexler filed his patent application in the U.S. Patent

Office on October 11, 1996.  (Ex. B, WTS000006.)  As originally filed, the application contained

nine claims.  In an Office Action dated July 13, 1998, the Patent Office rejected all 9 claims as

"clearly anticipated by any single one" of three prior art references.  (*Id.*, WTS00040.)  The

Patent Office Examiner found that each reference disclosed using a "third-party" to collect

accounting data and then redirecting the user to the advertisement they originally clicked on:

> Each of the references discloses a third-party which logs specific data concerning
> the path which a user took to get to that location, and a redirection operation
> which sends the user to their preferred location based on the advertisement which
> they "clicked" in the first place.

(*Id.*)

   ***First amendment***.  To overcome this rejection, Mr. Wexler amended his claims in an

Amendment dated November 18, 1998.  In the remarks to the Amendment, Mr. Wexler

explained that his claims had been amended "to clarify the distinction between the present

invention and the prior art."  (*Id.* WTS000050.)  Mr. Wexler argued that his "independent"

accounting service was novel, because in the prior art, according to Mr. Wexler, "the accounting

is performed by either the publisher or by the advertiser," (*id.*), while the accounting service

recited in the claims would address the need for third-party accounting services:

> Second, the present invention enables the accounting site to be owned and
> operated by an independent entity – one that is not associated with either the
> publisher or the advertiser. A disadvantage with Internet accounting systems in
> the prior art is that the accounting is performed by either the publisher or by the
> advertiser.  And *because the amount of money paid by the advertiser to the
> publisher is dependent on the accounting statistics collected, there is, or is
> perceived to be, the temptation by the one doing the accounting to bias the
> statistics in its favor*.  In other words, advertisers don't completely trust publishers
> to be honest and publishers don't completely trust advertisers either.

> The situation is analogous to that in television advertising.  *Because television
> advertising fees are based on ratings, television stations don't trust advertisers to
> tally the ratings and advertisers don't trust television stations*.  Therefore, the
> need existed for an independent entity to tally television ratings, which has been
> filled by the well-known A.C. Nielson Company.

> In the same way that television advertising needed an independent entity to tally
> ratings, the Internet needs an independent entity to account for the referrals from
> publishers to advertisers.  The present invention enables that independent entity.

(*Id.*, WTS000051-52, underline in original; italics added).  Thus, Mr. Wexler asserted that "because the independent claims, claims 1, 7, and 9, recite the interplay between multiple publishers, an advertiser, and an <u>independent</u> accounting web site . . . the claims, as amended, overcome the rejection and are now allowable." (*Id.*, WTS000052. )

*Second rejection*.  On February 9, 1999, the Examiner again rejected the claims.  The rejection cited additional prior art references that disclosed "a third-party which logs specific data concerning the path which a user took to get to that location, and a redirection operation which sends the user to their preferred location based on the advertisement which they 'clicked' in the first place." (*Id.*, WTS000059.)

*In-person meeting and second amendment*.  On April 29, 1999, Mr. Wexler and his attorney met with the Examiner at the Patent Office to object to the Examiner's characterization of the claims and the prior art.  (*Id.*, WTS000062.)  One week later, on May 3, 1999, the applicant submitted a second amendment and "remarks which summarize the discussion at the interview." (*Id.*, WTS000068.)  Those remarks show Mr. Wexler argued for allowance by repeating and emphasizing the exact same argument cited above: he argued that his claims were in fact allowable because his claimed accounting service would be "owned and operated by an independent entity – one that is not associated with either the publisher or the advertiser." (*Id.*, WTS000070.)

Again, Mr. Wexler stressed that the prior art did not address the divergent financial incentives of the publisher and advertiser: "A disadvantage with Internet accounting systems in the prior art is that the accounting is performed by either the publisher or by the advertiser.  And *because the amount of money paid by the advertiser to the publisher is dependent on the accounting statistics collected, there is, or is perceived to be, the temptation by the one doing the*

*accounting to bias the statistics in its favor.*" (*Id.*, WTS000070 (emphasis added).)  Mr. Wexler again analogized the problem to television advertising: "*Because television advertising fees are based on ratings, television stations don't trust advertisers to tally the ratings and advertisers don't trust television stations.*" (*Id.* (emphasis added).)  And again, Mr. Wexler asserted that his claims recited a solution to this problem not found in the prior art: "In the same way that television advertising needed an independent entity to tally ratings, the Internet needs an independent entity to account for the referrals from publishers to advertisers.  The present invention enables that independent entity." (*Id.*.)

*Allowance*.  Following the meeting and the second amendment, the Patent Office allowed the applicant's claims.  The patent issued on September 28, 1999.  (*Id.*, WTS000006.)

## C.      The Report & Recommendation

Magistrate Judge Reyes' report and recommendation analyzed and resolved numerous claim construction disputes among the parties, including the dispute regarding the scope of the "fourth Web site" recited in the asserted claims.   As the Court noted, the constructions proposed by Plaintiffs and Defendant were largely identical:

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| **Fourth Web site**: A Web site that is owned and operated by an entity that is independent from the entity(s) that own and operate the first, second and third Web sites, and that performs the function of a third party accounting and statistical service. | **Fourth Web site**: A Web site owned and operated independently from the first, second and third Web sites, and that performs the function of an unbiased third party accounting and statistical service. |

In light of these near-identical constructions, Magistrate Judge Reyes succinctly stated that "the parties dispute centers on *how* independent the fourth Web site must be from the other Web sites." (R&R at 10) (emphasis added).  The Court further recognized that the parties' similar proposed constructions for this term masked a deep divide on the scope of the asserted claims:

> Plaintiffs argue that the accounting service must only be owned and operated by an entity that is independent from the publisher and advertiser.  In other words, Plaintiffs argue, as long as these accounting functions are performed by an entity that is not either the publisher or the advertiser, the claim term is met.  Google counters that the existence of an independently owned and operated accounting service is not enough – the accounting service must be operated in such a way that there is no incentive to bias its statistics in either party's favor.

(Obj. at 10-11) (quote and citation omitted).

To resolve this dispute over claim scope, Magistrate Judge Reyes analyzed the claim language, the patent specification, and the prosecution history. (R&R at 11-16.)  As the Magistrate noted, Mr. Wexler's patent application was repeatedly rejected by the Patent Office as "clearly anticipated" by multiple prior art accounting systems.  (R&R at 14; Ex. B at WTS00040.)  In response to each rejection, Mr. Wexler told the Patent Office that his claimed accounting service would be paid differently than prior online accounting systems, and would therefore offer a new solution to a problem of trust.  (Ex. B, WTS000051-52.)  The R&R recognized that Mr. Wexler's argument regarding the "payment aspect" of the claims "was critical to Wexler's ability to overcome the Patent Office's two rejections of his application on the ground that his invention was 'clearly anticipated' by prior art," (R&R at 14), and that "Wexler emphasized this payment aspect in both of the amendments he submitted to the Patent Office" (*id.*).  The R&R likewise noted that Mr. Wexler limited his claims by repeatedly representing to the Patent Office that those claims recited an accounting system akin to the Nielsen television rating system; "Nielsen does not have a financial interest in the numbers it reports," and "Wexler cannot now disclaim his comparison of the '409 patent to the Nielsen television ratings."  (R&R at 15.)

The R&R concluded by emphasizing that Plaintiffs' proposed construction ignored Mr. Wexler's statements to the Patent Office.  As noted above, Mr. Wexler told the Patent Office that

his claims recited a financially-neutral accounting service not seen in the prior art.  But under Plaintiffs' proposed construction, any number of financially biased entities would fall within the scope of the claims – including accounting services that were paid based on the number of clicks they recorded.  (R&R at 17.)  Such a broach claim scope would undo Mr. Wexler's disclaimers to the Patent Office and "fly in the face of the purpose of the '409 Patent."  R&R at 17. Accordingly, the R&R concluded that Defendant's proposed construction more accurately reflected the scope of the claims in light of Mr. Wexler's prosecution disclaimers.  *See* R&R at 16 ("Thus, after considering the relevant prosecution history . . . Google's construction appropriately limits 'fourth Web site' to ownership by an accounting service that is owned independently and operates in an unbiased manner.").

## III.   THE LAW OF CLAIM CONSTRUCTION

Claim construction is an issue of law.  *Markman v. Westview Instruments,* 517 U.S. 370, 388 (1996).  The construction of a patent's claims "is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement."  *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).  A court's claim construction order must not leave disputed issues of claim scope open for the jury's consideration; "[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."  *O2 Micro*, 521 F.3d at 1362.

Accordingly, claim construction is not merely a selection of words to include in jury instructions.  The claim construction order "is an explanation to the parties of the *reasoning* behind [the] claim construction."  *MercExchange, LLC v. eBay, Inc.*, 401 F.3d 1323, 1329 (Fed. Cir. 2005) (emphasis added), *vacated on other grounds*, 547 U.S. 388 (2006).  The claim construction must instruct the jury on what the claims actually mean, rather than providing an

ambiguous definition that is itself open to litigation.  *See, e.g., Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004) ("[T]he district court must instruct the jury on the *meanings* to be attributed to all disputed terms . . . so that the jury [can] intelligently determine the questions presented.") (emphasis added).  As the Supreme Court has made clear, "judges, not juries, are the better suited to find the acquired meaning of patent terms," since a court is better suited to apply "special doctrines relating to the proper form and scope of claims that have been developed by the courts and the Patent Office."  *Markman*, 517 U.S. at 388-89; *see also O2 Micro*, 521 F.3d at 1362 n.3 ("the court, and not the jury, should resolve claim construction disputes").

One of these "special doctrines" relating to patent scope is prosecution disclaimer.  Under this doctrine, the Federal Circuit has emphasized that "[c]laims may not  be construed one way in order to obtain their allowance and in a different way against accused infringers."  *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).  Where a patentee characterizes claims during prosecution to distinguish them from invalidating prior art, the patentee cannot later assert that the claims have a broader meaning.  *See, e.g., Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997) ("[B]y distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover.").

## IV.   ARGUMENT – PLAINTIFFS' OBJECTIONS LACK MERIT

Plaintiffs' objections to the R&R are without merit.  Magistrate Judge Reyes properly used the patent's specification and prosecution history to determine the scope of the term "fourth Web site."  This determination was legal, not factual, and Plaintiffs' request to re-argue the issue to a jury is inappropriate.  This Court should adopt the R&R in full.

A.     **Claim Scope Is An Issue Of Law, Not Fact**

Plaintiffs repeatedly assert that Magistrate Judge Reyes made factual determinations by determining what type of accounting service is represented in the patent claims as the "fourth Web site."  According to plaintiffs, the nature of the "fourth web site" is inherently factual, and a definitive definition of the characteristics of the claimed "fourth web site" would "exceed the permissible scope of claim construction . . . by making factual determinations properly reserved for the jury, and thereby usurping the role of the jury to determine if the accused product infringes the asserted claims of the patent."  (Obj. at 3.)  Plaintiffs apparently contend that this Court may determine that the "fourth Web site" is in fact an accounting service, and may also determine that the accounting service must be "independent," but may not clarify *what it means to be independent* within the scope of the claims; "[f]ocusing on how independent the fourth Web site must be from the other Web sites invites the making of an impermissible factual determination factual determination that is properly reserved for the jury."  (Obj. at 10; *see also id*. at 9 ("it would have been error for Magistrate Judge Reyes to have determined, as a factual matter, that any third-party accounting service that is paid based on the number of clicks that it reports is necessarily biased and outside the scope of the patent").)

These arguments fundamentally misconstrue the legal nature of the claim construction inquiry, including determinations of prosecution disclaimer.  "The doctrine of prosecution disclaimer is well established in Supreme Court precedent, precluding patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution."  *Omega Eng. Ltd.*, 334 F.3d at 1323; *see also Graham v. John Deere Co.*, 383 U.S. 1, 33 (1966) ("claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent").  It is black-letter law that "prosecution history . . . limits the interpretation of claims so

as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985); *see also Computer Docking Station  Corp. v. Dell, Inc.*, 519 F.3d 1366, 1375 (Fed. Cir. 2008) ("a patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope . . . for example, by clearly characterizing the invention in a way to try to overcome rejections based on prior art") (quote and citation omitted).  The Federal Circuit has instructed district courts to treat prosecution disclaimer "as a fundamental precept in our claim construction jurisprudence," because this "basic principle of claim interpretation . . . promotes the public notice function . . . and protects the public's reliance on definitive statements made during prosecution."  *Omega Eng. Ltd.*, 334 F.3d at 1323-24.

A court does not cross the line from legal to factual issues by identifying and enforcing prosecution disclaimers.  The disclaimer inquiry is purely legal, even if it results in the conclusion that specific structures or processes were disclaimed.  *See, e.g., Computer Docking Station Corp.*, 519 F.3d at 1377-79 (patentee's disclaimers during prosecution limited claims by excluding specific computers with "built-in displays" or "built-in keyboards" from the scope of the claims); *Omega Eng. Inc.*, 334 F.3d at 1327-28 (patentee disclaimed certain specific placements and uses of lasers in heating processes); *Rheox Inc. v. Entact, Inc.*, 276 F.3d 1319, 1325 (Fed. Cir. 2002) (claims did not cover specific "triple superphosphate" embodiment disclosed in patent due to express prosecution disclaimers made to gain patent allowance).

The R&R's conclusions are consistent with these precedents.  The Patent Office rejected Mr. Wexler's patent application based on invalidating prior art, and Mr. Wexler responded by arguing that his claimed accounting service, unlike the prior art, would address a specific problem – when "the amount of money paid . . . is dependent on the accounting statistics

collected, there is, or is perceived to be, the temptation by the one doing the accounting to bias the statistics in its favor."  (Ex. B, WTS000051-52.)  This is a textbook prosecution disclaimer. It was correctly recognized as such by the R&R.  *See Omega Eng. Inc.*, 334 F.3d at 1324 ("where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches").  The R&R thus made a legal – not factual – determination that the asserted claims do not extend to financially-interested accounting services where "the amount of money paid . . . is dependent on the accounting statistics collected."  (Ex. B, WTS000051.)

**B.**  **Plaintiffs Improperly Request Permission To Argue Claim Scope To The Jury**

Having failed to convince Magistrate Judge Reyes that the claims extend to financially-interested accounting services, Plaintiffs now intend to make that same argument to the jury. Plaintiffs' objections assert that "it should be for the jury, not the judge during the claim construction process, to determine whether a third-party accounting service that is paid on the number of clicks is 'unbiased' within the meaning of the claim term."  (Obj. at 8-9; *see also id.* at 14 ("it is for the fact-finder in the present case to determine . . . whether a third-party accounting service that is paid based on the number of clicks it reports is nevertheless unbiased within the scope of the claim term construction").)  Plaintiffs effectively argue that the term "unbiased" is a blank slate for the jury to write upon, so that the jury may determine the scope of the claims. (Obj. at 7 ("the determination of ***what 'unbiased' means*** is a matter for the jury") (emphasis added).)[3]

---

[3]  Notably, Plaintiffs' current arguments regarding the term "unbiased" are a surprising about-face from Plaintiffs' pre-R&R position.  As Magistrate Judge Reyes recognized in his report and recommendation, Plaintiffs' claim construction briefing recognized that if the word "unbiased" appeared in the construction of "fourth Web site," that construction would limit the

These arguments are in direct conflict with controlling precedent.  The Federal Circuit has unambiguously stated that "the court, and not the jury, should resolve claim construction disputes."  *O2 Micro*, 521 F.3d at 1362 n.3.  This is because "judges, not juries, are the better suited to find the acquired meaning of patent terms" by applying "special doctrines relating to the proper form and scope of claims that have been developed by the courts and the Patent Office."  *Markman*, 517 U.S. at 388-89.  It is clear that Plaintiffs and Defendant dispute whether the claims extend to financially-interested accounting services, and it would be error to ask the jury to resolve this specific dispute over claim scope.

*O2 Micro* is instructive.  There the parties disputed the scope of claim terms regarding a feedback signal for controlling power in a circuit "only if said feedback signal is above a predetermined threshold."  521 F.3d at 1360-61.  Defendants asserted that the "only if" language did not allow for exceptions, and sought a construction reflecting that the claims did not extend to circuits where feedback signal controlled power below said threshold.  Plaintiff argued that the "only if" limitation did allow exceptions because it only applied during "steady state operation" of the circuit.  *Id.* at 1361.  The district court recognized this dispute, and "acknowledged that this dispute over the scope of the asserted claims 'boils down to whether I believe there can be an exception.'"  *Id.*  But rather than resolve this dispute over claim scope, the district court merely concluded that "[t]he term 'only if' needs no construction . . . . 'Only if' has a well-understood definition, capable of application by both the jury and this court in considering the evidence submitted in support of an infringement or invalidity case."  *Id.*  Following this construction, the

---

asserted claims to accounting systems with no financial interest in the accounting statistics.  *See* R&R at 13 ("Plaintiffs protest that including 'unbiased' in the construction of 'fourth Web site' is a 'prohibitively restrictive definition . . . [that] *would preclude the third party entity from having any financial incentive related to its performance of the accounting function*.'") (quoting dkt. 56 at 3) (emphasis added).

jury was presented with argument at regarding the proper scope of the "only if" limitation, including the testimony of experts opining on whether exceptions were or were not allowed in light of the "plain and ordinary" meaning of the claim limitation.  *Id*. at 1362.

The Federal Circuit vacated the jury's verdict of infringement and remanded to the district court for a construction that resolved the parties' dispute over claim scope.  As the Federal Circuit explained:

> This dispute over the scope of the asserted claims is a question of law.  In deciding that "'only if' needs no construction" because the term has a "well-understood definition," the district court failed to resolve the parties' dispute because the parties disputed not the *meaning* of the words themselves, but the *scope* that should be encompassed by this claim language.

*Id*. at 1361 (emphases in original); *see also id*. at 1362 ("For the reasons stated, the parties' arguments regarding the meaning and legal significance of the 'only if' limitation were improperly submitted to the jury.").  In remanding, the Federal Circuit instructed the district court to resolve the parties' dispute over claim scope.  *See id*. at 1362-63 ("When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it.").

In this case, Plaintiffs ask this Court to let the jury decide the parties' dispute over claim scope.  Plaintiffs apparently assert that the Court cannot determine whether the scope of the term "fourth web site" extends to financially-biased accounting services.  (Obj. at 8-9 ("it should be for the jury, not the judge during the claims construction process, to determine whether a third-party accounting service that is paid on the number of clicks is 'unbiased' within the meaning of the claim term.").)  This request is in direct conflict with *O2 Micro*.  The parties have presented a clear dispute over claim scope: whether Mr. Wexler's claims extend to financially-interested accounting services.  This Court should resolve that dispute, as the R&R does, and should not

entertain Plaintiffs' invitation to legal error by submitting this dispute over claim scope to the jury.

### C.       Plaintiffs Omit Critical Portions Of The *Markman* Hearing Transcript

As noted above, Magistrate Judge Reyes conducted a full-day hearing on claim construction issues in this case.  Plaintiffs selectively quote certain statements made in the course of that hearing as support for an "interpretation" of the R&R that "only recommends the adoption of Google's construction, without making any determination that a third-party accounting service that is paid based on the number of clicks that it reports is necessarily biased and outside the scope of the patent."  (Obj. at 4).

Plaintiffs'  effectively argue that the R&R does not say what it means.  According to Plaintiffs, the unambiguous statements regarding claim scope on pages 16 and 17 of the R&R should be disregarded, based on a handful of questions and answers at an oral argument conducted *before* the R&R issued.  But there is simply no basis for Plaintiffs to assume that a mid-stream line of questioning at the oral argument on claim construction should trump the actual language and reasoning of the R&R, which Magistrate Judge Reyes carefully drafted after considering the parties' briefs and arguments – including but not limited to the exchanges Plaintiffs cite in their objections.

Moreover, Plaintiffs' selective citations to the argument transcript are incomplete in important respects.  They fail to acknowledge the final exchange between Magistrate Judge Reyes and defense counsel regarding the "fourth Web site" limitation, and whether either parties' proposed construction of that limitation would in fact resolve the dispute over claim scope – i.e., whether the accounting service may have a financial interest in its own statistics:

> THE COURT: But the question is somewhat left open by both – by Google's
> proposed construction because it doesn't say – I'm just looking at the words that

have been given to me, it doesn't say – it says only "performs the function of an unbiased third-party accounting and statistical service."

MR. VERHOEVEN: That's correct, your Honor.

THE COURT: And I would have to like say, comma for example, one that is not paid based on the number of clicks –

MR. VERHOEVEN: Or you could –

THE COURT: – or something –

MR. VERHOEVEN:  Correct.  ***Or you could, I think it would be sufficient to say you could adopt our construction and say in a written order that this would be an example from the prosecution history of one instance [of bias] but I am not going to limit it to that one instanc***e.  And so here is the actual formal construction.  ***That happens a lot of the time***.

(Dkt. 63 at 130:12-131:5 (emphases added); *see also id*. at 133:3-8 ("So yes, we think that this specific example [from the prosecution history] should be addressed in your order, your Honor. But we would prefer that your Honor would keep the claim construction a little broader than that example so that you cover other instances that we may not have thought of that would be clear examples of bias.").)

As contemplated by this exchange, Magistrate Judge Reyes recommended a claim construction that required "unbiased" accounting services.  Thus, biased accounting services are not within the scope of the claims, *including but not limited to financially-interested accounting services*.  As the R&R notes, an accounting service paid based on the number of "clicks" it records is one example – but only one example – of an accounting service falling outside the scope of the claims.  This construction resolves the key disputed issue of claim scope, without foreclosing the possibility that other types of accounting services would likewise fall outside the scope of these claims.

**D.**     **Magistrate Judge Reyes Did Not Inappropriately Consider The Accused Product During Claim Construction**

Plaintiffs assert that "Magistrate Judge Reyes has added a claim limitation relating to method of payment that is developed specifically in view of Google's accused infringing product." (Obj. at 15.)  Specifically, Plaintiffs complain that the R&R "provides a specific a example of a third-party accounting service that . . . would fall outside the scope of the construed claim term, i.e., a third-party accounting service that is paid based on the number of clicks it reports." (*Id.*)  According to Plaintiffs, "Google has voluntarily disclosed to this Court that its AdSense product relies on its own click-tracking statistics to invoice advertisers and pay publishers, and that its revenues are typically generated on a pay-per-click basis." (Obj. at 15-16.)  This, Plaintiffs argue, violates the rule set forth in *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1330-31 (Fed. Cir. 2006).

Plaintiffs' arguments are both factually and legally inaccurate.  As a factual matter, the proper construction for the claim limitation at issue is not based on Google's product.  It is based on the '409 patent's specification and prosecution history, and in particular on the representations Mr. Wexler made to the Patent Office in order to obtain his claims.  According to Mr. Wexler, his accounting service solved a simple problem of financial incentives: when "the amount of money paid . . . is dependent on the accounting statistics collected, there is, or is perceived to be, the temptation by the one doing the accounting to bias the statistics in its favor." (Ex. B, WTS000051-52.)  Mr. Wexler asked the Patent Office to allow his claims over the prior art because his claimed accounting service would not have these problems – *i.e.*, it would not be paid based on the accounting statistics collected.  Thus, this limitation on claim scope was not introduced based on any accused product.  Mr. Wexler – not Google – introduced this claim limitation.

Moreover, as a legal matter, Plaintiffs incorrrectly apply *Wilson Sporting Goods*. That case did not bar knowledge of the accused product prior to claim construction. To the contrary, the Court held that a district court *should* understand the accused product and its relationship to the parties' claim construction disputes:

> This court, of course, repeats its rule that claims may not be construed with reference to the accused device. . . . *The rule, however, does not forbid awareness of the accused product or process to supply the parameters and scope of the infringement analysis, including its claim construction component.* In other words, the "reference" rule . . . does not forbid any glimpse of the accused product or process during or before claim construction. . . . For instance in this case, this court is puzzled by the relevance of [the term] "rigid" in this claim construction analysis. Without the full infringement context, including some record evidence about the accused devices, this court does not fully understand the necessity for inserting "rigid" into claims without that express language. . . . *On remand, in the context of a detailed examination of the alleged infringement of particular claims by the accused devices. the trial court may reconsider its construction in light of this opinion.*

442 F.3d at 1331 (emphases added); *see also id.* at 1326-27 (while a Court must "not prejudge the ultimate infringement analysis by construing claims with an aim to include or exclude an accused product or process, *knowledge of that product or process provides meaningful context for the first step of the infringement analysis, claim construction*") (emphasis added).

Magistrate Judge Reyes did not contravene *Wilson Sporting Goods*. The R&R does not reference or discuss the accused product, and does not make factual findings regarding that product's relationship to the claims. The R&R's claim construction is grounded in the patent specification and file history. This approach is entirely in accord with *Wilson Sporting Goods*, and tellingly, Plaintiffs cite no cases (other than mis-citing *Wilson Sporting Goods* itself) as support for their argument. Plaintiffs' unsupported argument on this issue should be rejected.

## V.     CONCLUSION

Google respectfully requests that the Court adopt the R&R in its entirety.


Dated:  September 30, 2010              Respectfully submitted,

                                       **QUINN EMANUEL URQUHART & SULLIVAN, LLP**

                                       By: _/s/ Edward J. DeFranco_

                                       CHARLES K. VERHOEVEN
                                        50 California Street, 22nd Floor
                                        San Francisco, California  94111
                                        Telephone: (415) 875-6600
                                        Facsimile:(415) 875-6700
                                        Email: charlesverhoeven@quinnemanuel.com

                                       EDWARD J. DEFRANCO
                                       PATRICK D. CURRAN
                                       AARON KAUFMAN
                                        51 Madison Avenue, 22nd Floor
                                        New York, New York  10010
                                        Telephone: (212) 849 7000
                                        Facsimile:(212) 849-7100
                                        Email: eddefranco@quinnemanuel.com

                                       ATTORNEYS FOR DEFENDANT
                                       GOOGLE, INC.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 30, 2010, I caused to be served the foregoing ***Google Inc.'s Response to Plaintiffs Web Tracking Solutions LLC's and Daniel Wexler's Objections to Magistrate Judge Reyes' Report and Recommendation*** by electronic means, on the following persons at the identified addresses:


Steven Hayes
HANLY CONROY BIERSTEIN
FISHER & HAYES
112 Madison Avenue, 7th Floor
New York, NY 10016
shayes@hanlyconroy.com

Edward C. Flynn
ECKERT SEAMANS CHERIN &
MELLOTT LLC
600 Grant Street, 44th Floor
Pittsburgh, PA 15219
eflynn@eckertseamans.com

Paul A. Lesko
SIMMONS COOPER LLC
707 Bershire Blvd.
East Alton, IL 62024
plesko@simmonscooper.com


Dated:  September 30, 2010                  ___/s/  Patrick D. Curran_____